# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**State of New Jersey and its**
**Division of Investment,**

          **Plaintiff,**

**v.**                                     **Case No. 03-2071-JWL**

**Sprint Corporation; William T. Esrey;**
**Ronald T. LeMay; Harold S. Hook; Charles**
**E. Rice; Louis W. Smith; Linda Koch Lorimer;**
**Stewart Turley; DuBose Ausley; Warren L.**
**Batts; Irvine O. Hockaday, Jr.; Arthur Krause;**
**and J.P. Meyer,**

          **Defendants.**

## <u>MEMORANDUM & ORDER</u>

Plaintiff filed this class action suit on behalf of persons who purchased or acquired Sprint FON common stock or Sprint PCS common stock on the open market from March 1, 2001 through January 29, 2003. In its second amended complaint, plaintiff asserts, in brief, that statements made in various Sprint SEC filings to the effect that Sprint had entered into new employment contracts with its top two executives to insure the long-term employment of those executives were misleading when made because Sprint failed to disclose the possibility or inevitability that the employment of those executives in all likelihood would be terminated as a result of certain tax shelters entered into by the executives.

Based on these facts, plaintiff alleges violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and the SEC's Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (fraud in connection with the sale of securities);

and violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and the SEC's Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 (proxy statement misrepresentations). Plaintiff also asserts against the individual defendants claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which imposes secondary liability upon persons who control persons primarily liable for violations of Section 10(b) and Rule 10b-5.

This matter is presently before the court on Sprint and the Board defendants' motion for judgment on the pleadings (doc. 197) and defendants Esrey and LeMay's motion for judgment on the pleadings (doc. 199).[1]  Sprint and the Board defendants also request oral argument on their motion (doc. 212).  The court, in its discretion, denies the request for oral argument in light of the strength and clarity of the parties' written submissions and its belief that argument would not aid the disposition of the motions and, as explained in detail below, denies the motions for judgment on the pleadings.

## I.  Procedural History

In its first amended complaint, plaintiff asserted that various Sprint SEC filings were false and misleading because those materials failed to disclose a multitude of facts (primarily concerning the tax shelters entered into by Sprint's top two executives) that a reasonable investor

---

[1] Sprint Corporation and the individual Board Members have together filed a motion for judgment on the pleadings and defendants Esrey and LeMay have filed a separate motion. In large part, the motions present the same arguments such that the court will in most instances refer to all defendants collectively.  The court will distinguish between the two sets of defendants and the corresponding motions only when necessary.

would have considered important in making a decision to purchase Sprint securities. Defendant Sprint Corporation and the individual defendants moved to dismiss the first amended complaint in its entirety. Oral argument was heard on the motion during which plaintiff focused less on the specific nondisclosures identified in its complaint and in its papers and focused more on the fact that defendants failed to disclose that the termination of the employment of Sprint's top two executives was inevitable in light the problems created by the tax shelters.

After oral argument, the court issued a written memorandum and order in which it granted in part and denied in part defendants' motion to dismiss. Specifically, the court granted the motion in all respects except for plaintiff's theory that statements made in various SEC filings concerning the long-term employment of the executives were misleading and obligated defendants to disclose the possibility or inevitability that the employment of those executives would be terminated as a result of the tax shelters. With respect to that theory, however, the court directed plaintiff to file a second amended complaint to clarify the significance of the statements in relation to the particular omissions alleged. Moreover, because plaintiff's theory was not fleshed out until oral argument, the court contemplated that defendants might challenge the second amended complaint by appropriate motion.

Plaintiff, then, filed its second amended complaint, based on the theory that survived defendants' motion, and defendants thereafter moved to dismiss that complaint on the grounds that, *inter alia*, the allegations contained in plaintiff's second amended complaint do not permit a strong inference of scienter as required by the PSLRA. The court denied the motion on the grounds that the allegations in the second amended complaint satisfied the pleading requirements

3

of the PSLRA as interpreted by the Tenth Circuit in *Pirraglia v. Novell, Inc*., 339 F.3d 1182 (10th Cir. 2003).   Nearly three years after this court's decision denying the motion to dismiss, the Supreme Court rendered its decision in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007).  Defendants now move for judgment on the pleadings against all claims in the second amended complaint on the grounds that while plaintiff's pleading of scienter may previously have been sufficient, it is insufficient under the standard articulated by the Supreme Court in *Tellabs*.[2]

## II.    Pertinent Facts

The following facts are taken from plaintiff's second amended complaint and, for purposes of analyzing defendants' motions, the court assumes the truth of these facts.  *See Tellabs*, 127 S. Ct. at 2509 ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.").[3]  Defendant Sprint Corporation

---

[2]Defendants Esrey and LeMay also contend that dismissal of the complaint is required in light of the Supreme Court's decision in *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1974 (2007) (court will dismiss a cause of action for failure to state a claim only when the factual allegations fail to "state a claim to relief that is plausible on its face") because the facts alleged in the second amended complaint are insufficient to permit a "plausible" conclusion that defendants were considering the termination of Mssrs. Esrey and LeMay at the time of the pertinent statements.  As should be evident from the text of this opinion, the court concludes that plaintiff's claims are facially plausible.

[3]Although defendants have filed motions for judgment on the pleadings pursuant to Rule 12(c), those motions are nonetheless analyzed utilizing the Rule 12(b)(6) standard. *Park Univ. Enterprises, Inc. v. American Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006).

is a global communications company that provides local, long distance and wireless services. During the Class Period, defendant William T. Esrey was Sprint's Chairman and Chief Executive Officer; defendant Ronald T. LeMay was its President and Chief Operating Officer; defendant Arthur Krause was Sprint's Executive Vice President and Chief Financial Officer; and defendant J.P. Meyer was Sprint's Senior Vice President and Controller.   The remaining individual defendants served on Sprint's Board of Directors during the Class Period.  According to the second amended complaint, Mssrs. Esrey and LeMay, who both joined Sprint in 1985, were primarily responsible for transforming Sprint from a rural local telephone company into one of the nation's largest local, long distance and wireless telecommunications companies.

During the Class Period, two classes of Sprint's common stock were actively traded on the New York Stock Exchange–FON common stock (intended to track the economic performance of Sprint's FON Group division) and PCS common stock (intended to track the economic performance of Sprint's PCS Group division).  Like many other publicly traded companies, Sprint paid its executives and certain employees, including Mssrs. Esrey and LeMay, a portion of their compensation in the form of Sprint common stock options.  This case arises out of events that occurred after Mssrs. Esrey and LeMay exercised certain options during 1999 and 2000.  According to plaintiff, Mssrs. Esrey and LeMay exercised options during 1999 and 2000 with an aggregate taxable gain of $287 million.  As a result of Mssrs. Esrey's and LeMay's option exercises, Sprint derived significant tax benefits in the form of deductions from its taxable income.  Plaintiff does not suggest that the options were improperly granted or exercised or that Sprint acted improperly in taking the resulting tax deductions.

Because the exercise of options results in tax liability on the gain realized thereby, the options exercised by Mssrs. Esrey and LeMay subjected them to significant personal tax liability. According to plaintiff, Mssrs. Esrey and LeMay would have needed more than $100 million in cash, collectively, to pay the taxes associated with their option exercises.  Plaintiff alleges that Mssrs. Esrey and LeMay wanted to avoid this tax liability entirely and, thus, approached Ernst & Young, the accounting firm that served as Sprint's auditor, to seek advice as to how to go about avoiding paying taxes on their option gains.[4]  Thereafter, Mssrs. Esrey and LeMay purchased from Ernst & Young certain "tax shelters" which were designed to eliminate Mssrs. Esrey's and LeMay's tax obligations with respect to the gains realized through the option exercises.  According to plaintiff, the shelters involved a two-part transaction.  First, Mssrs. Esrey and LeMay used the options to engage in a swap-based transaction that was designed to turn income from the options exercises into capital gains, which are taxed at a rate of 20 percent rather than the significantly higher ordinary-income rate of closer to 40 percent.  The second part of the transaction, according to plaintiff, was designed to appear to generate a loss for tax purposes by raising the costs of the assets–the Sprint shares–through the use of partnerships and trades in currency options.

On September 5, 2000, after Mssrs. Esrey and LeMay had entered into the transactions constituting the tax shelters, the IRS issued Cumulative Bulletin Notice 2000-36, which contained Notice 2000-44.  That Notice, in turn, outlined the IRS's position that tax shelters

---

[4]Ernst and Young was also named as a defendant and the court previously granted Ernst and Young's motion to dismiss in its entirety.

6

similar to the ones that Ernst & Young sold to Mssrs. Esrey and LeMay were invalid and subject to challenge.[5]  Specifically, the Notice stated that the "purported losses resulting from the transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests) are not allowable as deductions for federal income tax purposes."  The Notice further stated that participants in such transactions may be subjected to appropriate penalties.

Notwithstanding the IRS's position, neither Mr. Esrey nor Mr. LeMay took any steps to satisfy their tax liabilities.  According to plaintiff, Ernst & Young advised Mssrs. Esrey and LeMay not to sell shares to satisfy their tax obligations even though, by that point, Ernst & Young and Mssrs. Esrey and LeMay knew that the losses generated by the tax shelters would likely be disallowed by the IRS and that Mssrs. Esrey and LeMay would be liable for the taxes due on the exercise of their stock options.

In late 2000, Mssrs. Esrey and LeMay, according to plaintiff's second amended complaint, disclosed their "tax avoidance problem" to Sprint's Board of Directors.  In December 2000, Sprint and Ernst & Young approached the SEC for guidance on whether Sprint could "unwind" or rescind the option exercises, thereby nullifying Mssrs. Esrey's and LeMay's tax liability.  The SEC advised Sprint that the ramifications of unwinding the transactions would be disastrous for Sprint in that Sprint would lose the tax deductions it had taken upon Mssrs.

---

[5]Notice 2000-44 did not address the specific transactions entered into by Mssrs. Esrey and LeMay; it addressed in general terms transactions similar to the ones used by Mssrs. Esrey and LeMay.

Esrey's and LeMay's option exercises and, thus, would have to restate its earnings and refile its tax returns to pay back taxes at a time when its cash was limited.  Thus, Sprint rejected the possibility of unwinding the option exercises.

According to plaintiff, then, Sprint and the individual defendants knew by March 2001 (the beginning of the Class Period) that Mssrs. Esrey and LeMay had entered into improper tax shelters in an attempt to avoid paying over $100 million in taxes on their option exercises; that the decline in the market prices of Sprint's common stock precluded Mssrs. Esrey and LeMay from satisfying their tax liabilities through the sale of Sprint stock; that Mssrs. Esrey and LeMay were unable to satisfy their likely tax liability and were facing certain financial ruin; and that the only method by which Sprint could bail out its top two executives would have involved materially restating Sprint's results of operations for 1999 and 2000, refiling its tax returns and paying back taxes.  Plaintiff alleges that, in light of these facts, it was clear to defendants by the start of the Class Period that there was a material possibility or, more likely, a substantial probability that Mssrs. Esrey and LeMay would no longer be able to run Sprint.  As alleged by plaintiff in the second amended complaint, a source close to Sprint was quoted in a *Wall Street Journal* article dated February 6, 2003 as stating "Have you ever heard of a bankrupt CEO?"

Defendants did not disclose any of this information to investors.  Instead, as alleged by plaintiff, defendants "boasted" about the expected continued employment of Mssrs. Esrey and LeMay.  In Sprint's March 15, 2001 proxy statement filed with the SEC, Sprint stated that it had "entered into new employment contracts with Mr. Esrey and Mr. LeMay, each dated February 26, 2001, *designed to insure their long-term employment with Sprint*, to provide competitive

8

compensation, and to link their compensation to shareholder value." (Emphasis added in plaintiff's second amended complaint).  According to plaintiff, this statement concerning the long-term employment of Mssrs. Esrey and LeMay–without any reference to the tax shelters and the "no-win situation they had caused for Sprint"–was misleading when it was made because it was "clearly predictable" that Sprint was going to lose Mssrs. Esrey and LeMay as a result of the tax avoidance problem discussed above.

Between late 2000, when defendants met with the SEC to discuss the possibility of unwinding the transactions, and late 2001, defendants took no action to address the problems presented by Mssrs. Esrey's and LeMay's "tax avoidance problem."  In late 2001, however, Mssrs. Esrey and LeMay applied for and received tax amnesty from the IRS and thus were immune from any penalties the IRS might levy if it ultimately concluded that the tax shelters utilized by Mssrs. Esrey and LeMay were invalid.  Mssrs. Esrey and LeMay, however, were still liable for any unpaid taxes on the gains realized as a result of their option exercises (again, assuming the IRS ultimately concluded that the shelters were invalid).  By this time, however, Mssrs. Esrey and LeMay could not sell their shares to cover their potential tax liability because Sprint's common stock price had declined dramatically such that Mssrs. Esrey's and LeMay's potential tax liability far exceeded the total value of their Sprint holdings.  Thus, according to plaintiff, Mssrs. Esrey and LeMay still faced financial ruin as of late 2001.

During 2002, Sprint's Board of Directors held over twenty meetings dedicated to discussing the tax problems and the "dismal financial condition" faced by Mssrs. Esrey and LeMay, as well as the role Ernst & Young played in promoting and selling the tax shelters to

9

Mssrs. Esrey and LeMay.  In contrast, the Board held only nine meetings during all of 2000 and only seven meetings during 2001.  Notwithstanding these numerous meetings concerning Mssrs. Esrey and LeMay (and, according to plaintiff, the "termination of Esrey and LeMay"), defendants again touted the long-term employment prospects of Mssrs. Esrey and LeMay.  In that regard, in Sprint's March 15, 2002 proxy statement filed with the SEC, Sprint stated that it had "entered into new employment contracts with Mr. Esrey and Mr. LeMay, each dated February 26, 2001, *designed to insure their long-term employment with Sprint*, to provide competitive compensation, and to link their compensation to shareholder value." (Emphasis added in plaintiff's second amended complaint).  Sprint made a virtually identical statement in a Form 10-K filed with the SEC on March 4, 2002 and in an amended Form 10-K filed with the SEC on March 5, 2002.  According to plaintiff, these statements concerning the long-term employment of Mssrs. Esrey and LeMay–without any reference to the tax shelters and the "no-win situation they had caused for Sprint"–were misleading when they were made because defendants knew by that time that it was inevitable or, at a minimum, a material possibility, that Mssrs. Esrey and LeMay would no longer serve as Sprint's top executives as a result of the tax problems discussed above.

In June 2002, the Board learned that the IRS had begun formally investigating Mssrs. Esrey and LeMay in connection with the specific tax shelters utilized by them.[6]  At that time, the Board hired the law firm of Davis Polk & Wardwell to assess what action Sprint should take.

---

[6]The IRS's audit of the tax shelters utilized by Mssrs. Esrey and LeMay is apparently ongoing and no determination has been made about the validity of those shelters.

By October 2002, Davis Polk & Wardwell recommended to the Board the dismissal of Mssrs. Esrey and LeMay in light of the tax shelter problems and the resulting conflict between Mssrs. Esrey and LeMay and Ernst & Young.  During this same time frame, the Board hired an executive search firm to begin searching for a new CEO.  Defendants still did not disclose to the public any information concerning the tax problems faced by Mssrs. Esrey and LeMay.

On January 29, 2003, the *Wall Street Journal* reported on its website that both Mr. Esrey and Mr. LeMay were leaving Sprint.  In response to this news, the market prices of both FON common stock and PCS common stock fell considerably.  In early February 2003, the Wall Street Journal reported that Mssrs. Esrey and LeMay were forced out by Sprint as a result of the tax shelter situation and its resulting effects on the executives' financial condition.

## III.    Analysis

Defendants' motions require the court, for the first time, to apply the Supreme Court's recent guidance in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), regarding the standards for  determining the sufficiency of pleadings of scienter in securities fraud cases under Rule 12(b)(6).  As the Court explained in *Tellabs*, the Private Securities Litigation Reform Act (PSLRA) of 1995 "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" 127 S. Ct. at 2504 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976); 15 U.S.C. § 78u-4(b)(1), (2)).  The Court in *Tellabs* was concerned with the latter requirement and, more specifically, with the "strict[]

demand Congress sought to convey" in section 21D(b)(2) of the PSLRA, *id.*, which requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

In prescribing a "workable construction" of the "strong inference" pleading standard, the Court first reiterated that a district court faced with a Rule 12(b)(6) motion to dismiss a section 10(b) action must accept all factual allegations in the complaint as true.  *Tellabs*, 127 S. Ct. at 2509 (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993)).  Second, the Court admonished that district courts must consider the complaint in its entirety and that the appropriate inquiry is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* (emphasis in original) (citations omitted).  Ultimately, the Court held that in determining whether the pleaded facts give rise to a strong inference of scienter, the district court "must take into account plausible opposing inferences" rationally drawn from the facts alleged and must engage in a "comparative evaluation" of those inferences.  *Id.* at 2509, 2504.  "To qualify as 'strong' within the intendment of § 21D(b)(2) . . . an inference of scienter must be more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 2404-05.  Stated another way, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 2510.

Bearing these principles in mind, the court turns to the pending motions.

12

A.    *Section 10(b) claim*

Defendants assert that the comparative analysis required by *Tellabs* mandates judgment on the pleadings with respect to plaintiff's Section 10(b) claim.  According to defendants, any inference of scienter drawn from plaintiff's complaint is simply not as compelling as the opposing innocent inference that defendants, at the time of the pertinent disclosures, wished to retain Mssrs. Esrey and LeMay, believed that those individuals would remain employed by Sprint and did not consider terminating the employment of those individuals until some time after March 2002.  Plaintiff presents a multi-tiered response to this argument.  According to plaintiff, (1) *Tellabs* did not change the law in the Tenth Circuit concerning the pleading of scienter such that the court, in its prior ruling, applied the standard subsequently adopted by the Supreme Court in *Tellabs*; (2) even if *Tellabs* changed the law in the Tenth Circuit, the allegations of scienter in the second amended complaint fully satisfy the *Tellabs* standard; (3) if the court determines that the allegations do not satisfy *Tellabs*, then plaintiff should be permitted to amend its complaint; and (4) because the discovery obtained by plaintiff thus far corroborates the allegations in the complaint and refutes the innocent inference urged by defendants, the court should convert defendants' motions to ones for summary judgment under Rule 56 and either deny the motions or defer ruling on the motions until the parties have completed the discovery process.[7]  As will be explained, the court concludes that the allegations in plaintiff's second amended complaint are sufficient to permit a reasonable person to draw an

_____

[7]Toward that end, plaintiff has filed a motion for relief pursuant to Rule 56(f) as well as the appropriate corresponding affidavit in support of the motion.

inference of scienter that is cogent and at least as compelling as any opposing inference one could draw from the facts alleged.  Thus, the allegations in the complaint satisfy the pleading standard set forth in *Tellabs*.[8]

To begin, the court finds that the standard for pleading scienter as articulated by the Tenth Circuit in *Pirraglia* is substantially similar to the standard adopted by the Court in *Tellabs*.[9]  In *Pirraglia*, the court expressly agreed with the Ninth Circuit's holding in *Gompper v. VISX, Inc.*, 298 F.3d 893 (9th Cir. 2002) that "a court considering whether scienter has been established 'must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.'"  *Pirraglia*, 339 F.3d at 1187 (quoting *Gompper*, 298 F.3d at 897).  The Circuit, then, clearly required long before *Tellabs* that a district court engage in a comparative evaluation of all inferences to be drawn from the complaint.  *See id.* (in evaluating the strength of a plaintiff's inference of scienter, court considers the possibility of negative inferences "in an evaluative manner").  Moreover, the Tenth Circuit accurately predicted the holding in *Tellabs* by awarding the draw to the plaintiff when there are equally strong inferences for and against scienter.  *Id.* at 1188 ("Faced with two seemingly equally strong inferences, one favoring the plaintiff and one favoring the defendant, it is inappropriate for us to make a

_____

[8]The court, then, does not convert the motions to ones for summary judgment and need not address the merits of plaintiff's Rule 56(f) motion.  That motion is now moot.

[9]It is not disputed by defendants that *Pirraglia*, like *Tellabs*, requires a court to examine the totality of the pleadings in evaluating whether the allegations satisfy the pleading requirements and that the court, when faced with a Rule 12(b)(6) motion, must still accept all factual allegations in the complaint as true.  *See Pirraglia*, 339 F.3d at 1187, 1190-91.

determination as to which inference will ultimately prevail, lest we invade the traditional role of the factfinder."); *ACA Fin. Guaranty Corp. v. Advest, Inc*., ___ F.3d ___, 2008 WL 104099, at *8 (1st Cir. Jan. 10, 2008) (noting that *Tellabs* "awards the draw to the plaintiff" where there are equally strong inferences for and against scienter).   As Mssrs. Esrey and Lemay point out, however, *Pirraglia* leaves open the possibility that an inference of scienter could be deemed sufficiently "strong" to survive a motion to dismiss even if an innocent inference tips the scales ever so slightly.  *Pirraglia*, 339 F.3d at 1188 ("If a plaintiff pleads facts with particularity that, in the overall context of the pleadings, including potentially negative inferences, give rise to a strong inference of scienter, the scienter requirement of the Reform Act is satisfied.")–a result that is impermissible under *Tellabs*.  To this extent, then, *Tellabs* raises the pleading standard for scienter and it is appropriate for the court  to revisit the allegations in the second amended complaint through the lens of the *Tellabs* opinion.[10]

The allegations in the second amended complaint permit an inference that defendants, at the time the pertinent statements concerning the executives' long-term employment were made beginning in March 2001, knew the devastating tax liability faced by Mssrs. Esrey and LeMay; knew that, in all likelihood, the IRS would one day determine that the shelters utilized by Mssrs. Esrey and LeMay were invalid and would come to collect the liability; knew that the liability

_____

[10]While the court in its prior memorandum and order relied on *Pirraglia* in denying the motion to dismiss, the court did not engage expressly in a comparative evaluation of all inferences permitted by the allegations in the complaint.  For this reason, the court believes it is appropriate in light of *Tellabs* to expressly address all competing inferences even if *Pirraglia* entirely accords with *Tellabs*.

would bankrupt Mssrs. Esrey and LeMay; and knew that, as a result, Mssrs. Esrey's and LeMay's continued ability to lead Sprint was in grave doubt.  According to defendants, *Tellabs* requires dismissal of plaintiff's claim because any inference of scienter drawn from plaintiff's complaint is simply not as compelling as the opposing innocent inferences espoused by defendants.[11]  According to Sprint and the Board defendants, the most compelling inference permitted by the complaint is that defendants did not believe that the executives' tax problems would cause the Board to terminate the employment of the executives because the Board entered into new employment agreements with the executives (with the stated desire and purpose of retaining the executives for the long term) in the face of knowledge of those tax problems. Similarly, Mssrs. Esrey and LeMay insist that the most compelling inference to be drawn from plaintiff's complaint is that, at the time of the pertinent statements, Mssrs. Esrey and LeMay had no reason to believe that their long-term employment was in serious doubt and reasonably believed that the Board "wished" to retain them based on the simple fact that the Board awarded

---

[11]Both sets of defendants begin their arguments by highlighting language from this court's prior opinion denying their motions to dismiss and urging that the very language used by the court in that prior order now mandates the dismissal of the complaint under *Tellabs*. Specifically, the court, in denying the motions to dismiss for failure to plead facts permitting a strong inference of scienter, stated that "plaintiff has alleged facts sufficient to raise *the possibility* that defendant knew that the long-term employment of Mssrs. Esrey and LeMay was improbable." *State of New Jersey and its Div. of Invest. v. Sprint Corp.*, 2004 WL 1960130, at*11 (D. Kan. Sept. 3, 2004) (emphasis added).  Under *Tellabs*, however, an inference of scienter must be more than merely plausible or permissible.  127 S. Ct. at 2504-05, 2510.  Nonetheless, defendants have placed undue emphasis on the court's language. The court intended no special meaning by use of the word "possibility" and it would be inappropriate to attach significance to that word choice now only as a result of an intervening Supreme Court opinion.

them long-term employment contracts (expressly stating their desire to retain the executives) in the face of knowledge of the executives' tax problems.  Both sets of defendants, then, essentially assert that the only reasonable inference to be drawn from defendants' execution of long-term employment contracts is that Sprint and the Board defendants wanted to retain Mssrs. Esrey and LeMay and Mssrs. Esrey and LeMay wanted to remain at Sprint.

There are several problems with this argument.  First, it focuses almost exclusively on defendants' execution of the employment contracts.  This approach does not comport with the Supreme Court's directive in *Tellabs* that the appropriate inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."   127 S. Ct. at 2509 (emphasis in original).  Second, defendants consistently phrase their argument in terms of the Board's "wish" or "desire" to retain the executives and the executives' "desire" to retain their positions.  Indeed, certain allegations in the complaint certainly support the idea that all defendants would desire the continued employment of Mssrs. Esrey and LeMay.  But defendants' wishes or desires with respect to the continued employment of the executives is not inconsistent with the allegations that all defendants, in various SEC filings beginning in March 2001, touted the expected long-term employment of Mssrs. Esrey and LeMay to assure investors that Sprint's future included Mssrs. Esrey and LeMay when defendants knew that the long-term employment of those executives was unlikely (despite what the Board or the executives might desire).  It may well be that defendants truly wanted the executives to remain employed at Sprint but, at the same time, realized that the tax liability faced by the executives placed their continued employment in

17

serious doubt.  Finally, defendants' argument, by focusing only on the innocent inference drawn from the execution of the contracts, suggests that plaintiff is required to come forward with an inference of scienter concerning defendants' execution of the employment agreements.  But the inference of scienter in this case need only stem from the statements made in the SEC filings and, as explained above, that inference exists even if the court assumes that defendants undisputedly "wished" for the executives to remain employed.  In other words, there need be nothing nefarious about defendants' execution of the contracts; the point is that defendants then seized on the execution to boast to investors, without disclosing the significant tax problems faced by the executives, that the contracts would, in effect, "ensure" the long-term employment of the executives.[12]  Defendants' argument, then, does not undermine the inference of scienter raised by the complaint and the overall context of plaintiff's complaint gives rise to an inference of scienter that is at least as likely as defendants' competing inference.[13]

---

[12]In their reply, the Sprint and Board defendants contend that the employment contracts' "at-will" employment provisions undermine any inference that investors would believe that the long-term employment of the executives was "guaranteed."  The at-will nature of the contracts, however, actually permits an inference in favor of plaintiff by supporting the notion that the Sprint and Board defendants never intended for the executives' employment to be "long term" because they retained the right to terminate the executives' employment at any time for any reason or no reason whatsoever.  In any event, while the at-will employment provisions certainly would suggest to a reasonable investor that the executives' employment could be terminated at any time, the at-will provisions, in the face of language concerning the "long-term" employment of the executives, would in no way indicate the existence of a pending issue known to the Board and serious enough to cast significant doubt on the long-term employment prospects of the executives.

[13]In any event, the court finds that the allegations in plaintiff's complaint would still support a strong inference of scienter with respect to the execution of the contracts.  Taking the allegations as true, a reasonable person could infer that it is just as likely that defendants

Defendants also contend that any suggestion that defendants, in March 2001, knew that the long-term employment of Mssrs. Esrey and LeMay was in serious doubt is undermined by other allegations in the complaint, including that the IRS did not formally begin investigating defendants until June 2002, that defendants did not hire a law firm to advise them concerning the situation until some time after March 2002, did not hire an executive search firm until October 2002, did not hold the bulk of their meetings concerning the situation presented by Mssrs. Esrey's and LeMay's tax liabilities until after March 2002 and did not ultimately terminate the executives until nearly two years after the initial March 2001 statements.

The fact that the IRS did not begin its formal investigation until June 2002 is irrelevant in the face of allegations that defendants knew in March 2001 that the IRS would investigate the shelters and, in all likelihood, would determine that those shelters were unlawful.  The timing of the actual investigation, then, is not pertinent to the issue of scienter.  Moreover, defendants' decision to hire a law firm only after March 2002 does not necessarily suggest that defendants, as early as March 2001, did not believe that the long-term employment of the executives was in serious doubt–it may reflect only that the situation had not escalated to the point where defendants deemed the terminations more certain and needed outside counsel to advise them as to the appropriate next steps.  Similarly, it seems unlikely that defendants would have hired an executive search firm at a time when the long-term employment prospects of Mssrs. Esrey and

---

executed the contracts to maintain the "status quo" as part of an effort to provide assurances to investors that all was well despite the as-yet-undisclosed turmoil surrounding Sprint's leadership.

LeMay was in "doubt," but rather that they would have hired that firm only after such time that the terminations of those individuals was certain and imminent. Finally, the fact that the executives were not terminated until almost two years after the March 2001 statements does not render the inference of scienter any less cogent or compelling; it reflects only the passage of time necessary to fully come to grips with the tax situation and explore various alternatives in addressing that situation. These additional allegations, then, do not render plaintiff's inference of scienter less cogent or compelling that the innocent inferences espoused by defendants.

For the foregoing reasons, the court concludes that the allegations in plaintiff's complaint are sufficient to permit a reasonable person to draw an inference of scienter that is cogent and as compelling as any opposing inference. The court, then, denies the motions to dismiss plaintiff's section 10(b) claim.

B.    *Section 14(a) claim*

Defendants next assert that plaintiff's section 14(a) claim sounds in fraud and that judgment on the pleadings is appropriate because plaintiff, for the same reasons as argued above in connection with the section 10(b) claim, has not sufficiently pled scienter in accordance with *Tellabs*.[14] While plaintiff's section 14(a) claim expressly excludes all preceding allegations of

---

[14]As plaintiff highlights, defendants previously conceded that plaintiff's section 14(a) claim sounds in negligence. Plaintiff contends, then, that defendants should not be permitted the proverbial "second bite" at an issue long ago put to rest. While the court would agree if defendants' motion had not been filed in the wake of intervening case law, the court believes that *Tellabs* has appropriately caused defendants to scrutinize more closely plaintiff's claims such that it will permit defendants to raise the issue at this juncture.

fraud and expressly states that the claim "does not sound in fraud," defendants urge that these assertions are not determinative and the court must assess whether the "wording and imputations" of the complaint are "classically associated with fraud."  Sprint Br. at 14 (quoting *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004)).  According to defendants, plaintiff uses the "language of fraud" in its section 14(a) count.  Plaintiff disavows any reliance on fraud with respect to its section 14(a) claim and asserts that the claim is based entirely on a theory of negligence.

In support of their assertion that plaintiff's section 14(a) claim sounds in fraud, defendants principally rely on certain words and phrases used in connection with plaintiff's section 14(a) claim ("boast," "scheme," and "materially false and misleading") and the fact that the claim is based on the same conduct as plaintiff's section 10(b) claim–a core theory of fraud that permeates the entire action.  Defendants' argument, in turn, is based on *Rombach v. Chang*, 355 F.3d 164 (2d cir. 2004) and *In re JP Morgan Chase Sec. Litigation*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005).  There is no indication in these cases, however, that the plaintiffs included any allegations of negligence in support of their Securities Act claims and the complaints apparently contained allegations of fraud exclusively.  *See Rombach*, 355 F.3d at 172 (nominal effort to disavow fraud unconvincing where no effort was made to show any other basis for the claims); *In re JP Morgan Chase Sec. Lit.*, 363 F. Supp. 2d at 636 ("[P]laintiffs' Section 14(a) claim rests on the same charges of fraudulent conduct as their Section 10(b) claim.").  On the other hand,

21

plaintiff here has not merely disavowed already-pled allegations of fraud but has expressly pled

negligence in connection with its section 14(a) claim.  As persuasively explained by the Third

Circuit, this difference in pleading is dispositive:

> We now hold that where, as here, individual defendants are accused in separate claims of the same complaint of having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims.  In such a case, the fraud allegations cannot be said to "contaminate" the Section 11 and Section 12(a)(2) claims if the allegations are pled separately.  We applied Rule 9(b) to the Section 11 and Section 12(a)(2) claims in *Shapiro* because "plaintiffs did not allege ordinary negligence" and we could "see no way to construct a negligence cause of action." *Shapiro*, 964 F.2d at 288.  Here, ordinary negligence is alleged in the Section 11 and Section 12(a)(2) claims, and those claims are pled separately from the Section 10(b) fraud claims against the same defendants.  That is enough to avoid triggering Rule 9(b).  A contrary result would effectively preclude plaintiffs from filing suit under Section 11 and Section 12(a)(2) as well as Section 10(b)(5).  There is no suggestion that Congress intended such an incongruous approach.
>
> To be sure, the "sounds in fraud" determination for Securities Act claims will not always be clear cut in cases where the plaintiff simultaneously raises claims against the same defendants under a provision that requires a showing of scienter, like Section 10(b).  But where the plaintiff has exercised care in differentiating asserted negligence claims from fraud claims and in delineating the allegations that support the negligence cause of action as distinct from the fraud, the determination is straightforward.

*In re Suprema Specialties, Inc. Sec. Lit.*, 438 F.3d 256, 272-73 (3d Cir. 2006).

In its complaint, plaintiff's section 14(a) claim is expressly pled in, and limited to,

negligence, with preceding allegations of fraud expressly disavowed.  The section 14(a) claim

is also pled separately from the section 10(b) fraud claim against the same defendants.

Moreover, the facts alleged permit the construction of a negligence theory–that defendants made

the statements concerning the executives' long-term employment without fully considering the

impact those statements might have on investors in the absence of information concerning the tax situation faced by the executives.  For the foregoing reasons, the court concludes that plaintiff's section 14(a) claim is pled in negligence.  *See id.* at 274 (district court erred in holding that section 11 and 12(a)(2) claims sounded in fraud where claims were expressly negligence-based and pled distinctly from the fraud-based claims).[15]  The Sprint and Board defendants' motion to dismiss this claim, then, is denied and defendants' Esrey and LeMay's motion is denied with respect to this issue.[16]

Defendants Esrey and LeMay set forth the additional argument that judgment on the pleadings is still appropriate even if plaintiff's section 14(a) claim sounds in negligence because plaintiff's allegations do not give rise to a "strong inference" of negligence under *Tellabs*.  The first question presented by this argument is whether the PSLRA applies to section 14(a) claims of negligence such that plaintiff is required to plead facts giving rise to a "strong inference" of negligence.  If the PSLRA does apply to section 14(a) claims of negligence, then the second question becomes whether *Tellabs* applies to claims in which the applicable state of mind is negligence or whether *Tellabs* is limited to claims in which the pertinent state of mind is scienter.

---

[15]To the extent defendants mean to suggest that, despite the allegations of the complaint, factual insufficiencies or evidentiary issues compel the conclusion that plaintiff's section 14(a) claim sounds only in fraud, those issues are not ones that may be resolved at the pleading stage and are more appropriately resolved on summary judgment or at trial.

[16]Of course, even if the court construed plaintiff's section 14(a) claim as sounding in fraud and further concluded that such a finding required plaintiff to plead a strong inference of scienter within the meaning of *Tellabs*, the court would nonetheless deny defendants' motions to dismiss for the same reasons as discussed in connection with plaintiff's section 10(b) claim.

23

The first question–whether the PSLRA applies to section 14(a) claims of negligence–has been largely unaddressed by the Circuit Courts of Appeals and the decisions of district courts that have addressed the issue are split. *See, e.g., In re JP Morgan Chase & Co. Securities Lit.*, 2007 WL 4531794, at *7 (N.D. Ill. Dec. 18, 2007) (acknowledging split among district courts in Seventh Circuit and concluding that PSLRA does apply to section 14(a) claims of negligence). Ultimately, the court concludes that it need not resolve this issue because plaintiff appears not to dispute that the PSLRA applies to section 14(a) claims of negligence. See Plaintiff Br. at 20-21 ("[B]ecause negligence is the applicable state of mind, not scienter, some courts require that plaintiff 'must plead with particularity facts that give rise to a strong inference of negligence.' The Second Amended Complaint adequately pleads plaintiff's Section 14(a) claim under the applicable negligence standard.").

In any event, even assuming that the PSLRA applies to the claim, the allegations in plaintiff's complaint are sufficient to satisfy the pleading requirements of the PSLRA as set forth in *Tellabs*. While plaintiff suggests that *Tellabs* is limited to cases in which the pertinent state of mind is scienter, the court concludes that the *Tellabs* decision is not so limited. As indicated in the introductory paragraphs in the *Tellabs* opinion, the dispute amongst the Courts of Appeals that the Court sought to resolve concerned the meaning of the phrase "strong inference," regardless of the particular state of mind:

> Congress left the key term "strong inference" undefined, and Courts of Appeals have divided on its meaning. In the case before us, the Court of Appeals for the Seventh Circuit held that the "strong inference" standard would be met if the complaint "allege[d] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." 437 F.3d 588, 602 (2006). That

> formulation, we conclude, does not capture the stricter demand Congress sought
> to convey in § 21D(b)(2).  It does not suffice that a reasonable factfinder plausibly
> could infer from the complaint's allegations the requisite state of mind.

127 S. Ct. at 2504.  Later, in describing the nature of the issue before the Court, Justice Ginsburg

reiterated that the Court's "task [was] to prescribe a workable construction of the 'strong

inference' standard.'" *Id*. at 2509.  The court, then, discerns no limitation in *Tellabs* to cases

involving scienter.

That being said, the allegations set forth by plaintiff in connection with its section 14(a)

claim are sufficient to permit a reasonable person to draw an inference of negligence that is

cogent and at least as compelling as any opposing inference one could draw from the facts

alleged.  *See id.* at 2510.  As explained above, while there are both nonfraudulent and fraudulent

inferences permitted by the allegations in the complaint–that defendants truly desired to retain

the executives and made the statements based on that genuine desire and, conversely, that

defendants knew that the long-term employment of the executives was in serious doubt and yet

executed the contracts and made the pertinent statements to deceive the public into believing that

Sprint's brightest stars were securely at the helm–there is also another inference to be drawn.

Specifically, the allegations in the complaint permit a cogent and compelling inference that

defendants, while not actually intending to deceive investors, failed to exercise due care in

making the statements that were made in the pertinent SEC filings.

For their part, defendants Esrey and LeMay assert only that there is no inference of

negligence whatsoever to be drawn from the complaint as the complaint seeks to "establish" that

the statements were knowingly false, leaving "no room" for any inference of negligence.  But

as explained above in connection with defendants' argument that the section 14(a) claim sounds in fraud, the court concludes that the claim is one of negligence and that the facts as alleged permit such a construction.   Moreover, the only opposing inferences proffered by defendants Esrey and LeMay are the same inferences set forth in connection with plaintiff's section 10(b) claim–inferences that the court has held are not more compelling or more cogent than the inferences to be drawn in plaintiff's favor.   In the absence of any other arguments from defendants, the court denies their motion to dismiss.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motions for judgment on the pleadings (docs. 197, 199) are denied; the Sprint and Board defendants' motion for oral argument (doc. 212) is denied; and plaintiff's motion for relief pursuant to Rule 56(f) (doc. 218) is moot.

**IT IS SO ORDERED.**

Dated this 23rd  day of January, 2008, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

26