IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| STATE OF NEW JERSEY and its Division of Investment, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 03-2071-JWL |
| SPRINT CORPORATION, et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM & ORDER

### I.  Introduction

This complex securities class action case comes before the undersigned U.S. Magistrate Judge, James P. O'Hara, on the motion of the lead plaintiff, State of New Jersey and its Division of Investment, to compel discovery against the so-called Sprint defendants, i.e., Sprint Corporation ("Sprint") and all of the individually named defendants *except* Sprint's former top two executives, William T. Esrey and Ronald T. LeMay **(doc. 241)**.  The Sprint defendants filed a response to the instant motion (doc. 244), and the lead plaintiff filed a reply (doc. 252).  The court granted the Sprint defendants' motion for leave to file a surreply (doc. 261), which has been filed (doc. 262).

### II.  Background

The lead plaintiff filed this suit on behalf of persons who purchased or acquired Sprint FON common stock or Sprint PCS common stock on the open market from March 1, 2001 through January 29, 2003 (the "Class Period").  The lead plaintiff asserts, in brief, that

O:\M & O\03-2071-JWL-241.wpd

misleading statements were made in various Sprint SEC filings to the effect that Sprint had entered into new employment contracts with its top two executives, Messrs. Esrey and LeMay, to ensure the long-term employment of those executives. It is alleged that the statements were misleading when made because Sprint failed to disclose the possibility or inevitability that the employment of those executives would be terminated as a result of certain tax shelters entered into by the executives. Based on these facts, the lead plaintiff alleges defendants violated certain sections of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*

On November 5, 2004, the court bifurcated discovery on liability and damages, i.e., all damages-related discovery has been stayed until the court rules on anticipated motions for summary judgment on liability issues (*see* doc. 114). On February 13, 2008, the parties filed a joint certificate stating that document discovery among the parties and with respect to non-parties was complete (doc. 222). The court then held a status conference with the parties and set a July 14, 2008 deadline for the parties to complete all deposition and other "written" discovery on liability issues (*see* doc. 223). The court also reminded the parties that summary judgment motions on liability issues were to be filed within thirty days after the close of discovery.

On June 11, 2008, the lead plaintiff sent the undersigned a letter, with copies sent to all counsel, stating that the parties were conducting deposition discovery but that several discovery-related issues had arisen and seeking guidance from the undersigned on how to proceed (doc. 233, ex. 1). The undersigned requested the lead plaintiff file a formal motion

regarding the discovery issues.  On June 13, 2008, the lead plaintiff filed a motion to suspend depositions while the discovery issues were addressed and for an extension of time of discovery for sixty days following the court's resolution of the discovery issues (doc. 233).

After hearing oral argument from the parties and reviewing the parties' briefs, the undersigned granted the lead plaintiff's motion and suspended depositions until the discovery issues were resolved (*see* doc. 238).  The court also vacated the July 14, 2008 deadline for completing deposition and other written discovery on liability issues, as well as the August 13, 2008 deadline for filing summary judgment motions on liability issues.

On June 20, 2008, the lead plaintiff filed a motion for leave to file the instant motion under seal (doc. 239).  The court granted the lead plaintiff's motion (*see* doc. 240) and, on June 27, 2008, the lead plaintiff filed the instant motion.  The Sprint defendants filed a motion for leave to file their response under seal (doc. 242).  The court granted their motion (*see* doc. 243) and, on June 30, 2008, the Sprint defendants filed their response.

On June 30, 2008, the lead plaintiff filed a motion to compel the production of a amended privilege log regarding documents produced by Deloitte & Touche ("Deloitte") and to amend the briefing schedule of the instant motion (doc. 245).  The court granted the lead plaintiff's motion in part and denied it in part (*see* doc. 249).  Specifically, the court granted the lead plaintiff additional time to file its reply to the instant motion but denied as moot its request to compel the Sprint defendants to produce an amended privilege log regarding Deloitte documents, given the production of such a privilege log earlier on July 1, 2008.  The

lead plaintiff then filed its reply to the instant motion.  As earlier indicated, the court granted the Sprint defendants leave to file a surreply.

### III.   Analysis

A.     Waiver of Attorney-Client Privilege at Depositions

Because this securities case arises out of a federal statutory scheme, federal law (instead of Kansas law) provides the rules of decisions as to the application of the attorney-client privilege.[1]  Under federal common law, the essential elements of the attorney-client privilege are: (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except if the protection is waived.[2]

The privilege "protects confidential communications by a client to an attorney made in order to obtain legal assistance from the attorney in his capacity as a legal advisor."[3]  The privilege also protects advice given by the lawyer in the course of representing the client.[4]

---

[1] Fed. R. Evid. 501; *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 232 F.R.D. 669, 674 (D. Kan. 2005).

[2] *Marten v. Yellow Freight Sys., Inc.*, No. 96-2013, 1998 WL 13244, at * 5 (D. Kan. Jan. 6, 1998) (quoting *Great Plains Mut. Ins. Co. v. Mut. Reinsurance Bureau*, 150 F.R.D. 193, 196 n.4 (D. Kan. 1993)).

[3] *Id.* at *6 (quoting *Jones v. Boeing Co.*, 163 F.R.D. 15, 17 (D. Kan. 1995)).

[4] *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981).

The privilege protects communications with in-house counsel as well as outside attorneys.[5] The privilege, however, "is to be extended no more broadly than necessary to effectuate its purpose."[6]  As explained below, the lead plaintiff argues that during their depositions the Sprint defendants waived the attorney-client privilege regarding certain information.

1.      Waiver by Partial Disclosure

The lead plaintiff argues the Sprint defendants waived the attorney-client privilege as to certain subjects by partially disclosing legal advice during their depositions.  Specifically, the lead plaintiff argues the Sprint defendants waived the attorney-client privilege as to any legal advice rendered to Sprint regarding (a) what information should be disclosed to the public regarding the tax shelters, Messrs. Esrey and LeMay's financial condition, and the continued employment of Messrs. Esrey and LeMay with Sprint, and (b) the sustainability of the tax shelters.  The lead plaintiff seeks an order of the court requiring the Sprint defendants to produce all previously withheld documents pertaining to such advice and precluding the Sprint defendants' counsel from instructing any defendant not to answer related questions based on attorney-client privilege.

As set forth by the Tenth Circuit Court of Appeals in *In re Quest Communications, International, Inc.*:

> The attorney-client privilege is "the oldest of the privileges for confidential communications known to the

---

[5] *Id.*

[6] *Great Plains Mut. Ins. Co.*, 150 F.R.D. at 196 (citation omitted).

common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389
(1981). "Its purpose is to encourage full and frank
communication between attorneys and their clients and thereby
promote broader public interests in the observance of law and
administration of justice." *Id.* The privilege serves the client's
need for legal advice, but it also serves the attorney's need to
receive complete information in order to give the proper advice.
*See id.* at 390; *see also* 8 John Henry Wigmore, *Evidence* § 2291
(John T. McNaughton rev. 1961); Edna Selan Epstein, *The
Attorney-Client Privilege and the Work-Product Doctrine* 3 (4th
ed. 2001). Under the common law, a critical component of the
privilege "is whether the communication between the client and
the attorney is made in confidence of the relationship and under
circumstances from which it may reasonably be assumed that the
communication will remain in confidence." *United States v.
Lopez*, 777 F.2d 543, 552 (10th Cir.1985).

Because confidentiality is key to the privilege, "[t]he
attorney-client privilege is lost if the client discloses the
substance of an otherwise privileged communication to a third
party." *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th
Cir. 1990). This court has stated, "the confidentiality of
communications covered by the privilege must be jealously
guarded by the holder of the privilege lest it be waived. The
courts will grant no greater protection to those who assert the
privilege than their own precautions warrant." *Id.* (quotation
and alteration omitted). This court has also held that "[c]ourts
need not allow the claim of attorney-client privilege when the
party claiming the privilege is attempting to utilize the privilege
in a manner that is not consistent with the privilege." *United
States v. Bernard*, 877 F.2d 1463, 1465 (10th Cir.1989). "Any
voluntary disclosure by the client is inconsistent with the
attorney-client relationship and waives the privilege." *Id.*[7]

---

[7] 450 F.3d 1179, 1185 (10th Cir. 2006).

The burden of showing that the privilege has *not* been waived remains with the party claiming the privilege.[8]

For testimony to constitute a waiver of the attorney-client privilege, it must disclose the substance of privileged communications.[9]  "Underlying facts are not protected by the privilege."[10]  Revealing the general topic of discussion between an attorney and client does not waive the privilege, unless the revelation also reveals the substance of a protected communication.[11]

Not surprisingly, the lead plaintiff and the Sprint defendants characterize the deposition testimony at issue very differently.  The lead plaintiff argues substantive legal advice consisting of counsel's ultimate recommendations was revealed.  The Sprint defendants argue the testimony merely consisted of conclusory and unrevealing statements regarding receiving legal advice.

a.      Advice as to Disclosure of Tax Shelter Issues

The lead plaintiff argues the Sprint defendants have waived the attorney-client privilege regarding advice on the potential disclosure of several issues, including the tax shelters, Messrs. Esrey and LeMay's financial condition, the continued employment of

---

[8] *Johnson v. Gmeinder*, 191 F.R.D. 638, 643 (D. Kan. 2000).

[9] *Williams v. Sprint/United Mgmt. Co.*, No, 03-2200, 2006 WL 1867478, at *10 (D. Kan. July 1, 2006).

[10] *Id.* (citing *Upjohn*, 449 U.S. at 396).

[11] *Id.* (citing *Burton v. R.J. Reynolds Tobacco Co.*, 177 F.R.D. 491, 499 (D. Kan. 1997)).

Messrs. Esrey and LeMay with Sprint, and whether the tax shelters caused a conflict of

interest between Messrs. Esrey and LeMay and Ernst & Young.

During his May 15, 2008 deposition, defendant Warren L. Batts testified as follows:

> Q. Did you, as a member of the audit committee or the board of
> directors, participate in any discussion or consideration of
> disclosures to be made regarding the rescission proposal?
> A. A rescission proposal?
> Q. Yes.
> A. No.
> Q. Regarding -- I'm sorry. Regarding Ernst & Young's
> independence?
> A. No.
> Q. Regarding Mr. Esrey or Mr. LeMay's participation in the
> Ernst & Young investment vehicles?
> A. No -- well, let me make sure I understood the question to
> make sure my answers are correct. Sorry.
> (WHEREUPON, the record was read by the reporter.)
> BY THE WITNESS:
> A. I think my answers were incorrect. We discussed it, and we
> were advised that they were not required disclosures because
> there was not a problem at this time.
> BY MS. DOOLEY:
> Q. Okay. You discussed what?
> A. Whether we needed to make a public announcement.
> Q. About what?
> A. Ernst & Young's -- let's see, no, what did we discuss? I don't
> have a clear memory of what was discussed per se.
> Q. Was the issue of Ernst & Young's independence as a --
> needing to be disclosed or not?
> A. I think it was sort of this amorphous mass that we might have
> a problem, and -- but what precisely we discussed at that
> meeting I don't remember.
> Q. And you said that you were advised that you did not need to
> make a disclosure at this time?
> A. No.
> Q. By whom were you so advised?
> A. If we ever had a problem, we would have to disclose it.
> Q. Okay. Who gave you that advice?

A. God, I wish I remember it. I am sure it was one of the legal
counsel.
Q. Did you rely on that advice?
A. Yes.
Q. Did the committee rely on that advice?
A. Yes.
Q. Did the board of directors rely on that advice?
A. I believe so.
Q. And it did not make any disclosures as a result?
A. No.[12]

The lead plaintiff argues Mr. Batts clearly testified that Sprint's counsel advised not

to disclose the "amorphous mass" that might be a problem until it actually became "a

problem." The lead plaintiff therefore concludes that the Sprint defendants have waived the

attorney-client privilege with respect to any advice received by Sprint's counsel concerning

disclosure of tax shelter issues.

The Sprint defendants argue that Mr. Batts did not clearly testify about any legal

advice.  The Sprint defendants argue that in an exchange about what was discussed at a

December 19, 2000 meeting of the Audit Committee of Sprint's Board of Directors (the

"Board"), Mr. Batts merely testified that the Audit Committee discussed and was advised

about required disclosures regarding Ernst & Young's independence and that he did not have

a clear memory about what was discussed.

Mr. Batts's testimony is somewhat unclear, given his failure to remember certain

details and the unfortunately clumsy wording of counsel's questions.  Mr. Batts testified to

some advice received and stated that although he did not remember who gave that advice,

---

[12] Doc. 241, ex. 1, at 97:19 to 100:2.

he was sure it was one of the legal counsel.  Mr. Batts then testified he, the Audit Committee, and the Board relied on the advice and did not make any disclosures as a result.

The court agrees with the Sprint defendants that Mr. Batts did not clearly testify as to any legal advice received.   As earlier indicated, Mr. Batts mentioned a "sort of . . . amorphous mass that [they] might have a problem" but could not remember what was discussed at the meeting.  Mr. Batts answered "no" to counsel's question regarding whether they were advised they did not need to make a disclosure at this time, but the precise advice about what to disclose is unclear.  The court finds Mr. Batts's deposition testimony did not waive the attorney-client privilege regarding disclosure advice.

During his May 1, 2008 deposition, defendant Irvine O. Hockaday, Jr. testified as follows:

> Q. And would you agree, sir, that that potential for a conflict of interest between Mr. LeMay and Ernst & Young existed prior to 2001?
> A. *No, we looked at that. We got legal advice on that.* There was, I think, an annual confirmation from Messers. Esrey and LeMay that they had no intent at that point to bring any kind of action against E & Y, and similarly we got representations out of E & Y that they were able to perform the audit in an entirely independent way, so the reference to potential here is important because I don't think that kind of conflict existed - I don't think that kind of conflict existed, but it could have in the future.[13]

The lead plaintiff argues Mr. Hockaday made a partial disclosure of counsel's legal advice concerning a potential conflict of interest between Messrs. Esrey and LeMay and

---

[13] Doc. 241, ex. 2, at 182:23 to 183:11 (emphasis added).

Ernst & Young and that therefore any legal advice rendered to Sprint on the subject matter, including whether or not to disclose it, is discoverable.  The Sprint defendants argue that Mr. Hockaday did not testify about legal advice as to disclosure but was discussing the limited issue of Ernst & Young's independence prior to 2001.  Regardless, the Sprint defendants argue that Mr. Hockaday did not testify about the substance of any advice but simply that they got legal advice.

Here again, the court agrees with the Sprint defendants that Mr. Hockaday did not testify as to the substance of any legal advice.  Rather, Mr. Hockaday merely stated they got legal advice on the issue of Ernst & Young's independence.  This statement that advice was received regarding a certain issue does not reveal the substance of a protected communication.  An inference would have to be made to conclude that the legal advice was that a conflict of interest did not exist.  Based on the limited record presented, the court is wholly unpersuaded such an inference is reasonable, at least as would be necessary to find a waiver of the attorney-client privilege.

   b.  Sustainability Advice

The lead plaintiff also argues the Sprint defendants waived the attorney-client privilege regarding whether the tax shelters were sustainable.  During his deposition, Mr. Hockaday testified:

> Q.  Did you specifically ask Arthur Andersen to assess the sustainability of the tax shelters at this time?
> A.  Well, I recall asking -- I recall telling Mike Kesner about the tax shelter.  I think I told him that it had been recommended by E & Y and that there had been a legal opinion about the

sustainability of the tax shelter indicating that it was a valid tax shelter that would hold up, that some concerns had been expressed the IRS could take a different view of that and it would be helpful to get Arthur Andersen's sense of how they saw the situation.[14]

Mr. Hockaday also testified:

Q. In that first paragraph of this article it says, "Sprint Corp's two top executives were forced out as part of an unfolding boardroom dispute over their use of a questionable type of tax shelter that is under scrutiny by the Internal Revenue Service, according to people familiar with the situation." Do you see that paragraph?
A. I see that paragraph.
Q. Do you agree with the statement set forth in that paragraph?
A. Oh, I would have expressed it differently.
Q. How would you have expressed it, sir?
A. That's a good question. I guess I would have said that Sprint's top two executives were leaving, that they and the board had come to the conclusion -- had come to the conclusion that it made sense for them to transition out of the company, there were a variety of factors involved with that decision, and I would have -- that's not the way reporters work, I understand. I would not -- but to be more specific, I would question the word "dispute." We didn't always agree as a board. No board, in my experience, ever agrees down the line on all issues particularly when they're as complicated as some of those, and I'm not sure I would have said "a questionable type of tax shelter." I would have perhaps said "a tax shelter" -- if I mentioned it at all, *I would have said a tax shelter which the IRS has said they believe has no valid business purpose, but legal advice to the contrary was before the board at the time*,[] so you know, I would have done it differently.[15]

_____

[14] Doc. 241, ex. 2, at 56:20 to 57:7.

[15] *Id.* at 175:21 to 177:4 (emphasis added).

The lead plaintiff argues these excerpts of Mr. Hockaday's deposition consist of disclosures that there were legal opinions given to the Board stating that the tax shelters were sustainable. The Sprint defendants argue that Mr. Hockaday's references were to legal opinions prepared by a law firm, on behalf of Messrs. Esrey and LeMay, who in turn gave the opinions to the Board. The Sprint defendants state that the opinions were intended to be made public and to be used with the IRS and have been produced to the lead plaintiff.[16] The Sprint defendants therefore conclude that Mr. Hockaday could not have waived the attorney-client privilege of Sprint or the Board by disclosing legal advice provided to Messrs. Esrey and LeMay.

In its reply, the lead plaintiff does not dispute or even address the Sprint defendants' contention that the legal advice discussed in Mr. Hockaday's testimony was provided to Messrs. Esrey and LeMay and has been produced to the lead plaintiff. The court therefore finds Mr. Hockaday did not waive the attorney-client privilege concerning the sustainability of the tax shelters.

2.     Waiver by Placing Advice of Counsel at Issue

In addition to the waiver argument based upon partial disclosures discussed above, the lead plaintiff argues the Sprint defendants waived the attorney-client privilege concerning communications from counsel relating to public disclosures because the Sprint defendants have affirmatively placed "reliance on counsel" at issue in the litigation. In other words, the

---

[16] Doc. 244, exs. 10 & 11.

lead plaintiff argues that Sprint defendants have wielded reliance on counsel as a sword in the litigation and are therefore precluded from concurrently utilizing the attorney-client privilege as a shield.

None of the defendants have pleaded reliance on counsel as an affirmative defense. The lead plaintiff and the Sprint defendants agree that a defendant need not formally assert a reliance on counsel defense to waive the attorney-client privilege.  The Sprint defendants argue, however, they have not taken any affirmative action to put advice of counsel at issue in this case and that therefore waiver is precluded.

For support of their positions regarding at issue waiver, both the lead plaintiff and the Sprint defendants rely on a decision of the presiding U.S. District Judge, John W. Lungstrum, in *Williams v. Sprint/United Management Co.*[17]   In that employment case, the plaintiffs contended that the defendant's witnesses repeatedly testified that they relied upon the defendant's legal department to advise them if any particular reduction-in-force selection decisions violated or appeared to violate anti-discrimination laws.   Defense counsel, however, insisted that the defendant would not rely on an "advice of counsel" defense.[18]

Judge Lungstrum noted that courts generally apply one of three general approaches to determine whether a litigant has waived the attorney-client privilege.[19] Although the Tenth

---

[17] 464 F. Supp. 2d 1100 (D. Kan. 2006).

[18] *Id.* at 1114.

[19] *See id.* at 1104 (citing *Frontier Refining Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 699-700 (10th Cir. 1998)) (describing the automatic waiver rule, intermediate approach, and (continued...)

Circuit has not chosen one of the approaches to waiver, Judge Lungstrum held, and the undersigned agrees, that the Tenth Circuit would likely adopt the intermediate approach as applied by the court in *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975).[20]

> Under the *Hearn* test, each of the following three conditions must exist to find waiver: (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to its defense. *Frontier Refining Inc.*, 136 F.3d at 701 (quoting *Hearn*, 68 F.R.D. at 581). A court, then, should find that the party asserting a privilege has impliedly waived that privilege through his own affirmative conduct when the party "places information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would [be] manifestly unfair to the opposing party." *Hearn*, 68 F.R.D. at 581.[21]

The deposition testimony at issue in *Williams* was elicited in response to pointed questions by plaintiffs' counsel concerning adverse impact analyses—a subject defense counsel had consistently urged was off limits. Judge Lungstrum found defendants did not waive the attorney-client privilege.[22] Specifically, Judge Lungstrum found that the record did not indicate the defense witnesses voluntarily raised the advice-of-counsel issue but did

---

[19](...continued)
more restrictive approach).

[20] *Id.*

[21] *Id.* at 1104-05.

[22] *Id.* at 1114-15.

so only in response to direct questions from the plaintiffs' attorney concerning privileged communications.  Further, the testimony of the witnesses did not indicate that the defendant intended to use advice of counsel to justify any conduct on its part.[23]

The lead plaintiff argues the facts in the case at bar are more analogous to the facts in *Cox v. Administrator U.S. Steel & Carnegie*[24] and *United States v. Bilzerian*[25] than the facts in *Williams*.  In *Cox*, the Eleventh Circuit Court of Appeals affirmed the district court's ruling that a defendant waived the attorney-client privilege by claiming its actions were lawful.[26]  The court noted that the defendant had consistently taken the position it believed it acted lawfully.[27]  The court stated that the defendant went beyond mere denial of criminal intent and affirmatively asserted good faith, which injected the issue of its knowledge of the law into the case.[28]

In *Bilzerian*, the district court ruled that if the criminal "defendant testified regarding his good faith regarding the legality of [a securities] disclosure, it would open the door to cross-examination with respect the basis for his belief, and that such cross-examination

---

[23] *Id.* at 1116.

[24] 17 F.3d 1386 (11th Cir. 1994).

[25] 926 F.2d 1285 (2d Cir. 1991).

[26] 17 F.3d at 1419.

[27] *Id.* at 1418.

[28] *Id.* at 1419.

would allow inquiry into communications with his attorney."[29]  The defendant did not testify

regarding his good faith and on appeal claimed the trial court's ruling prejudiced his

defense.[30]  The Second Circuit Court of Appeals found the district court's ruling did not

prevent the defense from urging lack of intent because defendant was free to deny criminal

intent without asserting good faith.[31]  The court noted that the defendant's testimony that he

thought his actions were legal would have put his knowledge of the law and the basis for his

understanding of what the law required in issue such that his conversations with counsel

regarding the legality of the schemes would have been relevant in determining the extent of

his knowledge and his intent.[32]

The lead plaintiff argues that, unlike in *Williams*, the Sprint defendants have

voluntarily raised the advice of counsel issue to explain why Sprint omitted information in

its SEC filings concerning the tax shelters.  The lead plaintiff cites certain deposition

testimony as examples.  Defendant Linda Koch Lorimer testified at her June 2, 2008

deposition as follows:

> Q. Do you know if this proxy statement mentions the tax
> investment vehicles Mr. Esrey and Mr. LeMay entered into with
> the assistance of Ernst & Young?
> A. I would think that it would not.
> Q. And why is that?

---

[29] 926 F.2d at 1291.

[30] *Id.*

[31] *Id.* at 1293.

[32] *Id.* at 1292.

A. Because I could recall at one of these briefings we asked to what extent that would have to be disclosed, and one of our outside consultants, lawyers, I don't know whether –
MR. ROLFE: You don't want to give legal advice.  You just say period.
Q. It was an outside consultant.
A. It was an outside lawyer.  In all of these times, as I think we made clear, we had outside lawyers making sure we disclosed what the experts thought we needed to disclose.  This was an issue that had been reviewed with them in some conversations in the prior month.[33]

The lead plaintiff also relies on Mr. Batts's deposition testimony that he and the Board relied on the advice of counsel regarding the disclosure of Ernst & Young's independence, which is cited above.[34]  The lead plaintiff argues that Ms. Lorimer and Mr. Batts's deposition testimony "clearly demonstrate" that certain defendants intend to use advice of counsel to justify their decisions regarding what information was chosen to be disclosed in Sprint's proxy statements.  The lead plaintiff argues that neither Ms. Lorimer nor Mr. Batts was willing or able to explain their decisions concerning disclosure without asserting their reliance on counsel.  Further, the lead plaintiff notes Ms. Lorimer and Mr. Batts did not testify to reliance on counsel merely in response to a question concerning privileged information but volunteered the explanation that they relied on counsel in response to non-privileged questions regarding why certain information was not disclosed in Sprint's SEC filings.

---

[33] Doc. 241, ex. 3, at 153:24 to 154:21.

[34] *See supra* text accompanying note 12.

The Sprint defendants argue Ms. Lorimer's testimony did not put advice of counsel at issue.  They further argue Ms. Lorimer's testimony that the defendants had lawyers making sure they disclosed what the experts thought had to be disclosed was only a passing reference to the role of lawyers in the process.  The Sprint defendants note that before the testimony of Mr. Batts, plaintiff's counsel marked as an exhibit an agenda for a Board Audit Committee Meeting and directed Mr. Batts's attention to item 6, which states "Required Disclosures [Huber]."[35]  The Sprint defendants argue that in testifying that the Audit Committee received disclosure advice at the Audit Committee meeting, he simply was responding to the lead plaintiff's counsel's questions.  The Sprint defendants argue that the lead plaintiff raised the issue of reliance on the advice and that the testimony was not an affirmative attempt to raise advice of counsel.

The lead plaintiff also relies on certain testimony Mr. Hockaday gave at his deposition, as follows:

> Q. You're not -- you have no opinion one way or the other if there's any discussion of the tax shelters in this proxy statement?
> A. Well, I would have to look at it. I would doubt there's any discussion of the tax shelters in this proxy statement because at this particular time, again, in my view I wasn't sure the matter rose to a level that would require it to be discussed or disclosed. If boards decided to disclose every conceivable possibility of outcome, it would not only make the proxy statement unmanageable, but more importantly it would or could severely disrupt markets. So in my view you only disclose -- *and I think*

---

[35] Doc. 244, ex. 7, at 97:12-18; doc. 244 ex. 6.  John Huber was a lawyer for Sprint at the time.

*this is the legal view* -- what is material, and at this point I thought it was premature to make a judgment on that.[36]

The lead plaintiff argues Mr. Hockaday testified that he believed Sprint's disclosures were legal and that it should therefore be entitled to all of the information upon which Mr. Hockaday based his determination concerning what disclosure was legal. The Sprint defendants argue that Mr. Hockaday did not testify that he believed Sprint's disclosures were legal or that they were legal based on advice of counsel. The Sprint defendants state that Mr. Hockaday is a lawyer and was not speaking of any advice he received relating to any disclosure decision but was merely explaining what he believed would be required to be disclosed as a general matter.

Finally, the lead plaintiff claims it will be prejudiced if a waiver is not found and the Sprint defendants are allowed to tell the jury that their disclosure decisions were driven by the advice of counsel. The lead plaintiff argues that prejudicial inferences of legality and non-scienter could arise in favor of the Sprint defendants absent testimony regarding their lawyers' advice regarding disclosure. The Sprint defendants rebut this argument by stating that they "do not intend to tell a jury about any advice of counsel they received or otherwise 'introduce' into evidence any such advice."[37]

The court finds the Sprint defendants have not impliedly waived the attorney-client privilege by placing advice of counsel at issue through the above-cited deposition testimony.

---

[36] Doc. 241, ex. 2, at 91:16 to 92:6 (emphasis added).

[37] Doc. 262, at 2.

As in *Williams*, the testimony was elicited by the lead plaintiff's counsel during the depositions. Although the questions may not have been as clearly directed at eliciting privileged information as those in *Williams*, the Sprint defendants did not voluntarily raise their reliance on advice of counsel.

The lead plaintiff's counsel asked Ms. Lorimer why a proxy statement did not disclose the tax shelters. The lead plaintiff's counsel asked Mr. Batts about a specific item on an agenda for a Board Audit Committee Meeting which clearly referred to advice of counsel, i.e., Mr. Huber's advice regarding required disclosures. The court rejects the lead plaintiff's argument that because neither Ms. Lorimer nor Mr. Batts was willing or able to explain their decisions concerning disclosure without asserting reliance on counsel, they therefore affirmatively asserted reliance on counsel. Even if the Sprint defendants are unwilling or unable to explain their decisions concerning disclosure, it does not follow that they are therefore relying on advice of counsel as a justification for their decisions.

Mr. Hockaday did not testify that he believed the disclosures were legal based on the advice of counsel. As the Sprint defendants point out, Mr. Hockaday's conclusion may have been based on his own experience as a lawyer. Further, the testimony in the three depositions does not indicate that the Sprint defendants intend to use advice of counsel to justify any conduct on their part.

Unlike in *Cox* and *Bilzerian*, the Sprint defendants have not made an affirmative assertion of good faith. Further, the Sprint defendants have confirmed that they do not intend to introduce any evidence regarding advice of counsel. Because the Sprint defendants have

not placed privileged information in issue through an affirmative act for their benefit, allowing the privilege to protect against disclosure of such information would not be manifestly unfair to the lead plaintiff.  But as Judge Lungstrum warned in *Williams*, should the Sprint defendants affirmatively and voluntarily inject the reliance of counsel issue at trial or in subsequent briefing to the court, the court will revisit the issue of whether they waived the privilege.[38]

B.      Defense Counsel's Conduct at Depositions

The lead plaintiff argues the Sprint defendants' lawyers have improperly objected to certain areas of questioning during the Sprint defendants' depositions.  The lead plaintiff requests the court issue an order prohibiting this alleged misconduct during future depositions.

The court first addresses the Sprint defendants' argument that the lead plaintiff failed to confer with the Sprint defendants about the alleged improper deposition conduct before filing the instant motion.  The lead plaintiff appears to not have addressed this argument in its reply, after the Sprint defendants raised it in their response.

Under Fed. R. Civ. P. 37(a)(1), a motion for an order compelling discovery or disclosure "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action."  D. Kan. Rule 37.2 states that the court will not

---

[38] *See Williams*, 464 F. Supp. 2d at 1115 n.16.

entertain any motion to resolve a discovery dispute pursuant to Fed. R. Civ. P. 26 through 37 unless counsel have conferred or made a reasonable effort to confer with opposing counsel.

The Sprint defendants argue that they first learned of the lead plaintiff's position regarding the deposition instructions in the instant motion.  Specifically, the Sprint defendants allege the lead plaintiff did not indicate during any deposition that it objected to the instructions given by defense counsel, did not assert any objection in its June 11, 2008 letter to the court or during the June 16, 2008 status conference with the court, and did not satisfy its meet and confer obligations.  The lead plaintiff has not provided the court a certification or any other evidence establishing that it even made an effort to confer with defense counsel regarding the instructions given at depositions.  By not addressing the Sprint defendants' argument, the lead plaintiff may have conceded its failure to comply with its meet and confer obligations, as suggested by the Sprint defendants. Nevertheless, in the interest of avoiding further delay in the resolution of this discovery dispute, the court will exercise its discretion and address the merits of the motion.[39]  The court respectfully reminds the parties to strictly adhere to their Rule 37 duties in the future.

---

[39] *See White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*, No. 07-2319, 2009 WL 722056, at \*2 (D. Kan. Mar. 18, 2009) (waiving non-compliance with duty to confer to avoid further delay of resolution of the matter); *Strasburg-Jarvis, Inc. v. Radiant Sys., Inc.*, No. 06-2552, 2009 WL 129361, at \*2 (D. Kan. Jan. 20, 2009) (electing to address the merits of discovery dispute despite failure to confer).

1.      Documents Used by the Deponent to Prepare for the Deposition

The lead plaintiff argues that when it has inquired regarding the documents used by the deponent to prepare for the deposition, counsel for the Sprint defendants has improperly refused to allow the witness to respond as to any documents shown to him or her by counsel. The lead plaintiff argues it should be allowed to inquire as to the identity of the documents used and to compel production of any of the documents that are independently discoverable. The lead plaintiff also seeks to examine the witness on the documents' contents and as to whether that content refreshed the deponent's recollection, which would impact and influence the deponent's testimony under Fed. R. Evid. 612, or as to whether the content failed to refresh the deponent's recollection such that it may qualify as a recorded recollection under Fed. R. Evid. 803(5).

The Sprint defendants argue that the identity of specific documents selected by counsel for review prior to a deposition is protected by the work-product doctrine. Specifically, the Sprint defendants argue that requiring witnesses to identify the documents they reviewed at the direction of counsel would improperly provide the lead plaintiff with a roadmap of defense counsel's strategies and opinions. The Sprint defendants acknowledge that all of the documents at issue have been previously produced to the lead plaintiff.

The lead plaintiff cites the following deposition exchanges as examples of defense counsel improperly instructing the witness regarding documents reviewed in preparation for the depositions. During Mr. Batts's deposition, defense counsel made the following instruction:

> Q. You said you reviewed other documents. What other documents did you review in preparation for today's testimony?
> A. I don't--
> MR. PASKIN: I am going to instruct you not to answer -- to exclude from your answer documents that you reviewed at the direction or with counsel. To the extent you reviewed documents that weren't provided to you by counsel in your preparation, then you can - you can respond to that.[40]

During Ms. Lorimer's deposition, defense counsel made the following instruction:

> Q. Have you seen these meeting minutes before, Ms. Lorimer?
> MR. ROLFE: Let me instruct you, when Mr. Castaldo asked the question, he means have you seen them in the ordinary course of your Sprint work, not anything that I might have shown you in the course of our preparation.[41]

During the deposition of defendant Charles E. Rice, defense counsel made the following instruction:

> Q. Have you seen that document before, sir?
> MR. ROLFE: Mr. Rice, when you answer that, answer it in the context of your work at Sprint, not with respect to any document that you may have seen for the first time in connection with your preparation to testify.[42]

The Sprint defendants argue Fed. R. Evid. 612 does not support the lead plaintiff's challenge to defense counsel's instructions to deponents not to answer questions regarding documents reviewed in preparation for depositions.  The Sprint defendants argue that Mr. Batts's testimony that no document he reviewed at the direction of counsel in preparing

---

[40] Doc. 244, ex. 7, at 25:20 to 26:5.

[41] Doc. 241, ex. 3, at 24:11-18.

[42] Doc. 241, ex. 8, at 23:1-6.

for his deposition had refreshed his recollection satisfies Fed. R. Evid. 612.  Further, the

Sprint defendants argue that counsel for the lead plaintiff laid no predicate during Mr. Batts's

deposition such that Fed. R. Evid. 803(5) would apply.  The Sprint defendants argue that

defense counsel's instructions during the depositions of Ms. Lorimer and Mr. Rice were

attempts to clarify questions based on an exchange during the earlier deposition of Mr.

Hockaday.  The Sprint defendants cite the following exchange during the testimony of Mr.

Hockaday:

> Q. (By Mr. Castaldo) Have you seen this letter before, Mr.
> Hockaday?
> MR. ROLFE: Let me just say that when you ask that question,
> I'm going to ask him to interpret it as meaning in the ordinary
> course of his work as a Sprint director as opposed to anything he
> may have seen for the first time at preparation to testify.
> MR. CASTALDO: That is fine. That is actually what I was
> getting at.[43]

The Sprint defendants note that counsel for the lead plaintiff did not object to defense

counsel's instructions to Ms. Lorimer and Mr. Rice at the time they were given, which the

Sprint defendants argue indicates the instructions were consistent with the questioner's

intended meaning at the time the question was asked.

The lead plaintiff states it is not relying on Fed. R. Evid. 612 or 803(5) to support its

argument that it is entitled to question the witness regarding the documents reviewed in

advance of the deposition and to obtain a copy of those documents.  Rather, the lead plaintiff

cites these rules of evidence to explain its purpose in inquiring about the documents.

---

[43] Doc. 244, ex. 9, at 22:3-12.

Specifically, the lead plaintiff argues it should be permitted to examine the witness on the content of the otherwise discoverable documents to determine (1) whether that content refreshed the witness's recollection and the impact and influence the content of the document had on the deponent's testimony pursuant to Fed. R. Evid. 612, or (2) whether the content of any such document has failed to refresh that deponent's recollection and, therefore may qualify as a recorded recollection under Fed. R. Evid. 803(5). The lead plaintiff argues that the basis for it to be able to question a witness about and obtain the documents is grounded in the case law discussed below but that the rules of evidence provide the court a context for how it may want to use the documents at trial or to resist their admission. The lead plaintiff concludes that the rules of evidence therefore form the basis for why fundamental fairness dictates the documents be produced and the deponent be subject to related questioning.

The parties rely on two conflicting cases from this district. The lead plaintiff relies on *Audiotext Communications Network, Inc. v. US Telecom, Inc.*,[44] while the Sprint defendants primarily rely on *Aguinaga v. John Morrell & Co.*[45] In *Aguinaga*, which was decided almost ten years prior to *Audiotext*, the defendant objected to a deposition question regarding what documents the deponent had reviewed prior to the deposition claiming that the process of selecting documents was work product.[46] As here, the documents at issue had

---

[44] 164 F.R.D. 250 (D. Kan. 1996).

[45] 112 F.R.D. 671 (D. Kan. 1986).

[46] *Id.* at 683.

been previously produced in discovery.[47] U.S. District Judge Frank G. Theis interpreted Fed.

R. Evid. 612, which states:

> [I]f a witness uses a writing to refresh memory for the purpose
> of testifying, either–
>> (1) while testifying, or
>> (2) before testifying, if the court in its discretion
> determines it is necessary in the interests of justice,
> an adverse party is entitled to have the writing produced at the
> hearing, to inspect it, to cross-examine the witness thereon, and
> to introduce in evidence those portions which relate to the
> testimony of the witness.

Judge Theis noted that the purpose of Rule 612 was to allow an adverse party to have access

to those writings which have an impact on the testimony of the witness.[48]   Because the

plaintiffs already had possession of the documents, Judge Theis concluded that the only

purpose for ordering discovery of the documents the deponent reviewed would be to inform

the plaintiff of the attorneys' process of selection and distillation of documents.[49]   Judge

Theis therefore held that the process of selecting the documents is protected by the work-

product doctrine.[50]

In *Audiotext*, U.S. Magistrate Judge Gerald L. Rushfelt found that the defendant did

not support its claim of work product for a notebook of documents assembled by counsel and

---

[47] *Id.*

[48] *Id.* (citing Fed. R. Evid. 612 advisory committee note).

[49] *Id.*

[50] *Id.* at 683-84.

reviewed by a deponent between the second and third days of his deposition.[51]  Judge Rushfelt noted that "[t]he selecting and grouping of information does not transform discoverable documents into work product."[52]  The documents in the notebook at issue had all been previously produced, which the court stated demonstrated the discoverability of the documents.[53]  The defendant presented no other grounds for finding the notebook constituted work product.[54]

Judge Rushfelt rejected the defendant's argument that the notebook was protected by the attorney-client privilege, given that the previous production of the documents would have destroyed any privileged status that existed before the production.[55]  Judge Rushfelt also noted that if Fed. R. Evid. 612 applied, the notebook should be disclosed, regardless of whether it is work product or protected by the attorney-client privilege.  Judge Rushfelt found that the deponent had reviewed the notebook and that it had an impact on his testimony such that Fed. R. Evid. 612 applied.  Therefore, Judge Rushfelt ordered the defendant to produce the entire notebook in the interests of justice.[56]

---

[51] 164 F.R.D. at 252.

[52] *Id.* (citing *Bohannon v. Honda Motor Co. Ltd.*, 127 F.R.D. 536, 539-40 (D. Kan. 1989)).

[53] *Id.* at 252-53.

[54] *Id.* at 253.

[55] *Id.*

[56] *Id.* at 254.

In *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, U.S. Magistrate Judge David J. Waxse held that, to the extent *Audiotext* and *Aguinaga* were inconsistent, the more recent decision in *Audiotext* was the appropriate basis to rule the issue of whether a witness should be compelled to answer a deposition question inquiring into which documents he reviewed in preparation for his deposition.[57]   In compelling the witness to answer the question, Judge Waxse held that the identities of the documents were objective facts and were not, in themselves, the opinion or thought processes of an attorney.  The contents of the documents, all of which had already been produced, were not created by the objecting party's attorney in anticipation of litigation.[58]  Judge Waxse therefore rejected the objecting party's argument that the identification of the documents would reveal counsel's litigation strategy, stating that one cannot simply extrapolate backwards from the results of a selection process to determine the reason a document was selected for review by a deponent.[59]

The parties note that the Tenth Circuit Court of Appeals has not addressed this issue. Although the Sprint defendants acknowledge the holdings in *Audiotext* and *Pepsi-Cola* are contrary to the holding in *Aguinaga*, they encourage the court to follow cases decided by other circuit courts.  Like Judge Waxse, though, the undersigned magistrate judge finds the ruling and reasoning in *Audiotext* more persuasive than that in *Aguinaga*.  Therefore, the court holds that "the rule that selecting and grouping of information does not transform

---

[57] No. 01-2009, 2001 WL 1478659, at *1-*2 (D. Kan. Nov. 8, 2001).

[58] *Id.* at *2.

[59] *Id.*

discoverable documents into work product applies to a deposition inquiry relating to what documents a deponent reviewed prior to his deposition."[60]

Relying on *Audiotext* and *Pepsi-Cola*, the court rejects the Sprint defendants' argument that the identity of specific documents selected by counsel for review prior to a deposition is protected by the work-product doctrine.  Having prepared literally hundreds of witnesses for deposition and trial while in private practice, the undersigned simply believes it is too big a leap to suggest that the mere identification of documents a witness reviews at the direction of counsel improperly provides a roadmap of the attorney's strategies and opinions.  As stated earlier, all documents reviewed by the deponents have been previously produced to the lead plaintiff, and defense counsel's selection and grouping of the documents does not magically transform them into work product.  As in *Audiotext*, the Sprint defendants have not presented any other grounds for finding the documents to constitute work product. The Sprint defendants have also not asserted the documents are protected by the attorney-client privilege, likely because any such privilege would have been waived by the earlier production of the documents.

The court flatly rejects the Sprint defendants' argument that their counsel's instructions during Ms. Lorimer and Mr. Rice's depositions were only attempts to clarify questions based on an exchange during Mr. Hockaday's deposition.  Defense counsel's instruction to Mr. Hockaday to only answer a question to the extent the latter reviewed

---

[60] *Id.* at *3 (internal quotation omitted).

documents as a Sprint director and not in preparation for his testimony was improper. Under Fed. R. Civ. P. 30(c)(2), "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." The Sprint defendants have not alleged the limiting instruction was made pursuant to a limitation by the court or to present a Rule 30(d)(3) motion. As explained above, the identification of the documents Mr. Hockaday reviewed in preparation for his deposition at the advice of counsel are not privileged. Counsel's similar instructions to Ms. Lorimer and Mr. Rice were also improper.

The court finds the Sprint defendants' counsel's instruction to Mr. Batts not to answer a question regarding what documents he reviewed in preparation for this deposition to the extent the documents were provided by counsel was also improper. The identity of the documents reviewed at the instruction of counsel is not privileged information.

The court need not decide whether Fed. R. Evid. 612 or 803(5) applies such that the documents at issue would be admissible at trial. The court is convinced by the lead plaintiff's statement that it cited the rules to explain its purpose in inquiring about the documents. Until the lead plaintiff questions a deponent about the documents reviewed, it cannot determine whether the documents refreshed the deponent's memory.

The court therefore orders defense counsel not to instruct any deponent not to testify as to documents reviewed at the discretion of counsel, including the identity of the documents reviewed. The lead plaintiff shall be allowed to examine the witness on the documents' contents and whether the content refreshed the deponent's recollection. Further,

the Sprint defendants shall produce the documents reviewed by the deponents at the direction of counsel.

2.      Special Litigation Committee

The lead plaintiff argues counsel for the Sprint defendants has improperly stopped all questioning that discusses Sprint's Board's Special Litigation Committee ("SLC").  The SLC was a committee of a single director, defendant Louis W. Smith, formed in October 2001 to investigate matters arising out of the failed Worldcom merger and the acceleration of the vesting of stock options held by executives including Messrs. Esrey and LeMay.  The lead plaintiff states that it was the exercise of these options that led to Messrs. Esrey and LeMay entering into the Ernst & Young tax shelters, which the Sprint defendants claim is irrelevant. The lead plaintiff notes that special litigation committees are formed to investigate whether a company should move to dismiss a shareholder derivative action as not being in the best interest of the company.

The Sprint defendants attached as an exhibit to their response a letter to the undersigned from C. Malcolm Cochran, IV of Richards Layton & Finger, the law firm that represents Mr. Smith in his capacity as the sole member of the SLC.[61]  The letter notes the SLC was established by the Board to investigate the claims raised in the Circuit Court of Jackson County, Missouri, in a case styled *Amalgamated Bank v. LeMay, et al.*, Case No. 00-CV-230077 (the "Missouri case").  The letter describes the claims in the Missouri case and

---

[61] Doc. 244-3.

the work of the SLC, including that the SLC's investigation consisted of fact gathering by its counsel and legal evaluation of the claims and available defenses.  The SLC did not move to dismiss the Missouri case, which was settled.  Mr. Cochran's letter also states that the SLC's report and work product was not submitted to the court in the Missouri case or in any other case.

The Sprint defendants claim, citing Mr. Cochran's letter, that the SLC investigation was a confidential, internal investigation by an authorized special committee through its counsel, and it was and is the intention of the SLC and the SLC's counsel to maintain its work as a confidential, privileged, internal investigation.  During Mr. Rice's deposition, defense counsel made the following instruction:

> Q. Were there any discussions regarding the "SLC issues and risks (disclosure exacerbates SLC problem if no settlement)"?
> MR. ROLFE: You may answer yes, no, or I don't recall, and that will close the subject of the SLC.
> A. I don't recall.[62]

The Sprint defendants argue that investigations undertaken, including discussions with Sprint directors, and work product generated by and on behalf of the SLC are protected by the attorney-client privilege and the work-product doctrine.  The Sprint defendants simply rely on a statement in Mr. Cochran's letter that the work of a special litigation committee normally is not discoverable and state that their counsel's instruction was necessary to preserve privilege.

---

[62] Doc. 241, ex. 8, at 181:13-18.

The lead plaintiff argues counsel for the Sprint defendants did not make a claim of attorney-client privilege, attorney work product, or another privilege before closing the subject of the SLC and that they therefore had an obligation to seek a protective order before unilaterally placing the subject of the SLC out of bounds. The lead plaintiff notes that the Sprint defendants have not sought a protective order forbidding inquiry into SLC matters pursuant to Fed. R. Civ. P. 26(c)(1)(D) and that one is not appropriate now.

The Sprint defendants argue that they were not required to seek a protective order to preclude questions pertaining to the SLC. The court agrees with the Sprint defendants that an instruction not to answer a deposition question to preserve a privilege pursuant to Fed. R. Civ. P. 30(c)(1) ordinarily does not need to be preceded by or accompanied by a motion for a protective order.[63] The issue here, however, is whether the Sprint defendants properly asserted a valid privilege.

The Sprint defendants argue that because defense counsel asserted privilege and refused to allow witnesses to answer questions regarding the SLC investigation in an earlier case, the lead plaintiff has long been on notice of their position regarding the SLC. Specifically, the lead defendant notes two transcripts of depositions in the Johnson County, Kansas District Court case styled *Garco Investments LLP, et al. v. Sprint Corp.*, No. 04 CV 1714, which were taken on April 28, 2006 and May 5, 2006, were produced to the lead

---

[63] *See Mashburn v. Albuquerque Police Dep't*, No. CIV 03-747 JB/RLP, 2004 WL 3426419, at *4 (D.N.M. Apr. 1, 2004).

plaintiff on March 27, 2007.[64]   The Sprint defendants claim the lead plaintiff never raised the issue with them or the court, implying that the lead plaintiff should not have waited to raise the issue until the instant motion.

The court agrees with the lead plaintiff that the production of deposition transcripts in the *Garco* case did not require it to seek resolution of the propriety of the lead defendants' position regarding the SLC prior to Mr. Rice's deposition.   Regardless of whether a privilege was properly asserted during the *Garco* depositions, the matter was not ripe in this case until defense counsel closed the topic of the SLC at Mr. Rice's deposition.

As argued by the lead plaintiff, the Sprint defendants did not make a claim of attorney-client privilege, attorney work product, or any other privilege before closing the subject of the SLC.   The court rejects the Sprint defendants' argument that its assertion of privilege in the *Garco* depositions was sufficient.   The court also rejects the Sprint defendants' argument that the basis of defense counsel's instruction not to answer was obviously based on privilege.   Counsel for the lead plaintiff had clarified that a previous defense counsel instruction to Mr. Rice to answer "yes, no, or I don't recall" was because of a concern of attorney-client privilege.[65]   This previous clarification does not make it obvious that the instruction at issue was based on privilege.   Further, the Sprint defendants now claim the

---

[64] *See* doc. 244, exs. 13 & 14.

[65] Doc. 262, ex. 1, 181:2-8.

work performed by the SLC is protected by attorney-client privilege *and* the work-product doctrine.

As stated in the deposition guidelines posted on this district's website, "[w]hen privilege or work product immunity is asserted, the witness is nevertheless required to answer questions relevant to the existence, extent, or waiver of the privilege/immunity, such as the date of a communication, who made it, to whom it has been disclosed, and its general subject matter."[66] Defense counsel's "clos[ing] the subject of the SLC" obviously was overly broad. Counsel for the lead plaintiff should have been allowed to further question Mr. Rice to determine whether the Sprint defendants' assertions of attorney-client privilege and work-product doctrine regarding the SLC were valid. Questions regarding the existence, extent, or waiver of an attorney-client privilege or work-product immunity are not themselves privileged or protected, just as the question posed to Mr. Rice was not privileged.

The lead plaintiff requests it be permitted to explore the influence that the Missouri case and the SLC had on the substance and timing of the Board's actions and decisions regarding disclosures at issue in this case. The lead plaintiff does *not* seek the SLC's counsel's report, investigation notes, letters, or the like.

The court now turns to the issue of whether the SLC-related topics the lead plaintiff seeks to explore are privileged. Both the lead plaintiff and the Sprint defendants seem to

---

[66] Deposition Guidelines, http://www.ksd.uscourts.gov/guidelines/depoguidelines.pdf.

agree that Kansas law governs whether the SLC matter is privileged.[67]   They also acknowledge that Kansas law has not addressed whether the work of a special litigation committee is privileged.[68]   The Sprint defendants rely on Delaware law, noting that in the absence of controlling Kansas authority on an issue of corporate governance, Kansas courts look to Delaware law for guidance.[69]   The lead plaintiff does not argue the Sprint defendants' reliance on Delaware authority is improper.

The only analysis and explanation by the Sprint defendants as to why the SLC matter is privileged and work product is contained in Mr. Cochran's letter.   The court finds Mr. Cochran's analysis extremely limited and, as explained below, insufficient.   Mr. Cochran cites a secondary source for the proposition that the work of a special litigation committee normally is not discoverable in litigation.   Mr. Cochran also cites a case noting that a special committee of a board of a directors is "free to retain separate legal counsel, and its communications with that counsel [are] properly protected from disclosure" by the attorney-client privilege.[70]   Therein, the court referred to a special committee as an option for the board of directors of the corporate defendant to protect attorney communications regarding

---

[67] Doc. 252, at 10 n.5; doc. 244-3, at 3.

[68] *Id.*

[69] *See Achey v. Linn County Bank*, 931 P.2d 16, 21 (Kan. 1997).

[70] *Moore Bus. Forms, Inc. v. Cordant Holdings Corp.*, Civ. A. Nos. 13911 & 14595, 1996 WL 307444, at *6 (Del. Ch. June 4, 1996).

certain matters from disclosure to its largest single shareholder, the corporate plaintiff, and the plaintiff's designated director to the defendant's board.[71]

Mr. Cochran then states that the SLC did not file a motion in the Missouri case, which might have rendered its work discoverable. Mr. Cochran also states that there was no voluntary disclosure of the substance of the SLC's work to outsiders, or reliance on that work by Sprint or its directors in defending litigation, which might give rise to waiver arguments.[72] Mr. Cochran states that the Missouri case was prosecuted and settled by the derivative plaintiff without the participation or involvement of the SLC. Mr. Cochran concludes by simply stating that the SLC's work was the sort of privileged investigation that boards and their committees must be permitted to undertake in confidence if they are to fully and fairly evaluate and defend, or settle, litigation, and that its work was core work product in a classic sense and is at the heart of the attorney-client privilege.

The lead plaintiff argues that the authority cited by Mr. Cochran does not stand for the proposition that Delaware law expressly accepts or recognizes a protection of the work of special litigation committees from discovery. The lead plaintiff then states that the Sprint defendants have produced documents which demonstrate that the work of the SLC was communicated to the Board and was a contributing factor in the Board's deliberations concerning Messrs. Esrey and LeMay's continued employment. The lead plaintiff seems to

---

[71] *Id.*

[72] *See Ryan v. Gifford* (*Ryan I*), Civil Action No. 2213-CC, 2007 WL 4259557, at *3 (Del. Ch. Nov. 30, 2007).

argue, though not explicitly, that any privilege of the SLC's work has been waived as a result of such disclosure to the Board.

For support of this argument, the lead plaintiff relies on the discussion points for a September 25, 2002 Sprint meeting that includes "SLC issues and risks (disclosure exacerbates SLC problem if no settlement),"[73] and the draft agenda for the Board's September 25, 2002 meeting that includes "Litigation: Milberg and SLC."[74]  The Sprint defendants produced a document titled "Management's Suggestions for Addressing Current Issues, December 9, 2002," which includes handwritten notes.[75]  The document lists "Impact on Milberg settlement" under the heading "Changing Management to Address Auditor Independence Would be Harmful" and notes that "[a]nnouncing a management change would delay and increase the cost of settling Milberg litigation if there's even the slightest suggestion of wrongdoing by departing executives."[76]  Handwritten notes from defendant Stewart Turley note "SLC report damaging to: Co., most of all 3 Execs, Bd. (no matter defensible)."[77]  Deloitte produced a document titled "Statement Regarding Ron LeMay's Departure From Sprint" that states there are no other considerations which caused the

_____

[73] Doc. 241, ex. 10, at 1.

[74] *Id.* at 2.  The lead plaintiff notes that the law firm Milberg, Weiss represented the plaintiffs in the Missouri case and that therefore the term "Milberg" settlement or suit appears to be synonymous with "SLC."

[75] Doc. 241, ex. 11.

[76] *Id.* at 13, 18.

[77] Doc. 252, ex. 6, at 2.

decision and includes handwritten notes asking "how about lousy judgment & greed? how about SLC."[78]

The lead plaintiff relies on a Second Circuit Court of Appeals opinion in *Joy v. North*.[79] Specifically, the lead plaintiff relies on a statement that "[o]nce communicated, the [work-product] immunity may not be claimed, since the papers may be part of the basis for the committee's recommendations."[80] As noted by the Sprint defendants, a special litigation committee of the corporate defendant in *Joy* filed a motion for summary judgment in the derivative action. The Second Circuit held that, given the filing of the motion for summary judgment, the committee was required to disclose to the court and the parties its report and all underlying data, which waived any attorney-client privilege of communications involved in that data.[81] Similarly, the U.S. District Court for the District of Arizona held that "[b]y filing its motion for summary judgment based on the report of the Committee, the Corporation has waived any claims of privilege and any work product immunity to the extent that counsel communicated the information or documents to the committee."[82]

---

[78] Doc. 252, ex. 7, at 2.

[79] 692 F.2d 880 (2d Cir. 1982).

[80] *Id.* at 894.

[81] *Id.* at 893-94.

[82] *Zitin v. Turley*, No. CIV 89-2061-PHX-CAM, 1991 U.S. Dist. LEXIS 10084, at *16 (D. Ariz. June 20, 1991).

The Sprint defendants argue that even assuming the lead plaintiff is correct about the work of the SLC being communicated to the Board, no waiver exists. Specifically, the Sprint defendants note that the directors were acting in their fiduciary capacity, as directors, not as defendants. For support, the Sprint defendants note that Mr. Cochran's letter states the work of the SLC was never disclosed, or used as a defense, in any litigation. The Sprint defendants cite to a decision of the Delaware Court of Chancery regarding the receipt of privileged SLC information by directors.[83]

In *Ryan II*, the Delaware Court of Chancery denied the corporate defendant's application for certification of interlocutory appeal of the waiver analysis in *Ryan I*.[84] Two days following the filing of the derivative suit, the corporate defendant established a special committee of one director to investigate the company's stock option grants and practices.[85] The special committee then retained counsel, which conducted the investigation.[86] The special committee and its counsel orally presented its report to the company's board of directors, and the board met on several occasions to discuss actions in response to the committee's findings. The company then publicly announced the results of the committee's

---

[83] *Ryan v. Gifford* (*Ryan II*), Civil Action No. 2213-CC, 2008 WL 43699 (Del. Ch. Jan. 2, 2008).

[84] *Id.* at *7.

[85] *Id.* at *1.

[86] *Id.*

review and included committee findings in a non-public report to NASDAQ.[87]  The director

defendants in *Ryan* specifically used the committee's findings and conclusions for their

personal benefit in the case.[88]

The court in *Ryan I* held that the privilege protecting the committee's findings had

been waived.  The court noted that in addition to the special committee and its counsel, other

members of the board and other counsel were also in attendance.[89]  The court held that the

presentation of the report constituted a waiver of privilege because the client, the special

committee, disclosed its communications concerning the investigation and report to third

parties whose interests were not common with the client, precluding application of the

common interest exception to protect the disclosed communications.[90]  The court found that

the individual defendants, though directors on the board, could not be said to have interests

so parallel and non-adverse to those of the committee that they could reasonably be

characterized as joint venturers.[91]  The court then ordered that the communications relating

to the final report, including materials distributed or collected at meetings with board

---

[87] *Id.* at *2.

[88] *Id.* at *3.

[89] *Ryan I*, 2007 WL 4259557, at *3.

[90] *Id.*

[91] *Id.*

-43-

members, must be produced.[92]  The court also noted that all documents and communications related to the underlying factual information upon which the committee's counsel based any legal advice was not within the ambit of attorney-client privilege and should have already been produced.[93]

In denying the company's application for an order certifying an interlocutory appeal, the court in *Ryan II* stated that the *Ryan I* decision was based on factual circumstances including the receipt of purportedly privileged information by director defendants in their individual capacities from the special committee.[94]  The court then noted that "[t]he decision would not apply to a situation (unlike that presented in [the] case) in which board members are found to be acting in their fiduciary capacity, where their personal lawyers are not present, and where the board members do not use the privileged information to exculpate themselves."[95]  It is this statement on which the Sprint defendants rely for arguing that no waiver occurred here.  The Sprint defendants have not cited any other authority regarding whether and when the attorney-client privilege is waived when a special committee's findings or work is disclosed to a board.

As stated above, the Sprint defendants did not properly assert the attorney-client privilege or the work-product immunity before their counsel closed the topic of the SLC.

---

[92] *Id.*

[93] *Id.* at *3 n.10.

[94] *Ryan II*, 2008 WL 43699, at *5.

[95] *Id.*

Counsel for the lead plaintiff should have had the opportunity to inquire about the existence and possible waiver of the privilege. Indeed, such deposition testimony would be valuable to the court in determining whether the SLC information is privileged and that the privilege has not been waived. For purposes of the instant analysis, the court will assume the Sprint defendants have met their burden to show the SLC information is protected by the attorney-client privilege and the work-product doctrine through their conclusory statements and their reliance on Mr. Cochran's conclusory statements. The court finds, however, that the Sprint defendants have not met their burden to show that such protection has not been waived.

The lead plaintiff has presented several documents indicating the work of the SLC was disclosed to the Board. The court rejects the Sprint defendants' assertion that the work of the SLC was never disclosed, or used as a defense, in any litigation and that therefore the privilege has not been waived. The court does not have sufficient information to determine whether the SLC's work was only disclosed to the Board or whether third-parties may have received such disclosures as well. The Sprint defendants have stated that the directors received the SLC information in a fiduciary capacity but have not provided any information to verify their statement or that no one else was present when SLC information was disclosed. It is not even clear what SLC information was disclosed to the Board.

At this time, the court will not address the Sprint defendants' arguments that information regarding the work of the SLC is irrelevant to the claims in the instant case. The court is without a sufficient record to determine that all SLC information clearly "can have

no possible bearing on the claim or defense of a party."[96]  It does not appear counsel for the Sprint defendants objected during Mr. Rice's deposition based on relevancy.  Further, an instruction not to answer a deposition question is only proper when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Fed. R. Civ. P. 30(d)(3).[97]

For the above reasons, the court finds that counsel for the Sprint defendants made an improper objection and instruction during Mr. Rice's deposition.  The court finds that even if the Sprint defendants have properly supported their assertions that the SLC information is protected by the attorney-client privilege and work-product doctrine, they have not met their burden to show the protections have not been waived.  The court will not order that the lead plaintiff is entitled to explore the influence that the Missouri case and the SLC had on the substance and timing of the Board's actions and decisions regarding disclosures at issue in this case.  Rather, counsel for the Sprint defendants shall not object or instruct witnesses not to answer deposition questions regarding the existence and waiver of the attorney-client privilege and work-product immunity of SLC information.  In the hopefully unlikely event this issue comes before the court again, the court expects counsel for the parties to first meet and confer and then thoroughly brief and analyze the issue.

---

[96] *Sheldon v. Vermonty*, 204 F.R.D. 679, 689–90 (D. Kan. 2001) (citations omitted).

[97] Fed. R. Civ. P. 30(c)(2).

3.      An Attorney's Presence at a Meeting

The lead plaintiff argues counsel for the Sprint defendants erroneously interposed an instruction "not to answer" based on the presence of an attorney at a meeting. The deposition exchange at issue involves a September 25, 2002 Board meeting at which counsel was apparently present. During Mr. Rice's deposition, defense counsel made the following instruction:

> Q. The third thing down is E & Y, Independence and Disclosure Issues. What was discussed regarding E & Y Independence and Disclosure Issues?
> MR. ROLFE: I'm not going to let you answer that question to the extent that the discussion involved legal counsel.
> THE WITNESS: Well, this entire meeting was with legal counsel.
> BY MS. DOOLEY:
> Q. What was discussed regarding E & Y independence and disclosure issues?
> MR. ROLFE: I'll instruct you not to answer.
> BY MS. DOOLEY:
> Q. Was the entire discussion -- withdrawn. What -- was any advice or opinion provided at that meeting regarding E & Y independence and disclosure issues?
> MR. ROLFE: You may answer that question yes, no, or I don't recall.
> THE WITNESS: I don't recall.
> BY MS. DOOLEY:
> Q. Was there any discussion regarding E & Y independence?
> A. I don't recall.
> Q. Was there any discussion regarding disclosure issues?
> A. I don't recall.
> Q. Once -- was there any contemplation at this time to the promotion of Mr. LeMay to the position of CEO?
> A. I don't recall.
> Q. Did the board or any committee thereof that you participated in ever advance to a discussion regarding the disclosures that would need to be made if Mr. LeMay was promoted to CEO?

A. I don't recall.[98]

The lead plaintiff argues the mere presence of counsel alone is insufficient to invoke the attorney-client privilege. The lead plaintiff also claims that the form of defense counsel's objection was inappropriate. Specifically, the lead plaintiff argues defense counsel made a speaking objection with suggestive content for the benefit of Mr. Rice. The lead plaintiff claims that Mr. Rice then answered all remaining questions "I don't recall," which impeded the examining attorney's ability to vet the legitimacy of the privilege assertion.

The Sprint defendants claim that their counsel did not instruct Mr. Rice that he could not answer any question regarding the meeting because counsel was present. Rather, the Sprint defendants note that the first instruction was that Mr. Rice could not answer the question to the extent the discussion involved legal counsel. The Sprint defendants claim that once Mr. Rice testified the entire meeting was with legal counsel, defendants' attorney "instructed Mr. Rice not to testify regarding those privileged discussions."[99] Notably, though, the actual instruction given was simply for Mr. Rice "not to answer."

The Sprint defendants claim that defense counsel's instruction to Mr. Rice to answer "yes, no, or I don't recall" to the question whether any advice was given during the meeting was proper in order to preserve privilege. The Sprint defendants argue defense counsel did not instruct or suggest Mr. Rice answer "I don't recall." The Sprint defendants conclude that

---

[98] Doc. 244, ex. 12, at 182:24 to 184:9.

[99] Doc. 244, at 21.

-48-

examining counsel failed to refresh Mr. Rice's memory and argue that it is not an adequate ground for a motion to compel.

"Not every communication between an attorney and client is privileged, only confidential communications which involve the requesting or giving of legal advice."[100] "The focal point of the protection afforded by the attorney-client privilege lies with 'communications' between attorneys and their clients."[101]   And, although the privilege protects disclosure of substantive communication between attorney and client, "it does not protect disclosure of the underlying facts by those who communicated with the attorney."[102] There must be a connection between "the subject of the communication and the rendering of legal advice" for the attorney-client privilege to shield the communication from disclosure.[103]   Legal advice must predominate for the communication to be protected.[104]   The privilege does not apply where the legal advice is merely incidental to business advice.[105]

---

[100] *Burton v. R.J. Reynolds Tobacco Co.*, 175 F.R.D. 321, 327 (D. Kan. 1997) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976); *United States v. Olano*, 62 F.3d 1180 (9th Cir. 1995)).

[101] *IMC Chemicals, Inc. v. Niro, Inc.*, No. 98-2348, 2000 WL 1466495, at *8-*9 (D. Kan. July 19, 2000) (quoting *Upjohn*, 449 U.S. at 395-96 (1981)).

[102] *Id.*

[103] *Burton*, 175 F.R.D. at 328.

[104] *Burton v. R.J. Reynolds Tobacco Co.*, 170 F.R.D. 481, 484 (D. Kan. 1997) (citing *Leonen v. Johns-Manville*, 135 F.R.D. 94 (D.N.J. 1990)).

[105] *Id.* (citing *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, MDL No. 997, 1995 WL 354268, at *2 (N.D. Ill. June 9, 1995)).

There is a distinction between a conference with counsel and a conference at which counsel is present; the mere presence of counsel at a meeting does not make all communications during the meeting privileged.[106]  Further, the subject matter of meetings with an attorney, the persons present, the location of the meetings, or the persons arranging the meetings are also not protected by the privilege.[107]

As the lead plaintiff notes, the initial question asked was not specific to legal advice and defense counsel's instruction not to answer was not limited to legal advice received. Rather, defense counsel's instruction to Mr. Rice was not to answer to the extent the discussion involved legal counsel.  As earlier noted, not every communication with or involving legal counsel is protected by the attorney-client privilege.  Defense counsel's instruction was overly broad because it excluded all communications involving legal counsel regardless of whether any legal advice was requested or given at the meeting.  The court therefore finds defense counsel's initial instruction to Mr. Rice improper.

Likewise, defense counsel's second instruction to Mr. Rice not to answer once Mr. Rice testified the entire meeting was with legal counsel defense counsel was overly broad. Mr. Rice was instructed not to answer solely on the basis that the entire meeting was with legal counsel.  Defense counsel did not limit his instruction not to answer to just privileged discussions.  Based on Mr. Rice's testimony, it is unclear whether any legal advice was

---

[106] *Id.* (citing *Oil Chem. & Atomic Workers Int'l Union v. Am. Home Prods.*, 790 F. Supp. 39, 41 (D.P.R. 1992)).

[107] *Id.* (citing *United States v. Pappadio*, 346 F.2d 5, 9 (2d Cir. 1965)).

requested or given at the meeting.  As explained above, a witness is required to answer questions relevant to the existence, extent, or waiver of the privilege, such as who made a communication, to whom it has been disclosed, and its general subject matter.  Defense counsel should have instructed Mr. Rice to answer the questions with the above information regarding privileged communications.  Counsel for the lead plaintiff could then have determined whether certain communications at the meeting were privileged and whether the privilege was waived.  To the extent any communications during the meeting were not privileged, Mr. Rice should have fully answered the questions asked.

The court finds defense counsel's instruction to Mr. Rice that he may answer "yes, no, or I don't recall" was not improper or suggestive.  By giving Mr. Rice the options to answer yes, no, or I don't recall, defense counsel did not suggest Mr. Rice answer all questions I don't recall.  Although Mr. Rice could have likely determined on his own that he did not recall certain information, Mr. Rice's answer options were fairly presented by his attorney. While defense counsel's earlier instructions to Mr. Rice may have impeded the examining attorney's ability to vet the legitimacy of the privilege assertion, this instruction did not do so.

The court finds that defense counsel's instructions regarding legal counsel's presence at the September 25, 2002 Board meeting improper.  Defense counsel shall not make similar instructions in future depositions.  The court finds defense counsel's instruction to answer "yes, no, or I don't recall" was not improper or suggestive.

C.    Audit Committee Meeting Minutes and Related Documents

Request No. 17 of the lead plaintiff's first request for production of documents directed to all defendants sought:

> [a]ll documents concerning any regular or special meeting of the Board of Directors of Sprint, or any committee or sub-committee thereof during the Relevant Period, including without limitation, minutes, board packages, recordings, agendas, summaries, memoranda, transcripts, or notes, as well as all documents prepared, distributed, utilized, or submitted prior to or during such meetings.[108]

The request defined the relevant time period as the period beginning January 1, 1998 through and including the date of the request.[109]  The request is dated December 29, 2004.[110]

The parties have not provided the history of the Sprint defendants' production of documents in response to Request No. 17.  The lead plaintiff notes that in March and April of 2005, the parties conducted several meet and confer sessions concerning the defendants' production of documents responsive to the lead plaintiff's first request for production of documents.  The lead plaintiff has provided letters dated March 22 and April 4, 2005 from its counsel to defense counsel regarding the production.[111]  The lead plaintiff notes that in a

---

[108] Doc. 241, ex. 7, at 16.

[109] Doc. 139, ex. A, at 10.

[110] Doc. 241, ex. 7, at 19.

[111] Doc. 241, ex. 4.

March 25, 2005 letter, Sprint's counsel indicated that it had produced non-privileged documents responsive to Request No. 17.[112]

The lead plaintiff states that deposition testimony revealed additional responsive documents, including certain Audit Committee minutes and related documents, have not been produced. The lead plaintiff states that Audit Committee meeting minutes have only been produced as to the December 16 and 17, 2000 meetings. The lead plaintiff then requests the Sprint defendants produce the balance of the Audit Committee minutes pertaining to meetings at which (1) the tax shelters of Messrs. Esrey and LeMay were discussed; (2) the financial conditions of Messrs. Esrey and LeMay were discussed; (3) the employment prospects of Messrs. Esrey and LeMay were discussed; and/or (4) the relationship between Messrs. Esrey and LeMay and Ernst & Young was discussed, including related materials such as drafts of the minutes, notes, agenda, preparation materials, meeting materials and presentations, and other communication and materials preceding the meeting or in follow-up to the meeting.

The lead plaintiff states that during a June 13, 2008 meet and confer session, Sprint's counsel contended that the requested minutes were non-responsive, duplicative, or irrelevant but that he would produce the Audit Committee minutes. According to the lead plaintiff, Sprint's counsel reserved judgment on whether he would produce any related materials pending the outcome of all issues in the instant motion.

_____

[112] The lead plaintiff cites to exhibit 4, which consists of its counsel's letters to defense counsel. Exhibit 4 does not contain a March 25, 2005 letter from Sprint's counsel.

In their response to the instant motion, the Sprint defendants argue the lead plaintiff's objection is late and maintain their position that the requested Audit Committee meeting minutes discussing Ernst & Young's independence are nonresponsive and irrelevant. The Sprint defendants agreed, however, to produce nonprivileged Audit Committee minutes, notes, and related documents within the Class Period.

On July 1, 2008, the Sprint defendants produced over 2,000 pages of additional documents, consisting primarily of Audit Committee meeting minutes and related material, and an amended privilege log concerning the Audit Committee meeting minutes. The lead plaintiff states that the Sprint defendants' production only partially resolved the instant dispute regarding Audit Committee documents. Specifically, the lead plaintiff acknowledges the Sprint defendants produced non-privileged Audit Committee minutes, notes, and related documents within the Class Period. The lead plaintiff still seeks documents *relevant to* the Class Period, not just those *within* the Class Period. Additionally, the lead plaintiff argues the Sprint defendants' latest privilege log entries are insufficient to determine the validity of the asserted privileges.

### 1.     Documents Outside of Class Period

As stated above, the lead plaintiff seeks documents responsive to Request No. 17 that are relevant to the Class Period. Specifically, the lead plaintiff seeks Audit Committee minutes and related documents up to and including when the Audit Committee recommended Ernst & Young be replaced as its independent auditor. The lead plaintiff states this occurred just months after the close of the Class Period and the terminations of Messrs. Esrey and

LeMay and the documents are relevant and reasonably calculated to lead to discoverable information.

The Sprint defendants state that Sprint did not choose its new auditors until October 14, 2003 for the 2004 audit, after a solicitation of requests for proposals in which Ernst & Young participated.  Initially, the Sprint defendants argue the documents the lead plaintiff requests are not relevant.  The Sprint defendants also argue the lead plaintiff waived its right to seek documents outside the Class Period by not filing a motion to compel earlier.  The court will address this argument first.

In their January 23, 2005 objections and responses to the lead plaintiff's first request for documents, the Sprint defendants objected to the relevant time period as being overly broad, unduly burdensome, and seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.[113]  The Sprint defendants then stated that they would produce documents created or distributed from January 1, 1999 to February 1, 2003.  The Sprint defendants repeated their objections based on relevancy in their response to Request No. 17 but agreed to produce non-privileged documents that relate to the employment of Messrs. Esrey and LeMay and were responsive to the request.[114]

In the instant motion, the lead plaintiff claims that deposition testimony revealed Mr. Batts, the Chairman of Sprint's Audit Committee, caused the Audit Committee to put in place

---

[113] Doc. 244, ex. 16, at 5.

[114] *Id.* at 16.

a procedure whereby (1) Ernst & Young assured the Audit Committee that there was no conflict, and (2) Messrs. Esrey and LeMay were required to give the committee a signed letter every quarter stating that they were not having difficulties or intending to sue Ernst & Young.  Mr. Batts testified that after the committee started this process, they required Ernst & Young to assure the committee of their independence at the beginning of every Audit Committee meeting thereafter.  The lead defendant also cites the deposition testimony of Mr. Rice, who succeeded Mr. Batts as Chairman of the Audit Committee on or about April 16, 2002.  Mr. Rice testified that the above-described process of Ernst & Young confirming its independence continued under his chairmanship until the time Sprint changed independent auditors.

The Sprint defendants argue that the Audit Committee's certification process was not first revealed in deposition testimony.  Rather, the Audit Committee meeting minutes from December 17, 2000 set out the process in detail.[115]  The lead plaintiff even acknowledges the December 17, 2000 minutes were previously produced and that the minutes reflect the development and implementation of the two-pronged procedure for monitoring the conflict of interest situation.[116]  The Sprint defendants also cite certain Board minutes that reference the Audit Committee's continuing verification of Ernst & Young's independence. The Sprint

---

[115] Doc. 244, ex. 17, at 2.

[116] Doc. 241, at 18.

defendants also argue that they never agreed to produce documents beyond February 1, 2003, and the lead plaintiff never objected to that cutoff.

In its reply, the lead plaintiff does not address the Sprint defendants' argument that it never objected to the Sprint defendants' February 1, 2003 cutoff. The lead plaintiff merely states that it "seeks to ensure all documents *relevant* to the Class Period, not just those created within the Class Period[,] are produced."[117] It then simply states that the documents are relevant and reasonably calculated to lead to discoverable information.

The court agrees with the Sprint defendants that the lead plaintiff should not be allowed to reopen the issue of whether documents should be produced outside the Class Period. In the beginning of 2005, the Sprint defendants objected to the lead plaintiff's request for documents from January 1, 1998 through December 29, 2004 and clearly stated they would only produce documents through February 1, 2003. It does not appear the lead plaintiff ever challenged the Sprint defendants' objection and cutoff. Further, the parties certified that document discovery was complete on February 13, 2008.

The court finds the lead plaintiff's argument that it first discovered the existence of certain Audit Committee documents through deposition testimony not credible. Specifically, the court rejects the lead plaintiff's statement that Mr. Batts's testimony revealed the Audit Committee monitored and analyzed the conflict of interest issue on a continuous basis and that therefore all Audit Committee documents must be produced. The December 17, 2000

---

[117] Doc. 252, at 13.

Audit Committee meeting minutes clearly reveal the implementation of the committee's two-pronged procedure to ensure the independence of Ernst & Young.

Not only did the lead plaintiff fail to respond to the Sprint defendants' argument that documents disclosing the two-pronged procedure were previously produced, it also failed to articulate what documents it first discovered through deposition testimony. Presumably, the lead plaintiff could argue that it first learned of the continuous nature of the monitoring of the conflict of interest issue by the Audit Committee. But, the December 17, 2000 minutes reflect that the procedure would ensure "the ongoing monitoring of the relationship with and independence of [Ernst & Young]."[118] The minutes also state that the procedure would occur at each meeting Ernst & Young attends and that Messrs. Esrey and LeMay would reaffirm the relationship quarterly.

D. Kan. Rule 37.1(b) states that a motion to compel discovery shall be filed within thirty days of the service of the response, answer, or objection which is the subject of the motion. Otherwise, the objection to the response, answer, or objection is waived. By not timely objecting to the Sprint defendants' February 1, 2003 production cutoff, the lead plaintiff has waived its right to do so. Further, the lead plaintiff has not presented a convincing argument that it only recently discovered the existence of responsive documents outside the Class Period. The court therefore need not decide whether the requested documents are relevant. The court denies the lead plaintiff's request to compel the Sprint

[118] Doc. 244, ex. 17, at 2.

defendants to produce all non-privileged Audit Committee minutes, notes, and related documents relevant to the Class Period.

    2.        Sufficiency of Privilege Log

The lead plaintiff argues the Sprint defendants' privilege log entries with respect to the recently produced Audit Committee documents are vague, incomplete, and improper. The lead plaintiff seeks a court order providing for an in camera inspection of the documents at issue to determine whether any privilege asserted is valid. The Sprint defendants maintain they have properly asserted attorney-client privilege and attorney work product and state they are prepared to submit any of the challenged documents to the court for an in camera review.

Sprint's fourth amended privilege log, which was produced on July 1, 2008, contains forty new entries.[119] The recent entries on the privilege log are numbered 204 through 243. The Sprint defendants state that only thirteen unique documents are reflected in the entries. The thirteen documents appeared multiple times within the production because, for example, some contained additional pages, handwritten notes, or color highlighting not present on other versions.

The Sprint defendants claim that the forty entries now challenged by the lead plaintiff contain the same categories of information provided in the approximately 200 preceding

_____

[119] Doc. 262, ex. 14. The Sprint defendants prepared a new version of the privilege log to number the entries. Doc. 262, ex. 13. The Sprint defendants state that the entries themselves are identical to the those in the privilege log produced to the lead plaintiff on July 1, 2008. For convenience, the court will refer to the entries with the numbers given in exhibit 13.

entries.  The Sprint defendants argue the lead plaintiff had no objection to the first 200

entries when it certified that document discovery was complete in February 2008 and that the

lead plaintiff therefore conceded the sufficiency of the privilege log.  The court rejects the

Sprint defendants' argument that any concession by the lead plaintiff as to the first 200

entries somehow precludes it from objecting to the last forty entries.  The sufficiency of the

first 200 entries is not before the court, and the court will not review those entries to

determine whether they contain the same information as the most recent entries.  The court

will simply review the latest forty entries.

A party objecting to discovery on grounds of privilege has the burden to establish the

privilege.[120]  Fed. R. Civ. P. 26(b)(5)(A) provides that

> [w]hen a party withholds information otherwise discoverable by
> claiming that the information is privileged or subject to
> protection as trial-preparation material, the party must:
>     (i) expressly make the claim; and
>     (ii)  describe  the  nature  of  the  documents,
> communications, or tangible things not produced or disclosed—
> and do so in a manner that, without revealing information itself
> privileged or protected, will enable other parties to assess the
> claim.

If a party fails to make the required showing, by not producing a privilege log or by

providing an inadequate one, the court may deem the privilege waived.[121]  Minor procedural

---

[120] *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 232 F.R.D. 669, 671 (D. Kan. 2005).

[121] *Id.* (citing *Employer's Reinsurance Corp. v. Clarendon Nat'l Ins. Co.*, 213 F.R.D. 422, 428 (D. Kan. 2003)).

violations, good faith attempts at compliance, and other such mitigating circumstances bear

against finding waiver.[122]

"The information provided [in a privilege log] must be sufficient to enable the court

to determine whether *each element* of the asserted privilege or protection is satisfied."[123]

Courts have required that a privilege log include the following information:

1. A description of the document explaining whether the document is a memorandum, letter, e-mail, etc.;
2. The date upon which the document was prepared;
3. The date of the document (if different from # 2);
4. The identity of the person(s) who prepared the document;
5. The identity of the person(s) for whom the document was prepared, as well as the identities of those to whom the document and copies of the document were directed, "including an evidentiary showing based on competent evidence supporting any assertion that the document was created under the supervision of an attorney;"
6. The purpose of preparing the document, including an evidentiary showing, based on competent evidence, "supporting any assertion that the document was prepared in the course of adversarial litigation or in anticipation of a threat of adversarial litigation that was real and imminent;" a similar evidentiary showing that the subject of communications within the document relates to seeking or giving legal advice; and a showing, again based on competent evidence, "that the documents do not contain or incorporate non-privileged underlying facts;"
7. The number of pages of the document;

_____

[122] *Id.* at 671-72 (citing *Heavin v. Owens-Corning Fiberglass*, No. 02-2572, 2004 WL 316072, at *1 (D. Kan. Feb. 3, 2004)).

[123] *Hill v. McHenry*, No. 99-2026, 2002 WL 598331, at *2 (D. Kan. Apr. 10, 2002).

8.   The party's basis "for withholding discovery of the document (i.e., the specific privilege or protection being asserted); and

9.   Any other pertinent information necessary to establish the elements of each asserted privilege."[124]

Fed. R. Civ. P. 26(b)(3)(A) provides that:

Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, idemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

(i) they are otherwise discoverable under Rule 26(b)(1); and

(ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

"The 'in anticipation of litigation' element of the work-product doctrine focuses upon the motivating purpose behind creating the documents."[125]  To invoke the doctrine, a party must show that the document was prepared principally or exclusively to assist in anticipated or ongoing litigation.[126]

Initially, the lead plaintiff claims that none of the recent privilege log entries mention legal advice.  The lead plaintiff then argues that because the documents have been redacted virtually in their entirety, it has no way to determine whether the purpose of the documents

---

[124] *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 232 F.R.D. at 673 (citing *Hill*, 2002 WL 598331, at *3).

[125] *Raytheon Aircraft Co. v. U.S. Army Corps of Eng'rs*, 183 F. Supp. 2d 1280, 1288 (D. Kan. 2001) (citation omitted).

[126] *Id.*

was to provide legal advice.  The lead plaintiff also states that the privilege log reflects that eighteen of the documents were authored by the "Sprint Legal Dept."  The lead plaintiff argues the privilege log is insufficient because it fails to state who within the department authored each of the documents.  The lead plaintiff also argues that the privilege log fails to provide a basis for assertion of the work-product doctrine.  Finally, the lead plaintiff argues the privilege log's descriptions do not contain the requisite detail to ascertain whether the privilege asserted is valid.

The Sprint defendants correctly note that two entries, numbers 204 and 217, do expressly mention legal advice.  The Sprint defendants acknowledge that they cannot determine who within the Sprint Legal Department authored some of the documents.  The Sprint defendants then defend their assertions of privilege for eight categories of documents.  For almost each category, the Sprint defendants rely in part on the documents at issue being stamped "Attorney-Client Privileged" and/or "Work Product" as a basis for the privilege.  The Sprint defendants offer additional descriptions of the documents, including, for example, that they relate to a certain presentation to the Audit Committee or appear to be related to certain litigation.

Although there appears to be some deficiencies in the latest forty entries on the Sprint defendants' privilege log, the Sprint defendants have offered additional information that further describes the documents or explains some of the deficiencies.  Initially, the court notes that whether a document is stamped "privileged" does not conclusively indicate the document is indeed privileged, and the court will not solely rely on the existence of such a

stamp.  Rather than simply accepting the Sprint defendants' supplemental descriptions in their surreply, the court orders the Sprint defendants to produce unredacted versions of the documents represented in the forty latest entries on the privilege log to the court for an in camera inspection.  The court can then better determine whether the Sprint defendants' descriptions accurately reflect the information in the documents, including that certain documents appear to be authored by lawyers or appear to relate to certain litigation.  The court will then rule on the validity of the Sprint defendants' privilege assertions.

D.     Deloitte Documents

The lead plaintiff states that on November 11, 2005 it served a subpoena duces tecum on Deloitte seeking documents related to service performed for Sprint in connection with the claims asserted in this case.  Counsel for Sprint reviewed Deloitte's production and produced a privilege log on behalf of Deloitte on September 23, 2006.  Deloitte first produced documents to the lead plaintiff around that date.  After a meet and confer session regarding the sufficiency of the privilege log, Sprint's counsel provided an amended privilege log on November 27, 2006.  On November 28, 2006, Deloitte provided an additional production of documents previously withheld or redacted.

On February 23, 2007, counsel for Sprint advised the lead plaintiff that privileged materials had inadvertently been produced with the Deloitte production and requested the lead plaintiff return the documents produced via CD.  The parties agreed that the operative privilege log would be the November 27, 2006 log and that no changes or additions would

be made to that log.  A corrected CD with Deloitte documents was provided to the lead plaintiff on May 14, 2007.

As stated above, on February 13, 2008, the parties filed a joint certificate stating that document discovery among the parties and with respect to non-parties was complete.[127]  The lead plaintiff confirmed that it has had the opportunity to review all documents produced to it.  The parties preserved their right to seek production of documents not produced and not subject to objections or privilege claims if facts arose during depositions evidencing the existence of such documents.

On March 7, 2008, Deloitte sent a letter to the lead plaintiff inquiring about the need to preserve documents in connection with the subpoena.  On March 19, 2008, the lead plaintiff confirmed that Deloitte should continue its preservation of documents as the litigation was continuing.  On April 14, 2008, the lead plaintiff wrote Deloitte's counsel seeking the production of documents which appeared to be missing from the May 14, 2007 production.[128]  The letter states that documents appear to be missing within certain Bates ranges and requests the missing documents or an amended privilege log be produced.

The lead plaintiff sent Deloitte another letter regarding the missing documents on April 30, 2008.  On May 2, 2008, Deloitte referred the lead plaintiff to Sprint's counsel, who prepared the privilege log.  After exchanging e-mails with counsel for Sprint, the lead

---

[127] Doc. 222.

[128] Doc. 241, ex. 18.

plaintiff was advised on May 21, 2008 that due to an attorney's illness, another attorney for Sprint, Tara Tune, would handle the review. On May 28 and 29, 2008, Ms. Tune advised the lead plaintiff that Deloitte had Bates stamped documents before they were reviewed for responsiveness and that the documents were non-responsive. Ms. Tune also indicated that Sprint had mistakenly directed Deloitte to withhold certain documents from production on privilege grounds that did not apply and that Deloitte should be contacted for the missing documents.

On June 3, 2008, Deloitte produced some of the missing documents and indicated that the remaining documents were under review by Sprint's counsel. On June 13, 2008, two days after the lead plaintiff sent the undersigned its letter regarding the instant discovery disputes, additional documents and an amended privilege log were provided to the lead plaintiff.[129]  On June 30, 2008, the lead plaintiff was told by Deloitte that it would be producing over 500 pages of additional responsive documents and that the Sprint defendants would be amending their privilege log for the fourth time to withhold certain Deloitte documents from production to the lead plaintiff. On July 1, 2008, the lead plaintiff received a CD of the documents from Deloitte and an amended Deloitte privilege log from the Sprint defendants. In its reply, the lead plaintiff claims it had not received all the documents identified as missing in its April 14, 2008 letter and a new gap of missing documents was

---

[129] Doc. 241, ex. 26.

created with the July 1, 2008 production. Deloitte produced all the documents identified as missing in the lead plaintiff's reply on July 10, 2008.[130]

All of the Deloitte documents the lead plaintiff claims were missing have now been produced. The lead plaintiff argues the Sprint defendants have waived any privilege asserted regarding the recently produced Deloitte documents because of delay and dilatory tactics. Alternatively, the lead plaintiff seeks a court order for an in camera inspection to determine whether the privileges asserted as to the recently produced Deloitte documents are valid.

1.     Privilege Waiver through Delay

The lead plaintiff argues the Sprint defendants have waived the attorney-client privilege asserted for any documents not identified in the November 27, 2006 privilege log. The lead plaintiff claims a finding of waiver is appropriate because Sprint agreed it would stand by the November 27, 2006 privilege log, mischaracterized the missing documents, and directed Deloitte which documents to produce and which to withhold. The Sprint defendants argue they have worked diligently with Deloitte and the lead plaintiff to resolve the issue. The Sprint defendants note that the lead plaintiff waited a significant amount of time after the initial Deloitte production and its certification that written discovery was complete to inquire about the missing documents.

As explained above, failure to make the required showing to assert a privilege or to produce an adequate privilege log may result in waiver of the privilege. The lead plaintiff

---

[130] Doc. 262, ex. 3.

relies on *Peat, Marwick, Mitchell & Co. v. West*[131] for the proposition that the Sprint defendants' delay in asserting privilege should result in waiver.  In *Peat*, the Tenth Circuit denied a petition for writ of mandamus to order the trial court to reverse its order compelling discovery of a disputed document.[132]   The plaintiff served a request for production of documents on the defendant on May 25, 1983.   The defendant responded that certain unspecified materials sought were privileged.  After writing several letters to the defendant regarding its failure to make specifications, the plaintiff filed a motion to compel, which the district court granted.[133]   Only then did the defendant substantially identify the disputed document and set forth the circumstances which would support its privilege claim.[134]

The Tenth Circuit stated that "[i]t is not enough that a document would have been privileged if an adequate and timely showing had been made.  The applicability of the privilege turns on the adequacy and timeliness of the showing as well as on the nature of the document."[135]   The Tenth Circuit found that the defendant did not make the necessary showing of extraordinary circumstances required for the issuance of a writ of mandamus.[136]

---

[131] 748 F.2d 540 (10th Cir. 1984).

[132] *Id.* at 542.

[133] *Id.* at 541.

[134] *Id.* at 542.

[135] *Id.*

[136] *Id.*

The lead plaintiff argues the Sprint defendants have acted more egregiously than the defendant in *Peat*. Specifically, the lead plaintiff states that the defendant in *Peat* indicated that documents were being withheld under a claim of privilege, but the Sprint defendants attempted to deprive the lead plaintiff of even discovering the allegedly privileged documents at issue even existed. The Sprint defendants argue that the lead plaintiff has not explained how a waiver is needed to litigate this case fairly and efficiently. Although the lead plaintiff claims time and opportunity to question the Sprint defendants during their depositions has been lost, it fails to elaborate or explain how a finding of waiver would remedy any alleged lost time.

Because of the harshness of a sanction of waiver of privilege, courts reserve such a penalty for only those cases where the offending party committed unjustified delay in responding to discovery.[137] As stated above, mitigating factors, such as minor procedural violations and good faith attempts at compliance, bear against finding waiver. Here, it is unclear to what extent the Sprint defendants even had possession or control of the Deloitte documents.

It is clear that defense counsel reviewed documents and prepared the Deloitte privilege logs. The Sprint defendants state that the missing documents were in the possession of Deloitte and they first learned of the lead plaintiff's objection from Deloitte on May 9,

---

[137] *Heavin v. Owens-Corning Fiberglass*, No. 02-2572, 2004 WL 316072, at *2 (D. Kan. Feb. 3, 2004).

2008.  The lead plaintiff then received additional documents and an amended privilege log on June 13, July 1, and July 10, 2008.

The court finds that the lead plaintiff delayed in even inquiring about the missing Deloitte documents.  It received a CD of documents on May 14, 2007.  Further, the lead plaintiff certified on February 13, 2008 that document discovery among the parties and with respect to non-parties was complete.  Therein, the lead plaintiff specifically confirmed that it had the opportunity to review all documents produced to it.  On April 14, 2008, only after Deloitte inquired about preserving the documents, the lead plaintiff inquired about documents missing in certain Bates page ranges.  The lead plaintiff's inquiry was eleven months after the latest production and two months after it certified document discovery was complete.

Despite the Sprint defendants asserting the lead plaintiff unjustifiably delayed inquiring about the documents, the lead plaintiff has failed to provide any explanation for its delay.  The lead plaintiff argues that the Sprint defendants attempted to deprive it of discovering the documents even existed, but its April 14, 2008 letter clearly states that documents are missing in certain Bates page ranges.  Indeed, the lead plaintiff states the previous production was Bates pages DT000001-002225,[138] and the cited missing pages all fall within that range.  The lead plaintiff certified to the court that it reviewed all documents produced to it, and it is simply unclear why it took months before the missing pages were

---

[138] Doc. 252, at 20, n.12.

identified. Further, the parties' certification preserved their right to seek production of documents not produced if facts arose during depositions evidencing the existence of such documents. Unlike with the Audit Committee documents discussed above, the lead plaintiff has not even asserted it discovered the existence of the documents during depositions.

The court notes that this is not a case of "hide the ball" where the producing party has failed to produce documents only to claim later that because of delay, the requesting party waived its right to object or file a motion to compel. Rather, the lead plaintiff has, without explanation, waited unreasonably long in seeking the documents after their existence should have been apparent and then asserted waiver of privilege through delay. The issue before the court is not whether the lead plaintiff is entitled to any of the documents; indeed, the non-privileged documents have already been produced. The issue is whether a blanket privilege waiver is appropriate when the requesting party *and* the producing party and/or a non-party have delayed the production of documents and a privilege log.

Although it is unclear to what extent Sprint had possession of the documents or control of Deloitte's production, the court finds the lead plaintiff's unjustified delay in even inquiring about the documents is a mitigating factor against finding a privilege waiver due to delay. Further, the production of the missing Deloitte documents and amended privilege logs began only one month after Sprint learned of the lead plaintiff's objection. The court finds a blanket waiver of the privileges asserted as to the recently produced Deloitte documents is not warranted.

2.      Sufficiency of Privilege Log

The lead plaintiff argues that if a blanket waiver is not found, the court should conduct an in camera inspection of the documents withheld by Sprint on behalf of Deloitte because of Sprint's delays, the nature of the new privilege log entries, and the late stage of discovery. The lead plaintiff does not allege any specific inadequacies in the privilege log, but merely states that the privilege log "facially appears to be inadequate and fails to support the privileges claimed."[139]

The Sprint defendants state that they are willing to submit any privileged documents recently redacted or withheld from the Deloitte production to the court for an in camera review. The Sprint defendants provided the court the amended privilege log.[140] The recent entries are numbered 60 through 92.

Although the Sprint defendants are willing to submit the documents to the court for an in camera inspection, the court is not convinced such an inspection of the documents is necessary. Unlike with the Audit Committee documents discussed above, the lead plaintiff has not identified *any* alleged deficiencies with the latest privilege log entries. The court finds that any delay on Sprint's part, the mere nature of the new entries, and the late stage of discovery are not sufficient bases for the court to review the documents reflected in entries

---

[139] Doc. 241, at 29, n.12.

[140] Doc. 262, ex. 4.

60 through 92.  Further, the court has reviewed the latest entries on the Sprint defendants'
Deloitte privilege log and finds that they adequately support the privileges claimed.

IV.   Conclusion and Order

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1.      The lead plaintiff's motion to compel discovery against the Sprint defendants
**(doc. 241)** is granted in part and denied in part.  The Sprint defendants shall comply with the
document production aspects of this order by **July 10, 2009**.

2.      The lead plaintiff is entitled to re-open the subject depositions for the narrowly
limited purpose of securing compliance with the court's rulings on the scope of testimony.

3.      Sprint shall submit the documents for in camera inspection pursuant to Section
III(C)(2) of this order by **July 10, 2009**.

4.      Counsel shall confer pursuant to Fed. R. Civ. P. 26(f) and, by **July 17, 2009**,
submit to the undersigned's chambers via e-mail a schedule for the remaining depositions
and a proposed deadline for filing summary judgment motions on liability issues.

Dated this 2nd day of July, 2009, at Kansas City, Kansas.

 s/James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge