# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**State of New Jersey and its**
**Division of Investment,**

        **Plaintiff,**

**v.**                                         **Case No. 03-2071-JWL**

**Sprint Corporation; William T. Esrey;**
**Ronald T. LeMay; Harold S. Hook; Charles**
**E. Rice; Louis W. Smith; Linda Koch Lorimer;**
**Stewart Turley; DuBose Ausley; Warren L.**
**Batts; Irvine O. Hockaday, Jr.; Arthur Krause;**
**and J.P. Meyer,**

        **Defendants.**

## <u>MEMORANDUM & ORDER</u>

Plaintiff filed this proposed securities fraud class action suit on behalf of persons who purchased or acquired Sprint common stock on the open market from March 1, 2001 through January 29, 2003 (the "Class Period"). In its second amended complaint, which is subject to the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4, plaintiff alleges that a single statement made in Sprint's March 2001 proxy materials, and repeated in Sprint's March 2002 proxy materials, was misleading. That statement announced that Sprint had entered into new employment agreements with its top two executives "designed to insure the long-term employment" of those executives. Plaintiff alleges that the statement was misleading because, at the time the statement was made in March 2001, defendants knew that the termination of the executives' employment by Sprint was

"predictable"[1] and, at the time the statement was repeated in March 2002, defendants were considering the termination of the executives' employment.

Based on these allegations, plaintiff asserts violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and the SEC's Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (fraud in connection with the sale of securities); and violations of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and the SEC's Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9 (proxy statement misrepresentations). Plaintiff also asserts against the individual defendants claims under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), which imposes secondary liability upon persons who control persons primarily liable for violations of Section 10(b) and Rule 10b-5.

This matter is presently before the court on defendants William T. Esrey and Ronald T. LeMay's motion for summary judgment (doc. 408) and defendants Sprint Corporation; Harold S. Hook; Charles E. Rice; Louis W. Smith; Linda Koch Lorimer; Stewart Turley; DuBose Ausley; Warren L. Batts; Irvine O. Hockaday, Jr.; Arthur Krause; and J.P. Meyer's motion for summary judgment (doc. 414). As will be explained, the court grants the motions for summary

---

[1]In its second amended complaint, plaintiff uses various phrases to describe the alleged likelihood of the executives' termination as of March 2001, including "inevitable," "clearly predictable," a "substantial probability," a "material possibility" and a "strong likelihood." For clarity and consistency, the court utilizes the term "predictable" in this order. To the extent plaintiff perceives any difference between or among these standards, the court notes that summary judgment would be appropriate in favor of defendants even under the most lenient standard articulated by plaintiff.

2

judgment in favor of defendants.[2]

## I. Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the non-moving party. Defendant Sprint Nextel Corporation ("Sprint") is a Kansas corporation with its principal executive offices located in Kansas.[3] Sprint is a global communications company that provides local, long distance and wireless services. Defendant William T. Esrey was Sprint's Chief Executive Office from 1985 to 2003 and Sprint's Chairman from 1990 to 2003. Defendant Ronald T. LeMay was Sprint's President and Chief Operating Officer from 1996 to 2003.[4] In 2003, Sprint asked Mr. Esrey to resign his employment (he

---

[2]Three additional substantive motions are presently pending before the court. Both sets of defendants have moved to exclude the testimony of plaintiff's experts David V. Capes and J.W. Verret. Because the testimony of those experts has no bearing on the issue on which the court grants summary judgment, the court denies these motions as moot. Plaintiff has moved to strike or disregard the declarations of Mssrs. Esrey and LeMay on the grounds that those affidavits are inconsistent with the prior deposition testimony of the declarants. In granting summary judgment in favor of defendants, the court has not relied to any extent on the specific paragraphs of Mssrs. Esrey's and LeMay's declarations challenged by plaintiff. The court, then, denies this motion as moot.

One procedural motion remains pending before the court–plaintiff's motion to unseal the record underlying the summary judgment and expert motions. The court will resolve this motion by separate order.

[3]Sprint Corporation acquired Nextel Communications, Inc. in 2005 and changed its name to Sprint Nextel Corporation.

[4]An interruption of approximately one hundred days occurred during this time frame when Mr. LeMay left Sprint to serve as Chairman and Chief Executive Officer of Waste Management, Inc.

complied) and terminated the employment of Mr. LeMay.

During the Class Period, defendant Arthur Krause was Sprint's Executive Vice President and Chief Financial Officer and defendant J.P. Meyer was Sprint's Senior Vice President and Controller. The remaining individual defendants–DuBose Ausley;Warren L. Batts; Irvine O. Hockaday, Jr.; Harold S. Hook; Linda Koch Lorimer; Charles E. Rice; Louis W. Smith; and Stewart Turley–served on Sprint's Board of Directors during the Class Period. At various times, several of these Board members served on one or more committees of the Sprint Board. Mr. Batts and Mr. Rice each served as Chairman of Sprint's Audit Committee for a period of time during their respective tenures on the Board. Mr. Hockaday, Mr. Hook and Ms. Lorimer each served on the Audit Committee and the Organization, Compensation and Nomination ("OCN") Committee at various times during their respective tenures on the Board. Mr. Smith served on the Audit Committee and several other committees during his tenure on the Board. Mr. Turley, for a period of time during his tenure on the Board, served as Chairman of the OCN Committee.

Mssrs. Esrey and LeMay received significant portions of their compensation in the form of Sprint common stock options.[5] In 1999, Mssrs. Esrey and LeMay considered exercising a number of the stock options Sprint had granted them. In anticipation of Mr. Esrey's and Mr. LeMay's receipt of a substantial amount of ordinary income by virtue of their exercise of Sprint stock options, Ernst & Young LLP–Sprint's long-time independent auditor as well as Mssrs.

---

[5]During the Class Period, two classes of Sprint's common stock were actively traded on the New York Stock Exchange–FON common stock (intended to track the economic performance of Sprint's FON Group division) and PCS common stock (intended to track the economic performance of Sprint's PCS Group division).

Esrey's and LeMay's long-time personal tax return preparer and financial planning advisor–proposed to Mssrs. Esrey and LeMay an investment strategy referred to as "Contingent Deferred Swap" ("CDS"). The purpose of the CDS Investment Strategy was to dramatically reduce the amount of taxes that Mssrs. Esrey and LeMay would have to pay in connection with exercising stock options by essentially converting the ordinary income realized from the option exercise into capital gains, which are taxed at lower rates than those applicable to ordinary income.

As described by Mr. Esrey, the CDS Investment Strategy involved exercising options and then entering into trading transactions similar to those entered at a brokerage firm or a trading house, which would generate gains and losses with the net result that ordinary income that would be due on the exercise of the stock options was converted into a long-term capital gain the following year. As described by Ernst & Young ("E&Y") in a May 1999 letter to Mr. LeMay, the CDS Investment Strategy consisted of an "investment" in a "limited partnership" referred to as "the Trading Partnership." As a result of the business expenses incurred by the Trading Partnership in the course of its trading activities, there would, according to E&Y, be deductions "reportable on your tax return as an ordinary loss that offsets ordinary income" and that the results of the trading activities could, under certain circumstances, generate "a long-term capital gain," which "flows through to you and is reported for the tax year subsequent to the year the ordinary loss was generated."

According to Mr. Esrey, E&Y told him that the CDS Investment Strategy "had an 80 percent or more probability that it would be accepted by the IRS." In May 1999, E&Y advised

5

Mssrs. Esrey and LeMay that, with respect to the risks associated with the transaction, they would receive a tax opinion letter issued by the law firm of Pillsbury, Madison & Sutro LLP "indicating that the transaction 'should' provide the expected tax benefits (80% likelihood of success)" and that the executives should be able to reasonably rely on that opinion letter to avoid the imposition of penalties.[6]  Although Mssrs. Esrey and LeMay received drafts of Pillsbury's tax opinion (an opinion which Mr. LeMay characterized as "the strongest tax opinion" he had "ever seen"), no final opinion letter was ever issued.

In any event, in 1999, Mssrs. Esrey and LeMay exercised Sprint stock options and made investments in Trading Partnerships pursuant to the CDS Investment Strategy.  Specifically, Mr. Esrey exercised more than $55 million worth of Sprint FON options and more than $19 million worth of Sprint PCS options in 1999.  Mr. LeMay exercised more than $15 million worth of Sprint FON options and $6 million worth of Sprint PCS options in 1999.  On the advice of E&Y, Mssrs. Esrey and LeMay did not sell any Sprint FON or PCS shares obtained from their 1999 stock option exercises to cover federal tax withholding.  Prior to purchasing the CDS transaction, Mr. Esrey communicated to the Board that he had been approached by E&Y and was considering entering into certain transactions recommended by E&Y that were designed to minimize his tax burden.  Mr. Esrey did not communicate to the Board any details concerning

---

[6]A "should"-level tax opinion generally means that there is roughly a 70 to 80 percent probability that the tax benefits of the transaction, if the transaction is challenged, should be realized by the taxpayer.

the nature of the CDS transaction.[7]

In early 2000, the law firm of Locke Liddell & Sapp LLP ("Locke"), at the request of E&Y, issued an opinion to Mssrs. Esrey and LeMay concerning the federal income tax consequences of investments in a Trading Partnership pursuant to the CDS Investment Strategy. Ultimately, Locke opined that the Trading Partnership "should be respected as a partnership for federal income tax purposes" and that there existed "substantial authority" for that opinion. According to Locke, its use of the word "should" was intended to convey a greater level of comfort than "more likely than not." In 2000, Mssrs. Esrey and LeMay exercised Sprint stock options and made investments in Trading Partnerships pursuant to the CDS Investment Strategy. Specifically, Mr. Esrey exercised more than $36 million worth of Sprint FON options and more than $27 million worth of Sprint PCS options in 2000. Mr. LeMay exercised more than $42 million worth of Sprint FON options and $85 million worth of Sprint PCS options in 2000. On the advice of E&Y, Mssrs. Esrey and LeMay did not sell any Sprint FON or PCS shares obtained from their 2000 stock option exercises to cover federal tax withholding. Mssrs. Esrey and LeMay exercised options during 1999 and 2000 with an aggregate taxable gain of $288 million. As a result of Mssrs. Esrey's and LeMay's option exercises, Sprint derived significant tax benefits in the form of deductions from its taxable income. Plaintiff does not suggest that the options were improperly granted or exercised or that Sprint acted improperly in taking the

---

[7]There is no suggestion on the part of the Board that Mssrs. Esrey and LeMay failed to adequately inform the Board about the CDS transactions or failed to disclose pertinent information.

resulting tax deductions.

In this time frame, E&Y approached Mssrs. Esrey and LeMay with another investment strategy, which E&Y described as having the effect of deferring the Federal Income Tax liability on the capital gains generated by the CDS Investment Strategy. This investment strategy was known as the CDS Add-On. Mr. Esrey understood that the CDS Add-On transaction was used to defer the capital gains resulting from employing the CDS transaction strategy on the Sprint stock option exercise for an extended period of time into the future, possibly even until the time of the taxpayer's death. Based on assurances from E&Y as well as a tax opinion issued by Locke opining that the CDS Add-On Investment Strategy "more likely than not" would be sustained, Mr. Esrey understood that there was a "high probability" that the IRS would conclude that the tax benefits achieved through the CDS Add-On Investment Strategy were allowable. In mid-2000, Mssrs. Esrey and LeMay implemented the CDS Add-On for both of their CDS partnerships.

On or about August 11, 2000, the IRS issued Notice 2000-44, which outlined the IRS's position that tax shelters substantially similar to the CDS Add-On strategy were invalid and subject to challenge. On that same day, the *Wall Street Journal* published an article concerning the IRS taking "emergency action" against a "highly aggressive" tax shelter known as "Son of BOSS."[8] As described in the article, this tax shelter scheme "involves a series of highly contrived financial transactions aimed at generating a big capital loss for high net worth

---

[8]According to the article, BOSS is an acronym for "bond and option sales strategy."

individuals." After reading the *Wall Street Journal* article and related press reports about the IRS's position with respect to Son of Boss tax shelters, Mssrs. Esrey and LeMay became concerned about the viability of their Trading Partnerships, particularly because Sprint's stock prices had suffered a steep decline over the course of the year such that it would have been incredibly difficult for the executives to satisfy any tax liability arising from a successful challenge to the Trading Partnerships.[9] In this time frame, Mr. Esrey's potential tax liability from the tax shelters was estimated at $75 million and Mr. LeMay's potential tax liability from the tax shelters was estimated at $87 million.

In any event, after reading about the Son of BOSS transactions, Mssrs. Esrey and LeMay contacted E&Y, who assured them that their Trading Partnerships were not Son of BOSS transactions and that their transactions were "fine." Despite these assurances, Mssrs. Esrey and LeMay, in August or September 2000, personally retained the law firm of King & Spaulding to render an opinion on the viability of the CDS and CDS Add-On transactions. Although King & Spaulding did not issue a formal or written opinion, the firm expressed its opinion to Mssrs. Esrey and LeMay (and, later, to Sprint) that if the IRS, upon an audit of Mssrs. Esrey's and LeMay's tax returns, challenged the tax deductions from the Trading Partnerships, those deductions more likely than not would not be sustained by the Tax Court.

In the face of Mssrs. Esrey's and LeMay's increasing concern and the likelihood that they

---

[9]The decline in Sprint's stock prices resulted not only in a decline in the executives' total compensation (because stock options formed a significant part of the executives' compensation packages) but also a decline in the executives' net worth, as much of their wealth consisted of Sprint equity holdings.

would be unable to satisfy their tax liability should the CDS and CDS Add-On transactions not be sustained, E&Y began evaluating a number of different ways to manage the risk of Mssrs. Esrey's and LeMay's exposure to that tax liability. E&Y explored the possibility of obtaining tax insurance for the risks associated with Mssrs. Esrey's and LeMay's participation in the Trading Partnerships but was unable to find a willing insurer. E&Y also began exploring the possibility of rescinding the option exercises. A rescission of an option exercise involves the return of the options and exercise price paid to the employee and a return of the shares to the company. According to the record, if an exercise is rescinded during the same tax year in which it took place, the exercise can be ignored for tax purposes and the employee avoids the tax liability generated from exercising the option.

Once E&Y began exploring rescission,[10] Sprint's Board of Directors was advised about Mssrs. Esrey's and LeMay's tax situation. While the record is not clear with respect to when the Board was advised about the situation, minutes from an OCN Committee meeting reflect a discussion of that issue on December 12, 2000. At that meeting, "Mr. Esrey described the participation of Mr. LeMay, several other senior executives and himself in certain trading partnerships and the current concerns arising out of the situation." More specifically, according

---

[10]The parties include in their submissions numerous factual allegations concerning E&Y's relationship with both sets of defendants. The court does not delve into those facts because the court has previously dismissed E&Y as a defendant and any claims against the remaining defendant arising out of an alleged failure to disclose E&Y's role in the tax shelter scheme and the alleged conflict between and among E&Y and both sets of defendants. Finally, there is no suggestion in plaintiffs' submissions that the termination of Mssrs. Esrey's and LeMay's employment by Sprint was predictable in light of the alleged conflict with E&Y.

to Ms. Lorimer who was present at the meeting, Mr. Esrey explained that he had participated in some trading partnerships that were now the subject of inquiry by the IRS and on which the IRS had issued a Bulletin. Ms. Lorimer testified that Mr. Esrey further advised that if the IRS proceeded against him and Mr. LeMay and the ultimate ruling was adverse, then it could have a "substantial financial impact" on Mr. Esrey and a greater financial impact on Mr. LeMay.

At this time, although the Board had knowledge of King & Spaulding's opinion that the Trading Partnerships would not be sustained, the Board did not conclude that the tax shelters necessarily would be disallowed. The Board also had knowledge of a "carefully thought-out opinion" from Locke that the tax shelters were legitimate and, in any event, did not believe at that juncture that an adverse ruling would ultimately bankrupt Mssrs. Esrey and LeMay. According to Mr. Hockaday, he personally believed that it was "highly unlikely" that Mssrs. Esrey's and LeMay's participation in the Trading Partnerships would bankrupt them and he testified to his belief that even if the tax shelters were disallowed, the executives' financial status would depend on additional factors, including the price of Sprint's stock in the future. Similarly, Ms. Lorimer testified that there was "not a sense" among Board members that Mssrs. Esrey or LeMay faced personal bankruptcy as a result of the Trading Partnerships. Moreover, Ms. Lorimer believed that "there would be a long number of years ahead" before the full implications of Mssrs. Esrey's and LeMay's participation in the Trading Partnerships would be known.

In any event, the minutes of the December 12, 2000 meeting reflect that the OCN Committee then "commenced a discussion of the implications of the situation to the Corporation and its stockholders" and discussed various alternatives "to address the Corporation's concerns

11

for retention, focus and motivation." In addition, the Committee discussed the "need for appropriate expert advice" in exploring alternatives for addressing "the situation." Ultimately, the Committee decided to "focus on the potential for a rescission of options granted in 2000 given the time requirements for its implementation" and asked management to move forward "and to involve appropriate outside experts as necessary to understand the alternatives . . . and to give priority focus to time bound alternatives such as rescission." According to Ms. Lorimer, the Board wanted to consider the rescission proposal because the proposal would mitigate "what the worse case scenario might be" with respect to Mssrs. Esrey's and LeMay's "still speculative financial liability" and the Board was "interested in doing all [they] could to make sure that [Mssrs. Esrey and LeMay] stayed." Ms. Lorimer testified that the rescission proposal "would help [the Board] . . . glue the executives even more tightly to the corporation."

Over the next several days, then, the Board focused on the rescission proposal. On December 17, 2000, the Audit Committee decided that Sprint should approach the Securities and Exchange Commission (SEC) to discuss the rescission proposal and, over the next several days, Sprint sent several letters to the SEC requesting the SEC's views on Sprint's proposed accounting treatment of the rescission proposal. In the meantime, on December 22, 2000, the Board held a special meeting to discuss the rescission proposal. At that meeting, Mr. Esrey explained that he had decided not to participate in the rescission proposal if it was offered to him in light of certain "risks" with the proposal. Although the record is not entirely clear on this issue, it appears that Mr. Esrey was concerned both that a rescission (and the concomitant public disclosure) might cause the press and the investing public to question Mr. Esrey's judgment and

that the market would react negatively to Sprint's admittedly unusual decision to rescind the options. Mr. LeMay, however, remained interested in pursuing the rescission proposal and the Board continued to consider that approach, particularly as the Board was concerned that the personal financial circumstances of Mssrs. Esrey and LeMay could become a distraction to Mssrs. Esrey and LeMay which, in turn, could dilute the executives' focus on the business. The rescission proposal, then, would rectify the executives' tax situation entirely, permitting the executives to remain focused entirely on the business. Moreover, there was some concern by the Board in December 2000 that the executives' personal financial circumstances could cause the executives to consider leaving Sprint for another company in the hopes of increasing their compensation to alleviate their financial concerns. Indeed, during this time frame, retained experts advised Sprint that "the market [for senior executives] is very hot"; that other companies would be willing to pay "as much as $50 or $75 million or more" to attract a senior person; and that the market would react negatively to the loss of a key executive.

On December 28, 2000, the SEC advised Sprint that the SEC, if a company were to engage in a transaction such as the rescission proposal, would object to the application of an accounting method other than one that treated the value of the tax benefit to the company of the rescinded option exercise lost through the rescission as additional compensation to the employee and that applied variable accounting to options issued under Sprint's stock option plan going forward. According to the SEC, then, the rescission would require Sprint to restate its earnings. In light of the SEC's accounting decision, the Board, on December 29, 2010, concluded that it was "not practical" to pursue the rescission proposal.

After deciding against rescission, the OCN Committee began the process of exploring alternative means "to address executive retention, focus and motivation" through a potential change in the executives' compensation packages. Because of the significant decline in the price of Sprint's stock, the Board was concerned–even in the absence of the tax shelter issue–about the ability of the current compensation packages to retain Mssrs. Esrey and LeMay. Thus, while the Board did not have any specific concern regarding the retention of Mssrs. Esrey and LeMay at this juncture, the Board wanted to ensure that the executives had a competitive compensation package sufficient to retain the executives in order to maintain their leadership for the corporation. As Ms. Lorimer testified, the Board thought that both Mr. Esrey and Mr. LeMay were "exceptionally fine executives who we wanted to retain and expected" to retain. According to Ms. Lorimer, a compensation package that lacks retentive power poses a threat of departure for any senior executive. Mr. Hockaday testified that the Board was on "high alert pretty much all time" to be sure that they did not lose the executives to a competitor. Mr. Ausley agreed, testifying to his belief that there was a "real risk" that Mr. Esrey would leave at the end of 2000 because "men and women who are capable of running Fortune 200 companies successfully are highly mobile."

Beyond the Board's general desire to reexamine Mssrs. Esrey's and LeMay's compensation packages in late 2000 and early 2001, the Board also wanted to reexamine the compensation packages in light of the personal financial circumstances of the executives and, more specifically, the tax shelter situation. In essence, the Board wanted to come up with a compensation package for each executive that would foreclose the need for Mr. Esrey or Mr.

LeMay to seek a "more lucrative" opportunity elsewhere and that would reduce the distraction (or the potential for distraction) caused by the tax shelter situation. As summarized by Mr. Hockaday, the Board "wanted to understand the tax-shelter situation so that we could evaluate it, and it is my recollection that [the Board] wanted to, if we could, give comfort to the executives that . . . if they had any risks as a result of those shelters, the risks could be addressed at least to some extent" and "that would result in their keeping their eye on the ball and continuing to do what they had been doing."

Toward that end, the OCN Committee, in early January 2001, retained Michael Kesner at Arthur Andersen LLP ("Andersen") to advise and assist the committee in evaluating alternative compensation arrangements for Mssrs. Esrey and LeMay. Andersen's stated objectives were to design compensation agreements that would provide competitive compensation; minimize executive distraction; retain the executives; and provide significant incentive for continued motivation and focused service, through retirement in the case of Mr. Esrey. According to Mr. Kesner, the Board's objective with respect to any new compensation agreement was to "provide a solution to help [Mssrs. Esrey and LeMay] work themselves out of their issue" and not to "solve the tax problem" itself. Andersen was also asked to opine on the sustainability of the Trading Partnerships. Ms. Lorimer testified that during this time frame she believed that there was a "potential" for Mssrs. Esrey and LeMay to be financially insolvent if the Trading Partnerships were not sustained. Mr. Hockaday, in contrast, testified that during this time frame he believed that "there was not a compelling case to be made" that Mssrs. Esrey and LeMay would be financially insolvent if the Trading Partnerships were not sustained. As

to the sustainability of the Trading Partnerships, Mr. Hockaday further testified that he believed that there was not "a compelling case to be made" at that time that the Trading Partnerships would not "hold up."

As soon as Mr. Kesner was retained, Mr. Hockaday advised Mr. Kesner that the Board was considering a number of compensation ideas to address the tax shelter problem: (1) a special stock option award "sufficiently large enough to generate income to offset the potential tax liability"; (2) a standby loan provided by Sprint equal to the tax liability and interest on the tax deficiency; (3) tax risk insurance to be provided by Hartford to cover a portion of the exposure; and (4) risk sharing with E&Y, pursuant to which E&Y would pay some of the executives' tax liability.[11]  With respect to the special stock option award, Mr. Kesner noted that the "obvious problem" with that particular alternative is that the stock has to "bounce back" and that another issue of concern to the Board with respect to this alternative was "proxy disclosure."  Similarly, the problem with the standby loan alternative "is if the stock does not rebound, the executives may not be able to repay the loan to Sprint," which could necessitate a "standby forgiveness" arrangement which, in turn, "will likely create an adverse shareholder reaction when the arrangement is disclosed."  In any event, according to Mr. Kesner, Mr. Hockaday told Mr. Kesner that Sprint did not want to change the compensation of either Mr. Esrey or Mr. LeMay unless Andersen confirmed that there was a "real risk" that the potential tax liability could be

---

[11]Mr. Esrey had provided these ideas to the Board in late December 2000.

owed.[12]

Within days of his retention, Mr. Kesner met with Mr. Esrey to discuss the tax shelter situation. According to Mr. Kesner, Mr. Esrey advised him that "Ron LeMay is so completely consumed with the potential tax and personal bankruptcy risk that he would leave Sprint to work for another company if a substantial employment offer was made." At this time, Mr. Kesner believed that Mssrs. Esrey and LeMay would be rendered financially insolvent if the Trading Partnerships were not sustained and the stock price of FON and PCS did not rebound. During the second half of January 2001, Andersen and Sprint developed and discussed numerous alternative compensation arrangements consistent with Sprint's stated goals of executive retention, motivation and focus. Various alternatives (some of which were considered in more detail than others) included company-provided loans, with or without forgiveness provisions; stock option grants paired with guaranteed bonuses; special "megagrants" of stock options; reverse-vesting stock options; reverse split-dollar life insurance; and employment contracts that would expand the scope and duration of the executives' noncompete agreements.

On February 9, 2001, Mr. Kesner made a preliminary presentation to the OCN Committee on the proposed alternative compensation arrangements and, in the context of that presentation, the Committee reiterated its desire to focus on competitive compensation designed to "retain, motivate and maintain the focus" of Mssrs. Esrey and LeMay. During this meeting, Andersen

[12]As noted earlier, however, other Board members testified that the Board wanted to reexamine the compensation packages even in the absence of the tax shelter situation because of the significant decline in Sprint's stock price.

also projected the potential tax liability of Mssrs. Esrey and LeMay in the event the Trading Partnerships were not sustained and it estimated the combined tax liability of Mssrs. Esrey and LeMay as $170 million. By this time, Andersen had concluded that there was a "significant potential risk with sustainability" with respect to the Trading Partnerships and members of the Board began to understand that Mssrs. Esrey and LeMay could be rendered insolvent if Sprint's stock did not rebound and if the Trading Partnerships were successfully challenged. On February 19, 2001, Anderson proposed a four-point approach to retain the executives including providing stock-based incentive opportunities such as "mega" or front-loaded stock option awards and "enhanced, long-term employment contracts" with strengthened noncompete clauses. Andersen's presentation stated that Mssrs. Esrey and LeMay were "vulnerable to recruitment risk" in light of the decline in Sprint's stock prices and the impact of that decline on the executives' net worth combined with the "trading partnership results." At that February 19, 2001 meeting, the Board discussed "the favorable performance" of the executives and reflected on the costs of replacing them, including identifying qualified executives, recruiting the best candidate with a competitive compensation package, and intangible costs to Sprint. The Board concluded that it was "in the best interests of Sprint's shareholders" to retain Mssrs. Esrey and LeMay.

Ultimately, the Board authorized the OCN Committee to finalize employment contracts with Mssrs. Esrey and LeMay consistent with Andersen's proposal, including a "mega" stock option grant which would accelerate Mssrs. Esrey's and LeMay's stock option awards for 2002 and 2003 into 2001; the good faith consideration of a request from Mssrs. Esrey and LeMay for

a loan for the purposes of acquiring Sprint stock, exercising stock options or paying taxes;[13] and a provision stating an intent to "secure services of key executives to retirement." On February 26, 2001, the OCN Committee authorized and approved both contracts, which became effective that day.

According to Mr. Kesner, the 2001 Employment Agreements were designed to ensure the long-term employment of Mssrs. Esrey and LeMay. Mr. Esrey's agreement expired on May 1, 2005, near his 65th birthday. Mr. LeMay's agreement expired on his 65th birthday, or in 2010, but if he did not succeed Mr. Esrey as CEO he could leave with his options vesting in 2005. Pursuant to the agreements, both executives received front-loaded stock options as of the effective date, February 26, 2001.[14] Mr. Esrey's contract provided for "cliff vesting" stock options, which only became exercisable in 2005. Mr. LeMay's contract provided for "back-loaded" vesting of the stock options, with fixed percentages of the options vesting in 2005, 2006 and 2007. Mr. Esrey's vesting schedule, then, was designed to retain him through retirement, while Mr. LeMay's vesting schedule was designed to retain him beyond Mr. Esrey's retirement. It is beyond dispute, of course, that the value of the mega grants depended entirely on the future performance of Sprint's stock.

The 2001 Employment Agreements were attached in full to Sprint's Form 10-K, which

---

[13]Although the Board agreed to consider in good faith a future request from the executives for a loan, the Board generally was not comfortable supporting a standby loan arrangement.

[14]The OCN Committee did not then anticipate making additional regular grants of stock options to Ms. Esrey or Mr. LeMay in either 2002 or 2003.

was filed with the SEC on March 13, 2001. On March 1, 2001, in a preliminary proxy statement filed with the SEC, Sprint stated in the "Employment Contracts" section of the proxy that "it [had] entered into new employment contracts with Mr. Esrey and Mr. LeMay, each dated February 26, 2001, designed to insure their long-term employment with Sprint, to provide competitive compensation, and to link their compensation to shareholder value." Sprint made the same statement in its proxy statement filed with the SEC on March 15, 2001. Neither the preliminary proxy statement nor the final proxy contained any information whatsoever concerning the tax shelters or Mssrs. Esrey's and LeMay's potential tax liability or retention risk as a result of those tax shelters.

Plaintiffs do not dispute that, as of that time, the Board both expected and desired that Mssrs. Esrey and LeMay would be employed by Sprint through the duration of their employment agreements. According to Mr. Kesner, at the time the contracts were executed, "[there was] not a chance that [Mssrs. Esrey and LeMay] were being considered for termination. [The Board] had crossed the bridge. They wanted to stick with these guys. They wanted to lock them in." Mr. Hockaday testified that in February 2001

> from the Board's perspective and my perspective it was very important to keep these guys. They were proven, capable executives who had been proven over a period of time. They were at least conceivably and maybe actually at risk in the sense that those kind of executives, as I have suggested before, were inevitably going to be in demand we believed. We didn't want to lose them, and we wanted to do whatever we could do in terms of their compensation to keep them.

Similarly, Ms. Lorimer testified that her intention in approving the contracts was to ensure that Sprint had a good compensation plan that, "in light of all [she] knew, was likely to retain" the

executives. Mr. Esrey testified that at the time he executed his new employment agreement, he intended and expected that he would remain as CEO of Sprint until his normal retirement age. Mr. Lemay testified that at the time he executed his new employment agreement, he intended and expected that he would remain at Sprint for the long-term and that he would succeed Mr. Esrey as CEO of Sprint.

The remainder of 2001 passed fairly quietly with respect to the issues of the executives' tax shelter situation and compensation except that Sprint's stock price continued to decline. Sometime in the second half of 2001, the Board learned that the IRS was examining Mssrs. Esrey's and LeMay's Trading Partnerships. During this same time frame, Mr. Esrey contacted Philip Anschutz, the largest shareholder of Qwest, to express Sprint's interest in a business combination with Qwest, another global communications company. In its year-end 2001 performance appraisal of Mr. Esrey and Mr. LeMay, the Board "overwhelmingly indicates a high level of confidence in Bill Esrey and Ron LeMay to lead this company in the future and is grateful for the strong leadership they have provided during these most trying times." According to Ms. Lorimer, "there was a real sense . . . that [Mr. Esrey] was an outstanding leader and we were lucky to have him."

In early February 2002, in the ordinary course of its review of executive compensation, the OCN Committee approved, and recommended that the Board approve, Mr. Esrey's base salary, which was to remain at the same level as the previous year, and an increase in his 2002 Management Incentive Plan opportunity. On or about February 6, 2002, Mr. Esrey told Mr. Turley that he could not work for his present package and had to "explore alternatives."

Similarly, Mr. Esrey told Mr. Hockaday that he "could not work under these conditions." The following day, the Board again retained Mr. Kesner and Andersen to help the Board consider Mssrs. Esrey's and LeMay's requests for additional compensation and because the Board was still concerned about retaining Mssrs. Esrey and LeMay. During February 2002, Mr. Kesner made a number of presentations to the Board which provided the Board with an understanding of the financial implications to Mssrs. Esrey and LeMay depending upon various IRS actions concerning the Trading Partnerships. According to Ms. Lorimer, Mr. Kesner advised the Board during this time frame that he believed liability on the Trading Partnerships could be imposed as early as the end of 2002. Although no specific time frame for an adverse action by the IRS was known, Mssrs. Esrey and LeMay, at least according to Ms. Lorimer, were trying to find ways in February 2002 to increase their compensation to address the tax risk, particularly as it was beyond dispute that the mega grants awarded in the 2001 Employment Agreements turned out to have little or no value in light of the continued decline in Sprint's stock price.

Because Mssrs. Esrey's and LeMay's desire for increased compensation was apparently becoming more urgent, the Board was beginning to perceive Mssrs. Esrey and LeMay as a "flight risk." Indeed, Mr. Kesner concluded that the decline in Sprint's stock prices after early 2001 reduced the retention value of the stock option grants awarded in the 2001 Employment Agreements. Moreover, it is uncontroverted that Mr. Esrey told Mr. Hockaday in February 2002 that he needed to consider his "long-term wealth" and "his family" and that he hoped that Sprint could "find a way" such that Mr. Esrey would not have to respond to the "overtures" that he was receiving from other companies. Mr. Esrey was apparently more direct in a conversation with

22

Mr. Turley, telling him to "give me a significant increase in compensation" or I'll [be forced to] quit and go somewhere else." Mr. Turley told the other members of Sprint's Board about Mr. Esrey's comments. According to Mr. Batts, if Mr. Esrey had made that threat directly to him, he would have told Mr. Esrey "sayonara." According to notes made by Mr. Kesner, Mr. Rice told him this about Mr. Esrey's demands: "Produce, then we will reward. This is backwards. You have not produced, so you will be fired."

Nonetheless, in early February 2002, the Board recognized that the 2001 Employment Agreements had not achieved their "primary goal" and the Board remained open to designing a compensation package that would retain Mssrs. Esrey and LeMay because the value of the prior employment agreements had deteriorated. On February 14, 2002, the OCN Committee, along with Mr. Kesner, met to discuss various proposals by Mssrs. Esrey and LeMay for additional compensation. The Committee also discussed their belief that Mssrs. Esrey and LeMay were retention risks; whether and to what extent Sprint was willing to pay Mssrs. Esrey and LeMay to keep them at Sprint; and whether and to what extent it was important to try to retain them.

On February 18, 2002, the Board held a special meeting to consider the compensation issues of Mssrs. Esrey and LeMay and various alternatives proposed by Mr. Kesner. According to Mr. Kesner's notes, Ms. Lorimer indicated at the meeting that "retention is key" but that "this decision is more difficult than last year." His notes further indicate that Mr. Turley stated at the meeting that if Mr. Esrey left Sprint, then the Board would be inclined to give considerable additional compensation to Mr. LeMay. Within a few days of this Board meeting, Mr. LeMay

told Mr. Kesner that he could no longer refuse alternative CEO opportunities and he would have to do it "for his family." By this time, then, the Board, according to Mr. Kesner, clearly believed that Mssrs. Esrey and LeMay "might leave, if they couldn't . . . earn their way out of the hole they created for themselves."

On February 24, 2002, Mr. Esrey proposed to the Board that he leave Sprint to become the CEO of Qwest in the midst of merger negotiations between Qwest and Sprint. In this same time frame, Mr. Esrey told Mr. Hockaday that Mr. Anschutz of Qwest had a "more favorably aggressive position on compensation issues than the Sprint Board had." Mr. Esrey further proposed that Mr. LeMay be promoted to CEO of Sprint and that, at some point in the future, the companies would be merged. The Board was highly disturbed by Mr. Esrey's proposal to the Board that he move to Qwest while the merger discussions were concluding and believed that Mr. Esrey had exhibited bad judgment in making the proposal. The Board questioned whether Mr. Esrey's motivation for pursuing the Qwest alternative may have been improving his personal financial situation. At that Board meeting, according to Mr. LeMay, the Board told Mr. LeMay that he should prepare himself "in short order" to become the CEO of Sprint because it was "unclear" how long Mr. Esrey was going to be CEO of the company and "unclear how long Bill plans to be around." According to Mr. LeMay, the Board's reference to the possible departure of Mr. Esrey was due to Mr. Esrey's Qwest proposal and not to any Board dissatisfaction with Mr. Esrey. Still, as of February 24, 2002, the Board viewed Mr. Esrey as a CEO "with somewhat tempered enthusiasm."

The following day, on February 25, 2002, Mr. LeMay talked with Mr. Esrey and "it was

clear immediately Bill planned to stay, had no intention to leave."[15] Mr. Esrey testified that his Qwest proposal was "sort of a crazy idea, and I mentioned it, and the Board said, yes, that's a crazy idea, and that was the end of that idea." According to Mr. Esrey, he continued to expect to serve as Sprint's CEO until he turned 65. Around this time, the OCN suspended its review of new compensation packages for Mssrs. Esrey and LeMay pending the outcome of merger discussions with Qwest. Mssrs. Esrey and LeMay, then, were not given additional compensation by Sprint in February 2002.

In a Form 10-K filed with the SEC on March 4, 2002, and in an amended Form 10-K/A filed with the SEC on March 5, 2002, Sprint stated:

> In 2001, Sprint entered into new employment contracts with Mr. Esrey and Mr. LeMay designed to insure their long-term employment with Sprint, to provide competitive compensation, and to link their compensation to shareholder value.

This statement was repeated in the 2002 Final Proxy that Sprint filed with the SEC on March 15, 2002. On March 5, 2002, Mr. Esrey advised Mr. Turley that he was not "pleased" after the February 24, 2002 Board meeting and that he did not feel his compensation issues had been resolved. According to Mr. Esrey, however, at the time of the March 2002 proxy, he fully intended and expected that he would remain at Sprint until his normal retirement age.

In late March and April 2002, Mssrs. Esrey and LeMay each filed for amnesty for penalties relating to the Trading Partnerships and, pursuant to the IRS Amnesty Agreement, they were required to disclose their activities in the Trading Partnerships investment strategy. In May

---

[15]Indeed, Mr. LeMay testified that he did not hear anything from the Board regarding succession until June 2002.

2002, the IRS sought production of a broad category of documents and information concerning Mr. Esrey's Trading Partnerships. Because Mr. Esrey had waived any claims of privilege relating to such documents as part of the amnesty agreement, E&Y provided the information to the IRS. During this same time, E&Y advised Mr. Esrey that it expected that it would stop marketing the CDS transaction. As the summer of 2002 continued, the IRS began investigating the tax shelters more aggressively and initiated an audit of Mr. Esrey's personal tax returns.

In late May and early June 2002, the OCN Committee resumed its review of executive compensation and, more specifically, Mssrs. Esrey's and LeMay's requests for additional compensation in light of the decline in Sprint's stock price. In this time frame, Mr. Esrey became more aggressive in his requests for additional compensation and continued to suggest that he might leave Sprint if the Board did not fulfill his requests for additional compensation. According to Mr. Hockaday, the Board was becoming "increasingly frustrated with this drum beat of, if not demands, certainly heavy encouragement that we do more in terms of compensation [for Mr. Esrey.] The Board was getting tired of that."[16] After continued consulting with the OCN Committee and Mr. Kesner, the Board concluded in July 2002 that additional compensation would not be possible or practical. The Board also decided that "if Mr. Esrey was going to be looking elsewhere for employment, [the Board] couldn't just wait until he resigned" and had to start thinking about succession plans. Thus, the Board began putting together a

---

[16]According to Mr. Batts, during his tenure at Sprint, there were no other occasions for so many Board meetings regarding executive compensation as there were during 2001 and 2002.

promotion and retention package for Mr. LeMay and began thinking about the terms of a potential resignation/termination package for Mr. Esrey. According to Mr. Turley, Ron LeMay was unanimously the choice of the Board to become CEO in July 2002.

On July 25, 2002, Mssrs. Turley and Hockaday, on behalf of the Board, told Mr. Esrey that the Board could not meet his compensation needs and that he should consider retiring early. Mr. Esrey testified that he was "totally surprised" that the Board wanted him to take early retirement and he believed that the Board's decision to ask him to retire early was influenced by his participation in the CDS and CDS Add-On transactions. According to Mr. Smith, the Board asked Mr. Esrey to retire from Sprint because the Board had been "dealing with distractions regarding compensation and felt it was time for a change." Mr. Smith also believed that Mr. Esrey was distracted by his tax situation. Later that day, Mr. Esrey told Mssrs. Turley and Hockaday that he realized he had pushed hard on compensation but he wanted to stay at Sprint without increased compensation. According to Mr. Esrey, he told Mssrs. Hockaday and Turley and "it was a difficult time at Sprint" and he wanted to have "an opportunity to see it through." Although the Board was encouraged by Mr. Esrey's attitude, the Board continued to contemplate early retirement for Mr. Esrey.

By the fall of 2002, the Board began to second-guess its choice of Mr. LeMay to succeed Mr. Esrey as CEO in light of Mr. LeMay's "tax situation and a number of challenging issues that relate to that situation." According to Mr. Smith, he believed that Mr. LeMay was spending a lot of time on "other issues as opposed to the issues [Mr. Smith] thought were more important to [Sprint's] shareholders." On November 1, 2002, E&Y made a presentation to the Board

concerning the IRS's investigation of the tax shelter situation, possible timelines of that investigation (including litigation), and variables affecting Mr. LeMay's net worth. After that presentation, the Board decided that it was necessary as a matter of process and substance to compare Mr. LeMay to other candidates "that might be available to consider." In other words, in light of the "lingering uncertainty" concerning the impact of Mr. LeMay's tax situation, the Board decided to "get a sense of who else was out there" in terms of candidates for the CEO position.

In December 2002, Mssrs. Esrey and LeMay made a presentation to the Board urging the Board that Mr. LeMay's participation in the tax shelters should not preclude Mr. LeMay's succession to CEO and that the Board should "in all events" avoid the loss of Mr. Esrey and Mr. LeMay simultaneously. In early January 2003, the Board met with Gary Forsee as a potential candidate to succeed Mr. Esrey as CEO. Mr. Forsee was the vice chairman of BellSouth Corporation and the president of BellSouth International. The Board did not meet with any other potential candidates and Mr. Forsee was eventually selected to succeed Mr. Esrey. According to Mr. LeMay, he was told by the Board that he would not succeed Mr. Esrey as CEO in light of company "embarassment" if the CEO had a major tax issue and the "potential for distraction" related to worry, time consumption and litigation. In late January 2003, the *Wall Street Journal* reported that Mr. Esrey would step down as Sprint's Chairman and CEO and that Mr. LeMay would leave the company as well. On February 11, 2003, Sprint issued a press release discussing the "transition" to a new CEO and indicating that Mssrs. Esrey and LeMay would remain in their positions until a successor was in place. Sprint never issued a press release

explaining the departures of Mssrs. Esrey and LeMay. On March 18, 2003, Sprint issued a press release naming Mr. Forsee as the new CEO. Mr. LeMay "resigned" his employment effective April 9, 2003.[17] Mr. Esrey "resigned" as an officer of the company and a member of the Board on May 12, 2003 and resigned his employment effective May 31, 2003.[18] He continues to occupy the position of Chairman Emeritus of the company. To this day, there have been no determinations made by the IRS or any court concerning whether Mr. Esrey or Mr. LeMay have any tax liability for the Trading Partnerships. In October 2003, Sprint replaced E&Y as the Company's auditor.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson*, 477

---

[17]Although Mr. LeMay was permitted to resign, it is not disputed that the employment relationship was terminated by Sprint.

[18]It is undisputed that Sprint asked Mr. Esrey to resign.

U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant. *Id.* (citing Fed. R. Civ. P. 56(e)). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III.    Discussion

This securities fraud case is about a single statement made by Sprint in SEC filings in March 2001 and repeated by Sprint in SEC filings in March 2002: that Sprint had "entered into

new employment contracts with Mssrs. Esrey and LeMay, each dated February 26, 2001, designed to insure their long-term employment with Sprint, to provide competitive compensation, and to link their compensation to shareholder value." In its second amended complaint, plaintiff alleges that the statement concerning Mssrs. Esrey's and LeMay's "long-term employment with Sprint" was misleading because, at the time the statement was made in March 2001, defendants knew that the termination by Sprint of Mssrs. Esrey's and LeMay's employment was predictable in light of the tax shelter situation and, at the time the statement was repeated in March 2002, the Board was contemplating the termination of Mssrs. Esrey's and LeMay's employment with Sprint in light of the tax shelter situation. Based on this allegedly misleading statement, plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and the SEC's Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9; and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiff's Section 20(a) claims are asserted against the individual defendants and the remaining claims are asserted against all defendants. Defendants move for summary judgment on all claims.

A.     *Plaintiff's Section 10(b) and Rule 10b-5 Claims*

Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. Section 10(b) of the 1934 Act makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in

connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j. Rule 10b-5 in turn provides: "It shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. The elements of a Rule 10b-5 claim are: (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).

In their motions for summary judgment, the Sprint defendants and Mssrs. Esrey and LeMay contend that summary judgment is appropriate on plaintiff's Section 10(b) and Rule 10b-5 claims on the grounds that plaintiff has failed to come forward with evidence sufficient to show a false or misleading statement and has failed to come forward with evidence sufficient to show that defendants acted with scienter.[19] In its consolidated response to the motions, plaintiff contends that the factual record precludes summary judgment because a rational trier of fact

---

[19]The magistrate judge bifurcated this case into a liability phase and a damages phase such that no discovery has occurred on the loss causation and damages element of plaintiff's claim.

could conclude that defendants' statements concerning the "long-term employment" of Mssrs. Esrey and LeMay were false and/or misleading when made and that defendants acted with scienter. As will be explained, viewing this particular dispute in the greater context of the procedural history of the case, the court concludes that plaintiff has failed to come forward with evidence sufficient to raise a genuine dispute as to whether defendants' statements were false or misleading. The court, then, grants summary judgment in favor of defendants on plaintiff's Rule 10b-5 claims and declines to address the parties' arguments concerning scienter.

1.     The Proper Scope of Plaintiff's Claims

Both sets of defendants contend that summary judgment in their favor is appropriate because plaintiff has come forward with no evidence that the Board, at the time it made the "long-term employment" statement in March 2001, knew that the termination of Mssrs. Esrey's and LeMay's employment by Sprint was predictable or, at the time it repeated the statement in March 2002, was contemplating the termination of Mssrs. Esrey's and LeMay's employment.[20]

---

[20]Defendants also contend that summary judgment is appropriate because, even assuming that the Board, at the time the statements were made, was planning to fire Mssrs. Esrey and LeMay or knew that such firings were predictable, defendants had no duty to disclose that information because the challenged statement concerning the "long-term employment" of the executives did not make any predictions about the future employment of the executives; rather, the statements simply summarized the purpose of the employment agreements such that it was not misleading in any respect. In resolving defendants' motion to dismiss, the court held that defendants' statement concerning the "long-term employment" of the executives reasonably could be construed to convey that Sprint was not at that time considering the termination of the executives' employment. The court declines to revisit that decision, particularly as the court has determined that summary judgment is warranted in any event on other grounds.

33

In response, plaintiff contends that defendants have improperly narrowed plaintiff's theory of the case by focusing on the "termination" of Mssrs. Esrey's and LeMay's employment rather than on whether the continued employment of Mssrs. Esrey and LeMay was "uncertain" or "in jeopardy" because the executives were retention risks in light of their personal financial circumstances arising from the tax shelters.

To properly frame and analyze the parties' respective arguments in the particular context of this case, the court must review (somewhat exhaustively because it is critical to the outcome of defendants' motions) the significant procedural history of the case from which the argument stems. In its first amended complaint, plaintiff asserted that various Sprint SEC filings were generally false and misleading (without focusing on any particular statement contained in those filings) because those materials failed to disclose a multitude of facts concerning the tax shelters entered into by Mssrs. Esrey and LeMay, including that the tax shelters would render the continued employment of Mssrs. Esrey and LeMay at Sprint in serious doubt. Defendants moved to dismiss the first amended complaint in its entirety arguing primarily that there was simply no disclosure obligation in the absence of any particular statement alleged to have been misleading.

The court held oral argument on the motion during which plaintiff focused for the first time on the specific statement in Sprint's proxy materials concerning the "long-term employment" of Mssrs. Esrey and LeMay.[21] As argued by plaintiff's counsel at the motion

---

[21]While the "long-term employment" statement from Sprint's March 2002 proxy materials was identified in the first amended complaint, plaintiff did not allege with any

34

hearing, the specific statement concerning the "long-term employment" of Mssrs. Esrey and LeMay was misleading because, at the time it was made in March 2001 and again in March 2002, the "ticking time bomb" of the tax shelter situation could necessarily lead to one of only three results: Sprint was going to have to rescind the options and restate its earnings; Sprint was going to "fire" Mssrs. Esrey and LeMay; or Sprint was going to fire Ernst & Young. At another point in oral argument, plaintiff's counsel urged that it was "utterly predictable" that Mssrs. Esrey and LeMay "ended up being forced out." When the court inquired further as to why it was "inevitable" that Mssrs. Esrey and LeMay would have to "step down" in light of the tax shelter situation, plaintiff's counsel responded that the tax scheme made Sprint "look bad" and reflected poorly on the company's judgment. Plaintiff's counsel further stated that there was no possibility of retaining Mssrs. Esrey and LeMay and that, absent rescinding the options, it could not "have played out any other way" than the firing of Mssrs. Esrey and LeMay.

At the conclusion of oral argument, the court retained the motion to dismiss under advisement. Later, the court issued a written memorandum and order in which it granted defendants' motion to dismiss in all respects except for plaintiff's theory that the "long-term employment" statements in the proxy materials were misleading because the termination of Mssrs. Esrey and LeMay was inevitable (or, at least, a significant possibility) in light of the tax shelter situation.[22] With respect to that theory, the court denied the motion over defendants'

---

clarity whether or how that specific statement was misleading.

[22]The court granted defendant Ernst & Young's motion to dismiss in its entirety.

argument that defendants did not have an obligation to disclose "uncertain" plans. In rejecting

defendants' argument, the court stated:

> Ultimately, in light of plaintiffs' allegations that the Sprint defendants chose to speak on the issue of Mssrs. Esrey's and LeMay's "long-term employment" and suggested that such long-term employment was a specific goal that the company intended to pursue, the court cannot conclude that plaintiffs will be unable to prove a set of facts that may give rise to a duty on the part of the Sprint defendants to disclose the possibility (a possibility that was at least under serious consideration and, thus, was more than merely speculative; according to plaintiffs, either E&Y was going to be fired, or Mssrs. Esrey and LeMay were going to be fired) that the employment of Mssrs. Esrey and LeMay would be terminated as a result of the tax shelters. Similarly, the court cannot conclude that plaintiffs will be unable to prove a set of facts that may give rise to a duty on the part of the Sprint defendants to disclose the inevitability (to the extent plaintiffs choose to rely on this theory) that the employment of Mssrs. Esrey and LeMay would be terminated.

In reaching this conclusion, the court found guidance in the Second Circuit's opinion in *In re

Time Warner Inc. Securities Litigation*, 9 F.3d 259, 268 (2d Cir. 1993), in which the Circuit held

that when a corporation announces that it is pursuing a specific business goal and an intended

approach for reaching that goal, "it may come under an obligation to disclose other approaches

to reaching the goal when those approaches are under active and serious consideration."

Looking to *Time Warner*, the court denied defendants' motion in light of plaintiff's allegations

that defendants made statements touting the long-term employment of Mssrs. Esrey and LeMay

while at the same time it was considering a mutually exclusive alternative or was facing a

mutually exclusive alternative–the termination of the employment of Mssrs. Esrey and LeMay.

Nonetheless, because that particular theory was not fleshed out by plaintiff until oral argument,

the court directed plaintiff to file a second amended complaint concerning that theory and

contemplated that defendants could challenge the second amended complaint by appropriate motion.

Plaintiff, then, filed its second amended complaint in which it alleged that the March 2001 statement concerning the executives' long-term employment statement was misleading because, at the time the statement was made, defendants knew that the executives' future with Sprint was "doubtful" and that it was "clearly predictable" that the executives would no longer be able to run the Company. With respect to the March 2002 statement concerning the executives' long-term employment, plaintiff alleged that this statement was misleading because, at the time the statement was made, the Board "had met to consider terminating" Mssrs. Esrey and LeMay in light of the tax shelter situation. Defendants thereafter moved to dismiss the second amended complaint. In their motions, defendants, looking to *Time Warner*, argued that they had no duty to disclose that the termination of Mssrs. Esrey and LeMay by Sprint was predictable because the termination of Mssrs. Esrey and LeMay was not under "active and serious consideration" at the time the challenged statements concerning "long-term employment" were made. The court rejected this argument, concluding that the allegations in the second amended complaint were sufficient to state a claim and that "[w]hether and to what extent defendants were 'considering' the termination of Mssrs. Esrey and LeMay's employment . . . are fact questions to be resolved on a motion for summary judgment., if appropriate, or by a jury."

Now, of course, defendants have filed their motions for summary judgment and contend that the record is devoid of evidence that defendants were considering termination at the time the challenged statements were made. In its response, plaintiff asserts that the factual record

37

reveals that defendants' statements "were materially false or misleading for numerous reasons, not strictly because Sprint was seriously and actively considering firing Esrey or LeMay." Plaintiff contends that the record viewed in the light most favorable to plaintiff demonstrates that Mssrs. Esrey's and LeMay's jobs with Sprint were in "jeopardy" or "uncertain" because both executives were retention risks as a result of their personal financial conditions at the time the challenged statements were made and defendants were well aware of that risk at the time the statements were made.

In support of its contention that this case is not limited to whether defendants were considering the termination of Mssrs. Esrey's and LeMay's employment (or whether those terminations were predictable), plaintiff points to language in the court's order denying defendants' motion to dismiss the second amended complaint, to wit:

> It is reasonable to infer from these allegations that defendants knew that Mssrs. Esrey's and LeMay's ability to continue to lead Sprint was in jeopardy.

> * * * *

> [T]he statement that the contracts were "designed to insure" long-term employment can reasonably be read to convey the message that, at least in Sprint's view, Mssrs. Esrey's and LeMay's long-term employment was certain.

When read in the full context of the court's prior order, however, these statements simply do not lend support for plaintiff's argument that this case encompasses a theory of liability based on the notion that defendants knew that the executives were a retention risk. The court's statement that Mssrs. Esrey's and LeMay's ability to lead Sprint was "in jeopardy" was simply setting up the the sentence that immediately followed:

Whether and to what extent defendants were "considering" the termination of Mssrs. Esrey's and LeMay's employment (and, at a more basic level, what type of conduct might constitute "active and serious consideration") are fact questions to be resolved on a motion for summary judgment, if appropriate, or by a jury.

It is beyond dispute, then, that the court's use of the word "jeopardy" was referring to whether defendants were considering firing the executives. The context of the court's use of the word "certain" similarly clarifies that any uncertainty on the part of the Board stemmed not from knowledge of an alleged retention risk but from knowledge of an alleged plan to fire the executives. The sentence immediately following the court's statement regarding whether defendants were "certain" of the executives' long-term employment reads:

Stated another way . . . Sprint's statement that the contracts were "designed to insure" the long-term employment of Mssrs. Esrey and LeMay could reasonably have led an investor to conclude that the termination of Mssrs. Esrey's and LeMay's employment (at least in the near future) was simply not an option from Sprint's perspective.

To be sure, this court's prior order did not contemplate any theory of liability based on defendants' alleged knowledge, at the time the statements concerning the executives' long-term employment were made, that the executives were a retention risk in light of their personal financial conditions. Plaintiff did not make that argument then and it did not preserve that theory to be litigated now.

At oral argument on the initial motion to dismiss, plaintiff focused solely on the idea that defendants, in direct contradiction to their statements concerning the "long-term" employment of Mssrs. Esrey and LeMay, were in fact considering the termination of those executives or, at a minimum, knew that Mssrs. Esrey and LeMay necessarily would be fired as a result of the tax

shelter situation. Plaintiffs at no time during oral argument suggested that Mssrs. Esrey and LeMay were flight risks in light of their personal financial conditions. Similarly, after the court directed plaintiff to file a second amended complaint on the only viable theory articulated by plaintiff–that the "long-term employment" statement was misleading because the termination of Mssrs. Esrey and LeMay was under consideration or was inevitable (or, at least, a significant possibility) in light of the tax shelter situation–plaintiff filed a second amended complaint that in no way suggested that the "long-term employment" statement was misleading because the executives were retention risks.

Indeed, the second amended complaint is devoid of any allegation that Mssrs. Esrey and LeMay might leave Sprint on their own accord against the Board's wishes. Plaintiff alleges in the second amended complaint that, leading up to the March 2002 statement, the Board held numerous meetings "concerning the termination of Esrey and LeMay" and, more specifically, alleges that the March 2002 statement was misleading because defendants knew at that time those statements were made that "the Board of Directors had met to consider terminating Esrey and LeMay." Other language in the second amended complaint is consistent with the idea that the termination of Mssrs. Esrey and LeMay was under consideration or, with respect to the March 2001 statement, was predictable, including allegations that the Board knew that the tax shelters in all likelihood "would end the careers" of Mssrs. Esrey and LeMay; that the Board could not "salvage the careers" of Mssrs. Esrey and LeMay without rescinding the options; and that Mssrs. Esrey and LeMay "would no longer be able to run the company" in light of the tax shelter situation. While the second amended complaint contains a handful of ambiguous

references to the departures of Mssrs. Esrey and LeMay (that their tenure at Sprint was "in serious jeopardy" or "in grave doubt"), the court interpreted those references as reflecting the only theory articulated by plaintiff that had survived a motion to dismiss–whether and to what extent defendants knew that Mssrs. Esrey and LeMay would be fired over the tax shelter situation.

There is yet another reason to disregard plaintiff's allegations concerning risk retention at this late juncture. Plaintiff's additional facts concerning risk retention not only significantly expand plaintiff's claims, but turn plaintiff's initial theory on its head. Plaintiff pled in its second amended complaint that defendants were either actively planning to fire Mssrs. Esrey and LeMay or knew that they would ultimately have to fire Mssrs. Esrey and LeMay. Many years after the filing of their second amended complaint, plaintiff contends that defendants were scrambling to retain Mssrs. Esrey and LeMay and knew that retention would be difficult. To permit what would in effect constitute a radical amendment of plaintiff's complaint at this juncture would permit plaintiff to bypass entirely the pleading requirements of the PSLRA, which requires a complaint to specify not only each allegedly misleading statement but the reason or reasons why the statement is misleading. 15 U.S.C. § 78u-4(b)(1). To borrow from another district court facing the same issue, plaintiff "survived a motion to dismiss in light of the theories they, themselves, chose; they may not now evade Congress's PSLRA mandates by switching horses midstream and pursuing a new theory." *In re St. Jude Medical, Inc. Securities Lit.*, 629 F. Supp. 2d 915, 921 (D. Minn. 2009) (refusing to consider new theory set forth in response to summary judgment where theory was not previously included in securities fraud

complaint; complaint must be addressed "as pleaded"); *accord In re Oracle Corp. Securities Lit.*, 2009 WL 1709050, *18 (N.D. Cal. June 19, 2009) (refusing to permit plaintiffs to add an unpled fraud theory at the summary judgment stage in light of formidable pleading requirements of PSLRA); *In re Art Tech. Group, Inc. Securities Lit.*, 394 F. Supp.2d 313, 318-19 (D. Mass. 2005) (under the PSLRA, plaintiff "must plead particular facts to show their case has merit *before* gaining unfettered access to Defendants' files"); *see also Samuels v. Wilder*, 871 F.2d 1346, 1349-50 (7th Cir. 1989) (in securities fraud case, district court properly disregarded new factual theories of fraud presented by plaintiff in response to summary judgment and focused only on fraud theory originally pleaded; otherwise, plaintiff would be permitted to bypass Rule 9(b)).[23]

For the foregoing reasons, the court will disregard the factual allegations concerning "risk retention" and will look only to the factual allegations in the second amended complaint which

---

[23]Even if the court were to consider plaintiff's "risk retention" theory on the merits, it would conclude, as a matter of law, that defendants' statements that the 2001 Employment Agreement were "designed to insure" the long-term employment of the executives were not misleading. Defendants' statements conveyed that Sprint was intending or desiring to retain the executives for the foreseeable future. As the court noted in prior rulings, knowledge at the time those statements were made that termination by Sprint of the executives' employment was imminent is entirely inconsistent with such statements such that the statements could be rendered misleading. Knowledge at the time the statements were made that the executives were a retention risk is in no way inconsistent with a stated desire to retain the executives. Had Sprint stated that the agreements "will insure" the long-term employment of the executives in the face of a known flight risk, the court might conclude otherwise. But a statement that the agreements were "designed" to insure retention is not misleading even in the face of knowledge that the executives were retention risks.

are the focus of defendants' motions for summary judgment.[24]  The court returns, then, to

determine whether the factual record contains evidence sufficient to permit a reasonable trier of

fact to conclude that (1) defendants, at the time they made the March 2001 statements

concerning the "long-term employment" of Mssrs. Esrey and LeMay, knew that the termination

of that employment by Sprint was predictable; and/or (2) defendants, at the time they made the

March 2002 statements concerning the "long-term employment" of Mssrs. Esrey and LeMay,

were considering the termination of that employment.  As explained below, no reasonable trier

of fact could conclude that the statements concerning Mssrs. Esrey's and LeMay's long-term

employment were misleading under either of the theories advanced by plaintiff in its second

amended complaint.


2.      The March 2001 Statement

        Plaintiff alleges in its second amended complaint that defendants' March 2001 statement

touting the long-term employment of Mssrs. Esrey and LeMay was misleading because, at the

time of the statement, it was predictable (and defendants knew as much) that Mssrs. Esrey and

LeMay would ultimately be fired in light of the tax shelter situation.  According to plaintiff, it

is undisputed that the Board knew by December 2000 that the IRS was inquiring into tax shelters

---

[24]Plaintiff also contends for the first time in its summary judgment response that the
statements concerning the purposes of the 2001 Employment Agreements are misleading
because defendants failed to disclose that the "primary goal" of those Agreements was to
mitigate the executives' tax liability in the event the shelters were not sustained.  For all the
reasons the court declines to address plaintiff's "risk retention" allegations, the court declines
to address plaintiff's "primary goal" allegations.

similar to the ones executed by Mssrs. Esrey and LeMay and that King & Spaulding had opined that the Trading Partnerships would not be sustained. Moreover, by mid-January 2001, some Board members believed that the executives could face financial insolvency if the Trading Partnerships were disallowed and if the price of Sprint's stock did not rebound substantially. Plaintiff contends that these undisputed facts are sufficient to permit a reasonable fact finder to conclude that defendants, in March 2001, knew that the termination by Sprint of the executives' employment was predictable because, as summarized by plaintiff in its summary judgment response, "[b]ankrupt or financially insolvent executives cannot feasibly lead a Fortune 500 company."

The court does not agree that the factual record supports the inference drawn by plaintiff. To begin, it defies logic to conclude that defendants, back in March 2001, knew that Mssrs. Esrey and LeMay would necessarily have to be fired in light of a risk of financial insolvency when the evidence, at least with respect to Mr. Esrey, does not even support that defendants ever fired him for that reason. Viewed in the light most favorable to plaintiff, the evidence suggests that Mr. Esrey utimately was fired not because the Board was concerned that he would be rendered financially insolvent but because the Board was irritated with Mr. Esrey and tired of his demands for increased compensation and his threats to leave for greener pastures. While there is some evidence that Mr. LeMay was not promoted in part because of the financial risks associated with the Trading Partnerships, that evidence pales in comparison to evidence that the Board was simply fed up with Mssrs. Esrey and LeMay.

Moreover, the record does not support plaintiff's suggestion that, as of March 2001, it

44

was predictable that Mssrs. Esrey and LeMay would be rendered financially insolvent such that the Board would have to fire them. Again, putting aside the fact that plaintiff's "prediction" never transpired (even to this day there has been no adjudication on the executives' tax liability), there were simply too many unknown factors in the months leading up to the March 2001 statement to conclude that the executives' termination by Sprint was predictable. At that time, the IRS had not yet investigated the particular Trading Partnerships executed by Mssrs. Esrey and LeMay and had not audited the tax returns of Mssrs. Esrey or LeMay. Even assuming that an investigation or audit had begun by March 2001, defendants had been provided with at least one opinion from a reputable firm that the Trading Partnerships ultimately should be sustained. But even assuming that defendants knew in March 2001 that, in all likelihood, the Trading Partnerships would not be sustained, there is no evidence to suggest that the Board knew or should have known that Mssrs. Esrey and LeMay would feel any financial effects of that decision prior to the expiration of the 2001 Employment Agreements. Again, it appears that the executives to this day have not experienced any negative financial effects as a result of a challenge to the tax shelters. On top of these factors, it is further undisputed that the price of Sprint's stock was yet another factor playing into whether and to what extent the personal financial conditions of Mssrs. Esrey and LeMay would render them unable to continue their leadership of Sprint. As aptly summarized by Ms. Lorimer, then, "there would be a long number of years ahead" before the full implications of the executives' participation in the Trading Partnerships would be known.

The uncontroverted testimony of the Board members further demonstrates that the

termination by Sprint of Mssrs. Esrey's and LeMay's employment was anything but "predictable" and, in fact, was not even in the realm of possibilities. Mr. Hockaday testified that, at the time of the March 2001 statement, the Board "wanted to do whatever we could" to retain the executives in terms of compensation prior to the March 2001 statement. Indeed, according to Ms. Lorimer, the Board was looking for ways to "glue the executives even more tightly" to Sprint. Mr. Kesner was retained to assist the Board in finding a way to keep Mr. Esrey at Sprint through retirement. It is not reasonable to conclude that the Board would expend time and resources retaining Mr. Kesner for that purpose (and participating in numerous meetings concerning that purpose) if the Board knew that, at the end of the day, it would have to terminate the executives' employment in any event. In sum, the factual record, viewed in the light most favorable to plaintiff, does not permit the inference that defendants knew at the time it touted the long-term employment of Mssrs. Esrey and LeMay in March 2001 that the termination by Sprint of the executives' employment was predictable.

3.     The March 2002 Statement

Plaintiff also alleges in its second amended complaint that defendants' March 2002 statement touting the long-term employment of Mssrs. Esrey and LeMay was misleading because, at the time of the statement, the Board was considering the termination of Mssrs. Esrey's and LeMay's employment. According to plaintiff, it is undisputed that the Board, in February 2002, discussed whether it was "worth it" to try to retain Mssrs. Esrey and LeMay; was highly disturbed by Mr. Esrey's proposal that he move to Qwest; and advised Mr. Lemay that

he should prepare himself to become CEO because it was "unclear" how long Mr. Esrey would remain CEO. Plaintiff also highlights that the executives' tax-related problems had "worsened substantially" by February 2002 and that it was clear by that time that the 2001 Employment Agreements were not going to mitigate any potential tax liability because Sprint's stock price had failed to rebound. Plaintiff contends that these undisputed facts are sufficient to permit a reasonable trier of fact to conclude that defendants, in March 2002, were considering the termination of Mssrs. Esrey's and LeMay's employment.

The court disagrees. While the record clearly indicates that the Board was less enamored with the executives in February 2002 than it had been the previous year, the facts do not permit a reasonable inference that the Board was considering firing the executives at that time. The evidence with respect to the Board's discussion of whether was "worth it" to retain the executives reflects that the discussion was held in the context of deciding whether to increase the executives' compensation packages to prevent the executives from leaving the company. There is no support for plaintiff's suggestion that the discussion somehow encompassed a consideration of whether to terminate the executives. With respect to Mr. Esrey's Qwest proposal, while it is undisputed that the Board questioned Mr. Esrey's judgment and motivation in making the proposal, there is no evidence that anyone on the Board suggested or thought of terminating Mr. Esrey's employment at the time (or prior to the March 2002 statement) as a result of the proposal. The Board's advice to Mr. LeMay that he should prepare himself to become CEO similarly does not reflect an intent or plan to terminate Mr. Esrey. It simply reflects that the Board understood that Mr. Esrey was contemplating (perhaps actively so in light

of his Qwest proposal) leaving Sprint to improve his financial situation.

Plaintiff's evidence that the executives' tax-related problems were much worse in early 2002 and that the 2001 Employment Agreements undisputedly failed to mitigate any potential tax liability also do not support an inference that the Board was contemplating termination (or that termination by Sprint was predictable, as suggested in plaintiff's response). In January 2002, Mr. Esrey received a positive performance review from the Board and the Board undisputedly felt "lucky to have him." In February 2002 the Board again retained Mr. Kesner to consider the executives' requests for additional compensation. Again, it is not reasonable to conclude that the Board would expend significant time and money to retain Mr. Kesner to propose alternative compensation packages if the Board planned to terminated Mr. Esrey or believed his termination was likely. Finally, plaintiff's suggestion that the Board necessarily was going to have to fire the executives in light of a risk of financial insolvency–a risk that, according to plaintiff, was far more significant in March 2002–is not plausible when the evidence in the record does not support the conclusion that Mr. Esrey was fired for that reason in the end. For the foregoing reasons, the factual record, viewed in the light most favorable to plaintiff, does not permit the inference that the termination of Mssrs. Esrey's and LeMay's employment was under consideration at the time Sprint touted the long-term employment of Mssrs. Esrey and LeMay in March 2002. Summary judgment in favor of defendants is appropriate.


B.     *Plaintiff's Remaining Claims*

Because the court grants summary judgment as to plaintiff's Section 10(b) and Rule 10b-5 claims, the court must also grant summary judgment as to plaintiff's remaining claims. Plaintiff's Section 14(a) claim requires evidence that "a proxy statement contained a material misrepresentation or omission." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007). As described above, the court concludes that the factual record does not reflect a genuine dispute of fact as to whether defendants made any actionable misrepresentations or omissions in its proxy materials. Summary judgment, then, is appropriate in favor of defendants on plaintiff's Section 14(a) claims.

Section 20(a) of the Securities and Exchange Act of 1934 provides for "joint and several liability for any person who controls another that has violated the Act or any regulation promulgated thereunder." *DeJulius v. New England Health Care Employees Pension Fund*, 429 F.3d 935, 938 (10th Cir. 2005). Plaintiff's Section 20(a) claims, then, depend upon a primary violation of the securities laws. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1107-08 (10th Cir. 2003). As described above in connection with plaintiff's Section 10(b) and Rule 10b-5 claims, plaintiffs have not established the primary liability of any defendant. Accordingly, there can be no liability under Section 20(a). *See Pugh v. Tribune Co.*, 521 F.3d 686, 698 (7th Cir. 2008) (dismissal of section 10(b) and Rule 10b-5 claims mandates dismissal of section 20(a) claim); *In re Ultimate Corp. Securities Lit.*, 1989 WL 79372, at *5 (S.D.N.Y. July 11, 1989) ("As is evidenced by the plain language of the statute, there can be no liability under the controlling person provisions of the 1934 Act where there is no finding of liability pursuant to the substantive provisions of the Act.").

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants William T. Esrey and Ronald T. LeMay's motion for summary judgment (doc. 408) is **granted**; defendants Sprint Corporation; Harold S. Hook; Charles E. Rice; Louis W. Smith; Linda Koch Lorimer; Stewart Turley; DuBose Ausley; Warren L. Batts; Irvine O. Hockaday, Jr.; Arthur Krause; and J.P. Meyer's motion for summary judgment (doc. 414) is **granted**; defendants Sprint Corporation; Harold S. Hook; Charles E. Rice; Louis W. Smith; Linda Koch Lorimer; Stewart Turley; DuBose Ausley; Warren L. Batts; Irvine O. Hockaday, Jr.; Arthur Krause; and J.P. Meyer's motion to exclude the proposed testimony of David V. Capes and J.W. Verret (doc. 411) is **denied as moot**; defendants William T. Esrey and Ronald T. LeMay's motion to exclude the proposed testimony of David V. Capes and J.W. Verret (doc. 413) is **denied as moot**; and plaintiff's motion to strike or disregard the declarations of defendants Esrey and LeMay (doc. 441) is **denied as moot**.

**IT IS SO ORDERED.**

Dated this 17th day of December, 2010, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

50